UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**JURY DEMANDED**

------------------------------------------------X

NORMA KNOPF and MICHAEL KNOPF,

                 Plaintiffs,

  - against -

FRANK M. ESPOSITO,
DORSEY & WHITNEY, LLP,
NATHANIEL H. AKERMAN,
EDWARD S. FELDMAN and
MICHAEL HAYDEN SANFORD,

                 Defendants.

Case No.   17  Civ. 5833      (      )

**<u>COMPLAINT</u>**

------------------------------------------------X

Plaintiffs Norma Knopf and Michael Knopf, by their attorneys, Berry Law PLLC and

Paykin, Krieg & Adams, LLP, for their Complaint, allege as follows:

**A.  <u>PARTIES</u>**

    1.  Plaintiff Norma Knopf resides in Traveler's Rest, South Carolina.  Norma is married

to plaintiff Michael Knopf.

    2.  Plaintiff Michael Knopf resides in Traveler's Rest, South Carolina. Michael is

married to plaintiff Norma Knopf.  (Hereinafter, Michael and Norma Knopf will be referred to as

"the Knopfs.")

    3.  Defendant Frank M. Esposito is an attorney who resides in Nassau County, New

York and has a principal place of business in Cold Spring Harbor, Suffolk County, New York.

    4.  Defendant Dorsey & Whitney, LLP ("Dorsey") is a law firm which has a principal

place of business in New York County, New York.

    5.  Defendant Nathaniel H. Akerman is an attorney and member or partner of Dorsey &

Whitney and has a principal place of business in New York, New York.   Dorsey is liable for the

conduct of Akerman alleged herein pursuant to agency law and the doctrine of *respondeat superior*.

6.   Defendant Edward S. Feldman is an attorney who has a principal place of business in Englewood, New Jersey and who, at the time of the events alleged herein, had a principal place of business in New York County.

7.   Defendant Michael Sanford resides in Suffolk County, New York.

B. **NATURE OF THE ACTION**

8.   This action involves a conspiracy to violate 42 U.S.C. §1983 undertaken by Sanford, Esposito (Sanford's attorney), Esposito's wife (a court attorney employed by the Appellate Division, First Judicial Department), Akerman, Feldman and non-party James M. McGuire (a former First Department Justice now in private practice, for whom Esposito's wife clerked during his service on that Court).  Given the sensitive nature of the allegations herein, the Knopfs are declining to identify the Court Attorney at this time, and will refer to her only as "the Court Attorney" or "Esposito's wife."

9.   The conspiracy began in late 2015 or early 2016, at a time when the Knopfs had already obtained summary judgment on their claim that Pursuit Holdings, LLC (which is owned by Sanford) had breached two real estate loan agreements.  One of the Knopfs' real estate loans to Pursuit was in the amount of  $1,690,890, and Pursuit had used that loan in 2006, to acquire a residential property located at 44 East 67th Street in Manhattan ("the 67th Street Property").  Pursuit and Sanford had promised that they would deliver a mortgage against the 67th Street Property to collateralize that loan, but then refused to do so.  (The Knopfs had entrusted Sanford with the bank checks which Pursuit used to close on its purchase of the 67th Street Property, but

unfortunately did not themselves attend the closing of that transaction.)  The Appellate Division, First Department, granted the Knopfs summary judgment on this claim (and others) on December 11, 2014, but did not direct entry of judgment or assess damages.

10.   A year later, in December 2015, the Knopfs were still seeking entry of judgment and a hearing on their damages was about to begin, and it was at about this time when the conspiracy to violate the Knopfs' due process rights commenced.

11.   Specifically, after the Knopfs had obtained two First Department Orders in late 2015 which required that Pursuit and Sanford escrow the proceeds from any sale of the 67th Street Property, Akerman and Feldman contacted Esposito's wife in an *ex parte* phone call which took place on January 12, 2016.  During this call, Esposito's wife, purportedly in her capacity as a court attorney, stated to Akerman and Feldman that these two orders did not mean what they seemed to say, and that in fact, there was no escrow requirement after all.  Sanford and Feldman then used that improper advisory ruling to persuade to a buyer, Michael Phillips, and Phillips' title company, that the 67th Street Property could be sold without the proceeds being paid into escrow, notwithstanding the two orders.   On February 1, 2016, the property was sold and none of the proceeds were escrowed.  Instead, the bulk of the proceeds were dissipated and placed beyond the Knopfs' reach before the Knopfs could obtain new orders from the First Department freezing the remaining proceeds of the sale.  Among the recipients of the sale proceeds were Dorsey (Akerman's firm), Feldman and McGuire's firm, Dechert, LLP, which received an initial retainer of *$500,000*.

12.  Critically, even if the *ex parte* interpretation provided by Esposito's wife had been legally correct –  which it patently was not – an actionable due process violation would have still

occurred because of the lack of notice to the Knopfs.  Had the Knopfs been afforded an opportunity to participate in the call with Esposito's wife they would have known that Sanford and Pursuit were intending to sell the property without escrowing the proceeds, and they would have been able to obtain a new escrow order and a preliminary injunction from the Court.  Any suggestion that the Knopfs would not have been able to protect themselves in such a fashion (had they been included on the call) is without merit.  On February 25, 2016, promptly after the Knopfs learned of the sale and failure to escrow the proceeds, they applied for and obtained a new escrow order from Appellate Division Justice Karla Moskowitz; by that time, however, most of the sale proceeds had been dissipated.  A few weeks later, on March 24, 2016, a full appellate panel issued a preliminary injunction against any further dissipation of the real estate assets that Pursuit had acquired with the loans from the Knopfs.  Had the Knopfs been included in the call with Esposito's wife, as they properly should have been, they would have been able to obtain these new orders before the damage was done.

13.  As a result of this conspiracy, the Knopfs have suffered damages of between $2 million and $3 million dollars, the exact amount of which will depend on the success of their efforts to mitigate the loss by means of several ensuing fraudulent conveyance actions.

14.  The Knopfs learned of the *ex parte* call involving Akerman, Feldman and a then unidentified court attorney on March 17, 2016, six weeks after the property sale, when Akerman and Feldman filed affirmations in the state court action.   However, these affirmations did not identify the court attorney by name.  It was not until June 21, *2017* that the Knopfs learned the identity of the court attorney when, in a related action – *Knopf v. Phillips*, 16 Civ. 6601 (S.D.N.Y.) (DLC)  –  Feldman produced a memorandum to file which he had prepared regarding

the *ex parte* phone call with the Court Attorney.  On June 26, June 29 and June 30, 2017, the Knopfs took the depositions of, respectively, former Justice McGuire, Feldman and Sanford in the *Phillips* case, and learned:

(a) In late 2015, McGuire was recruited by Esposito, who was then acting as a lawyer for Sanford and Pursuit, to appear as counsel for Sanford and Pursuit in the *Knopf v. Sanford* action if funds sufficient to pay the retainer required by Dechert (McGuire's firm), could be obtained from a "liquidation" of the 67th Street Property.

(b)  The Court Attorney who rendered the January 12, 2016 *ex parte* advisory ruling allowing the 67th Street Property to be sold *was married to Esposito*,  a lawyer whom Sanford had hired to achieve precisely that outcome.

(c)  The Court attorney who had rendered the *ex parte* interpretation, which not only allowed the property to be sold but also generated the funds required to pay the $500,000 retainer McGuire and Dechert had requested, had also been McGuire's law secretary during the time McGuire served as Justice on the First Department.

(d)  When Akerman and Feldman called her, the Court Attorney knew all about the case and immediately stated without qualification that the orders did not mean what they seemed to say.

- and -

(e) McGuire and Dechert elected not to disclose any of this information to the Knopfs or to the Appellate Division during the ensuing litigation because they were concerned that the Knopfs would use it in their efforts to recover the losses they had incurred as a result of the sale of the 67th Street Property.  (McGuire and Dechert are not named as defendants because of a

settlement between the Knopfs and Dechert which was reached shortly before the foregoing information was disclosed.)

15.   The First Claim alleges a conspiracy by all defendants, as well as McGuire and the Court Attorney, to violate section 1983 by depriving the Knopfs of their interest in the proceeds of the sale of the 67th Street Property without affording them their Fourteenth Amendment right to notice and an opportunity to be heard in connection with the advisory ruling rendered by Esposito's wife in her conference call with Akerman and Feldman.  The Second Claim alleges that Dorsey, Akerman and Feldman violated New York Judiciary Law §487.  The Third Claim charges Dorsey, Akerman, Feldman, Esposito and Sanford with common law fraud and deceit. The Fourth Claim alleges a violation of the New York Debtor and Creditor Law's fraudulent conveyance provisions by Dorsey, Akerman and Feldman.

## C.  **JURISDICTION AND VENUE**

16.   Federal subject matter jurisdiction exists under 42 U.S.C. §1331 since the First Claim involves a federal question.

17.   The Second through Fourth Claims in this case are within the Court's supplemental jurisdiction, as defined in 28 U.S.C. §1367(a), since they form part of the same case or controversy as the First Claim, and involve a common nucleus of operative fact as the First Claim.  Any parties against whom solely state law causes of action are found to be stated are thus within the Court's pendent party jurisdiction in accordance with 28 U.S.C. §1367(a)

18.   Federal subject matter jurisdiction also exists under 28 U.S.C §1332(a) because complete diversity of citizenship exists among adverse parties and the monetary relief sought exceeds $75,000. Specifically:

(a) Michael and Norma Knopf are citizens, residents and domiciliaries of South Carolina.

(b) Esposito is a citizen, resident and domiciliary of New York.  Esposito is not a citizen, resident or domiciliary of South Carolina.

(c)  Dorsey is a citizen, resident and domiciliary of Minnesota.  Dorsey is not  a citizen, resident nor domiciliary of South Carolina, nor is any partner or member of  Dorsey is a citizen, resident or domiciliary of South Carolina.

(d) Akerman is a citizen, resident and domiciliary of New York.  Akerman is not a citizen, resident or domiciliary of South Carolina.

(e)  Feldman is a citizen, resident and domiciliary of New Jersey.  Feldman is not a citizen, resident or domiciliary of South Carolina.

- and -

(f)  Sanford  is a citizen, resident and domiciliary of New York. Sanford is not a citizen, resident or domiciliary of South Carolina.

19.   Esposito is subject to the *in personam* jurisdiction of this Court pursuant to CPLR 301 since he resides in, and has a principal  place of business within, the State of New York.

20.  Dorsey is subject to the *in personam* jurisdiction of this Court pursuant to CPLR 301 since it is present and doing business within the State of New York.

21.   Akerman  is subject to the *in personam* jurisdiction of this Court pursuant to CPLR 301 since he resides in, and has a principal  place of business within, the State of New York.

22.   Feldman is subject to the *in personam* jurisdiction of this Court pursuant to CPLR 302(a)(2) since this action is arises out of his tortious conduct within the State of New York.

23.   Sanford is subject to the in *personam jurisdiction* of this Court since he resides in,

and has a principal place of business within, the State of New York.

24.   Venue properly lies in this District pursuant to 28 U.S.C. §1391(b)(2) since this action arises out events which occurred in New York County, and because Dorsey resides and has a principal place of business within this District. .

## D.   ALLEGATIONS COMMON TO ALL CLAIMS

### (i) Background and Status of the *Knopf v. Sanford* Action

25.   The Knopfs are an elderly couple who were the sole investors in defendant Michael Sanford's hedge fund.  In 2003, after the death of the Knopfs' son, Paul, in a plane crash[1], Sanford ingratiated himself into the Knopfs' family and they began to shower him with gifts and also entered into several loan agreements with him.  However, Sanford and his company, Pursuit Holdings, LLC, refused to repay or collateralize the loans, as Sanford had repeatedly promised in writing that they would do.  The Knopfs were ultimately forced to file a lawsuit, *Knopf v. Sanford*, in Supreme Court, New York County (Index No. 113227/2009).  The Knopfs alleged that four of these loans were entirely unpaid, and that an outstanding balance of $797,472 remained on a fifth, that Sanford and Pursuit breached written promises to grant them mortgages on the two properties purchased with the loans, one of which is 44 East 67th Street, PHC ("PHC") in Manhattan ("the 67th Street Property"), and that the amount owed was $6,188,332.

26.  On December 11, 2014, the Appellate Division, First Department, granted the Knopfs summary judgment on all five loan agreements, the Knopfs' second successful appeal in the case. *Knopf v. Sanford*, 123 A.D.3d 521, 1 N.Y.S.3d 18 (1st Dept. 2014).  However, the decision did

---

[1]Hernandez, "2 L.I. Men Die in Connecticut Plane Crash," *The New York Times*, December 22, 2002,  http://www.nytimes.com/2002/12/22/nyregion/ 2-li-men-die-in-connecticut-plane-crash.html, last accessed November 4, 2016.

not direct entry of judgment or contain any decretal language or any directions to the trial Court upon remand.  *Id.*  Following the remand, the Knopfs moved for entry of judgment in the "sum certain" amounts of the agreements or, alternatively, for a prejudgment attachment. The trial Court, Richard F. Braun, J.S.C., denied both the request for entry of judgment and the demand for an attachment, an order which the Knopfs appealed.[2]  Instead, Justice Braun ordered a hearing on the Knopfs' damages. That hearing was conducted in January and February 2016 before Judicial Hearing Officer Ira Gammerman.   Following the hearing, on February 8, 2016, JHO Gammerman issued a report which found that the Knopfs were entitled to damages against Sanford in the amount of $10,937,850, and that Pursuit was jointly liable for $8,336,488 of that amount.

27.   However, in a ruling issued on November 1, 2016, Justice Braun denied the Knopfs' motion to have JHO Gammerman's report confirmed. That ruling was based solely on the grounds that the attorney's affirmation of service filed with the note of issue (a creature of the CPLR that is filed to calendar a hearing) contained a typographical error. Justice Braun also ordered a jury trial.   On May 25, 2017, the Appellate Division, again reversing, ordered Justice Braun to address the merits of the Knopfs motion to confirm a report by JHO Gammerman. *Knopf v. Sanford*, 150 A.D.3d 608, __  N.Y.S.3d __  (1st Dept. 2017).  Shortly thereafter, Justice Braun recused himself and, as a result, the Knopfs still have not obtained a ruling on whether judgment should be entered upon JHO Gammerman's report, but expect to presently when Justice Gerald Lebovits, to whom the case has since been assigned, addresses the merits of the Knopfs'

---

[2]In deciding the appeal, the First Department ordered a preliminary injunction freezing certain of Pursuit's assets pending an evidentiary hearing on the attachment request. *Knopf v. Sanford*, 137 A.D.3d 662, 26 N.Y.S.3d 866 (1st Dept. 2016).

motion to confirm JHO Gammerman's report.

**(ii)  Pursuit's and Sanford's Agreement Not to
Sell or Encumber the 67th Street Property**

28.  As alleged in the *Knopf v Sanford* state court action, on January 31, 2006 Norma
loaned Pursuit $1,690,860 to purchase the 67th Street Property.  A loan agreement dated January
23, 2006 states that Sanford and Pursuit "will jointly execute . . . a mortgage lien against [PHC]"
in favor of the Knopfs.  In a subsequent, February 9, 2006 agreement, Sanford states, on behalf of
Pursuit: "I guarantee that until which time you and I execute agreements with respect to the loan
for [PHC], I will not offer for sale, mortgage, hypothecate or otherwise encumber [PHC]."  On
May 31, 2006, the Knopfs loaned Pursuit an additional $3,250,000, which Pursuit used to acquire
three condominium units at 10 Bedford Street.  The May 31, 2006 agreement likewise stated:
"Until [a mortgage] is executed by both parties, Sanford [*sic:* Pursuit] shall not sell, hypothecate
or otherwise encumber the real property [it] owns at [PHC] or 10 Bedford Street without the
express written permission of Knopf."

29.  Pursuit did not grant the promised mortgages, or repay any portion of either real estate
loan.  Also, out of three personal loans that Sanford had taken from the Knopfs, he failed to pay
two in their entirety, and failed to pay an outstanding balance of $797,472 on the third.

30.  In 2009, the Knopfs sued for repayment of both the real estate loans Pursuit had used
to purchase the 67th Street Property and 10 Bedford, as well as all three personal loans that
Sanford had received, and also sought the imposition of a constructive trust based on Pursuit's
failure to grant a mortgage.  As purchase money mortgage lenders suing over Pursuit's failure to
deliver a mortgage, the Knopfs' claims support the imposition of an equitable lien or a lien based
on their constructive trust claim, and such a lien, if established, which would have a priority date

10

of January 29, 2006, the date their loan to Pursuit was made.

31.  At the outset of the lawsuit, the Knopfs filed notices of pendency against both the 67th Street and Bedford properties.   On October 15, 2013, the Appellate Division, reversing an order by Justice Tingling, extended the notices of pendency for a second three-year term.  (This was the first appeal in the *Knopf v. Sanford* action)

**(iii) <u>The Grant of Summary Judgment in the Knopfs' Favor</u>**

32.  On December 11, 2014 the Appellate Division, reversing, granted the Knopfs summary judgment on all five loan claims *Knopf v. Sanford*, 123 A.D.3d 521, 1 N.Y.S.3d 18 (1st Dept. 2014). (This was the second appeal.)  However, because the decision did not direct entry of judgment or make express findings on damages, despite the Knopfs' victory on liability, they did not have an enforceable judgment.

**(iv)  <u>The Knopfs' Efforts to Prevent Pursuit<br>From Liquidating the Properties</u>**

33.  Unbeknownst to the Knopfs, on December 23, 2013, Sanford, on behalf of Pursuit, agreed to sell the 67th Street Property to an individual named Michael Phillips.  Phillips' agreement to purchase was conditioned upon the cancellation of the notices of pendency. Shortly after the Appellate Division's grant of summary judgment in the Knopfs' favor, Justice Tingling, without explanation, issued a December 23, 2014 order cancelling the notices of pendency, and Pursuit and Phillips prepared to close.

34.  On January 8, 2015, before the sale to Phillips could close, the Knopfs obtained a stay against any sale or encumbrance of the properties from Appellate Division Justice Rolando Acosta.  Thereafter, on April 2, 2015, the Appellate Division entered a preliminary injunction against the sale of the properties pending the Knopfs' efforts to have the notices of pendency

reinstated on appeal.

35.   At the trial court level, in February 2015, the Knopfs moved for entry of judgment in the "sum certain" amounts of the agreements or, alternatively, for a prejudgment attachment.

36.   The Appellate Division's April 2, 2015 injunction expired when the decision cancelling the notices of pendency was affirmed on July 2, 2015 on grounds that the substitute service of the complaint the Knopfs had utilized in 2009 was not adequate.  *Knopf v. Sanford*, 130 A.D.3d 407, 13 N.Y.S.3d 365 (1st Dept. 2015).  Shortly before that ruling, the Knopfs filed new notices of pendency in a related federal action entitled *Knopf v. Meister, Seelig & Fein, LLP*, 15 Civ. 5090 (S.D.N.Y.) in which they alleged that a $575,000 mortgage that Pursuit had granted Meister Seelig was a fraudulent conveyance.

37.   On July 2, 2015 the Appellate Division affirmed the cancellation of the notices of pendency, and that decision dissolved the preliminary injunction as a matter of law.  *Knopf v. Sanford*, 132 A.D.3d 416, 17 N.Y.S.3d 674  (1st Dept. 2015).

38.   On July 7, 2015, in connection with the then-pending motion for a pre-judgment attachment, the Knopfs obtained a TRO from Justice Braun staying the sale.  However, the TRO was dissolved when this Court denied the Knopfs' motion for an attachment on July 23, 2015. At the same time Justice Braun denied the motion for entry of judgment in the sum certain amounts of the agreements.  On July 24, 2015, the Knopfs filed a notice of appeal ("the Fourth Appeal") from that decision.

39.  Also on July 24, 2015, in connection with the Fourth Appeal, the Knopfs filed a motion in the Appellate Division for a preliminary injunction against the sale or further encumbrancing of either property.  This motion was assigned number **M-3660** by the First

Department's Motions and Orders Department.

40.   On September 8, 2015, Meister Seelig withdrew as Pursuit's and Sanford's attorneys. In connection with that withdrawal, proceedings at the trial level -- but not the appellate level – were stayed for sixty days in order to permit Pursuit and Sanford to retain new counsel.

41.   On October 16, 2015, in the *Knopf v. Meister* in the Southern District, Judge Cote cancelled the notices of pendency that the Knopfs had filed in that action as duplicative of those previously cancelled by Justice Tingling, but granted a 10-day stay of the cancellation with respect to 67th Street, in order to permit plaintiffs to "return to state court and make any arguments made here that they believe may be persuasive." *Knopf v. Meister*, 2015 WL 6116926, *3 (S.D.N.Y.)

42.   Heeding Judge Cote's direction, on October 22, 2015, the Knopfs filed a motion (**M-5459**) in the Appellate Division for reconsideration of the decision affirming cancellation of the notices of pendency. (This motion was timely since the First Department had revised its July 2, 2015 decision at defendants request and reissued it on October 6, 2015.)

43.   In connection with the motion they filed in the Appellate Division on October 22, 2015 (**M-5459**), the Knopfs requested an interim stay against the sale of 67th Street Property pending the determination of that motion (*i.e.*, **M-5459**). First Department Justice John M. Sweeny, who heard the interim application, did not stay the sale of PHC. Instead he issued an order, dated October 22, 2015 which stated:  "1-bedroom property may be sold -- proceeds to be placed in escrow pending further court order." (Hereinafter, this will sometimes be referred to as "the Escrow Order.")  Justice Sweeny clearly meant that the escrow should remain in place "pending [any] further Court order" pertaining to any funds paid into escrow or "further Court

13

order" on motion **M-5459** (the motion that the Knopfs had presented to him along with their request for an interim stay) not just *any* motion.  *See* First Department Rule 600.2(a)(7) ("When an application is presented for an interim stay or other relief *pending the determination of a motion*, . . .")

44.   Matt Bronfman, an advisor to Phillips, and Lori Braverman, Phillips' attorney, learned of the October 22 Escrow Order on November 2, 2015, and when pressed Sanford told them that he would not go forward with the sale if he was required to escrow the proceeds. Bronfman and Braverman then urged Sanford to move to clarify or vacate the October 22 Escrow Order.

45.   In early November 2015, Pursuit and Sanford retained Holwell, Schuster & Goldberg, LLP.  Although Holwell Schuster entered a general appearance, Sanford has asserted that he intended to retain the firm only as appellate counsel, and not at the trial level.

46.   On November 12, 2015, the motion which the Knopfs had filed back on July 22, 2015 (**M-3660**) was denied by the First Department in an order which, like the vast majority of First Department rulings on motions, did not set forth any reasoning.  At that time, the motion the Knopfs had filed on October 22, 2015 (**M-5459**) and had presented to Justice Sweeny when he entered the Escrow Order was still *sub judice*. In fact, Pursuit and Sanford had not yet submitted any opposition to it.

47.   On November 20, 2015, Sanford and Pursuit filed a cross-motion to vacate the Escrow Order (which was assigned motion number **M-5942**), and in the cross-motion contended that the November 12, 2015 decision on motion **M-3660** had overridden the Escrow Order. In support of the cross-motion to vacate the Escrow Order, Pursuit and Sanford argued:

> On November 12, 2015, after full briefing, a full panel of this Court issued an order denying Appellants' July 24, 2015 motion for a preliminary injunction. Thus, the underlying motion in support of which Appellants obtained the Interim Order [*i.e.*, Justice Sweeny's Escrow Order] has been denied.

The argument was plainly incorrect since the motion underlying Justice Sweeny's Escrow Order was that which the Knopfs had filed on October 22, 2015 (**M-5459**), not the motion which had been filed earlier on July 22, 2015 (**M-3660**).  Pursuit further argued in its cross-motion to vacate the Escrow Order that:  "This Court's November 12, 2015 order denying Appellants' preliminary injunction motion resolved the underlying matter in its entirety. As a result, there no longer is any basis upon which to continue the Interim Order."   That argument was likewise incorrect, since motion **M-5459** was seeking reinstatement of the notice of pendency, and the Escrow Order was necessary to prevent liquidation of the assets Pursuit had acquired with the loans from the Knopfs.[3]

48.   The Knopfs, of course, opposed the cross-motion by Sanford and Pursuit to vacate the Escrow Order and contended, in their response to the cross-motion, that:

> The escrow should remain in place. At the [argument on the] interim application on October 22, plaintiffs emphasized that they could well have an enforceable judgment against Pursuit as soon as February 2016, as a result of the appeal now scheduled to be heard during the January Term [*i.e.*, the Fourth Appeal] and that it would be an aberration of justice to permit Pursuit to liquidate that asset and put the proceeds beyond plaintiffs' reach immediately before plaintiffs converted their summary judgment into an enforceable judgment lien. Justice Sweeney's Escrow Order as issued, at least in part, in response to these concerns. Nothing has changed this regard since October 22.

49.   Not surprisingly, the First Department *agreed with the Knopfs*.  In a decision dated December 29, 2015, a full panel, *which included Justice Sweeny*, denied the cross-motion to

---

[3]In fact, on April 2, 2015 the First Department had enjoined the sale of the properties pending the appeal in which the Knopfs sought to reinstate the notice of pendency.

vacate the Escrow Order. Though that ruling did not state any reasoning, the Court necessarily

agreed with the Knopfs' position that the Escrow Order should stay in place until the Knopfs'

appeal of the decision denying their motion for either judgment or pre-judgment attachment was

decided.  The December 29, 2015 decision stated:

> Plaintiffs-appellants having moved for reargument of the decision and
> order of this Court entered on October 6, 2015 (Appeal No. 15613) [M-5459],
> And defendants-respondents having cross-moved for vacatur of a certain
> interim order by a Justice of this Court dated October 22, 2015 [M-5942],
> Now, upon reading and filing the papers with respect to the motion and
> cross motion, and due deliberation having been had thereon,
> It is ordered that the motion for reargument is denied (M-5459). **The cross
> motion for vacatur of the interim order dated October 22, 2015 is denied** (M-
> 5942).

(Emphasis added.)

### (v)   The Conspiracy to Deprive the Knopfs of their Due Process Right to Notice and An Opportunity to Be Heard

#### (a) Sanford's Engagement of Esposito

50. In his deposition in the *Phillips* case Sanford testified that he and Esposito had met in

late Summer or early Autumn 2015 at a boating event in Oyster Bay, where Esposito resided.

According to Sanford's deposition, he learned that Esposito was a lawyer, and promptly retained

Esposito as his general counsel.  As he further testified, he also engaged Esposito for three

specific tasks:

> (a) to provide strategic advice about the Knopf litigations, and to assist
> in these lawsuits.

> - and -

> (b) if and when Sanford and Pursuit were freed from the judicial
> restraints prohibiting them from liquidating the properties they had
> purchased with the loans from the Knopfs, assisting Sanford in locating
> and retaining new counsel to take over the trial level proceedings

in *Knopf v. Sanford* action.

51.   Sanford also testified that he "absolutely" made Esposito aware of the notices of pendency, stays and restraining orders the Knopfs had filed or obtained in their efforts to keep him from selling the properties he had purchased with the loans from the Knopfs.

52.   In his deposition, Sanford further testified that, at about the time he retained Esposito, Esposito informed him that his wife was a court attorney employed in the First Department. Sanford further testified that Esposito recommended that Sanford and Pursuit retain a former Appellate Division Justice, James M. McGuire, then an attorney at Dechert, as his new counsel in the *Knopf v. Sanford* case.  In his own deposition in the *Phillips* case, McGuire testified that he was contacted by Esposito on Sanford's behalf in early January 2016, and learned from Esposito that Sanford and Pursuit were interested in retaining him as counsel.  McGuire also testified that he only knew Esposito through Esposito's wife (the First Department Court Attorney). McGuire further testified that Esposito's wife had been his "law secretary" when he served as an Appellate Division Justice on the First Department.

53.   In late December and early January 2016, Esposito's wife, the Court Attorney,  was employed as Director of the First Department's  "Pre-Argument Conference Program," a mediation part.

### (b) The Agreement to Obtain an Advisory ruling From Esposito's Wife that No Escrow Requirement Existed

54.   Sanford testified that, in early January 2016, Phillips' attorney, Lori Braverman, Esq., stated that she intended to obtain a ruling from the Appellate Division clarifying whether the proceeds from a sale of the 67th Street Property would have to be escrowed.  Sanford also testified that he was concerned that if Braverman sought the clarification, she "would screw it

up."

55.   The known events and circumstances indicate that, in order to head off the possibility that Braverman would pursue (and "screw up") a motion for clarification, Sanford, Esposito, Esposito's wife and McGuire agreed on the following plan.   Sanford would direct two other attorneys – Akerman and Feldman –  to contact the First Department telephonically for an advisory ruling of the Escrow Order and the ensuing December 29, 2015 order.  Akerman and Feldman would then request that the call be routed to the extension assigned to Esposito's wife. According to their plan, Esposito's wife would advise Akerman and Feldman that there was no escrow requirement or other restrictions relating to the sale of the 67th Street Property in effect. Phillips' lawyer, Braverman, would either also be on the line, listening, or some other means would be devised to relay the purported "conclusion" of Esposito's wife to Braverman and Royal Abstract (Phillips' title company).  The transaction would then close with none of the proceeds being escrowed, and $500,000 retainer would be used to hire McGuire's firm, Dechert, to take over the *Knopf v. Sanford* case.

56.   As Sanford admitted in his deposition in *Phillips*, he asked Akerman (his attorney in several matters) and Feldman (whom he had retained to close the sale to Phillips) to contact the First Department for the advisory ruling.  Sanford testified that he asked Feldman to make the call and obtain the information and that he asked Akerman to be on the call "as a witness."  Feldman testified at his own deposition in the *Phillips* case that Akerman called him on January 12, 2015, and the Akerman indicated that he already knew that, when they contacted the Appellate Division, they would be told that the restraints had been "dissolved as a matter of law."  Feldman further testified that Akerman then called the First Department with Feldman on the line and

requested somebody by "position," and that they were transferred to the Court Attorney who happened to be Esposito's wife.

57. According to Feldman's testimony, the Court Attorney confirmed that the denial of the motion to vacate the escrow order "resulted in the dissolution of all restraints and we could close." Feldman further testified that the Court Attorney was so familiar with the case that he had the impression that: "She was either the law clerk, Court Attorney of the Judge, who had either decided the motion or whatever, and she knew exactly what it was. Gave her the index number. She knew exactly what it was, and said yes, those restraints are gone." Feldman also testified in his deposition that: "The Court Attorney was . . . familiar with the order and the action. [Akerman] didn't describe anything to her. The question was, we have got this Order, the title company needs to know, does this dissolve." (*Sic*.) Feldman further testified that Akerman did not have to go through the appellate events with the Court Attorney because: "She knew the issues. She knew the case. Assuming she got it. I'm using the term got it in front of her, whether it was on her computer, in her files, or in her memory. She knew what was going on and she knew the order to which she was referring to."

58. Feldman further testified that the Court Attorney specifically stated that the reason the December 29, 2015 motion was denied was "because it was moot."

59. According to Feldman, in response to his own question, the Court Attorney confirmed that there were no longer any restrictions regarding on the sale of the 67th Street Property.

60. Feldman acknowledged that the Knopfs' attorneys were not on the call and that the reason he did not think that it was inappropriate was because the Court Attorney didn't request that the Knopfs' attorneys be on the call.

61.   Feldman has also suggested that Akerman led the Court Attorney to believe that the Escrow Order had been issued in connection with the motion that had been filed on July 24, 2015 and decided on November 12, 2015 (**M-3616**), rather than the motion filed on October 22, 2015 (**M-5459**).

62.   Later, in a March 14, 2016 affirmation filed in the *Knopf v. Sanford* matter, Feldman stated that the Court Attorney had said that December 29, 2015 ruling could not "retain" any restraints or the escrow requirements because "those provisions had been vacated by the November 12, 2015 Order."

63.   There was no disclosure by either Feldman or Akerman to the Court Attorney that her husband, Esposito, was an attorney for the parties who would benefit from the a sale of the 67th Street Property.  The complicity of Akerman and Feldman in this scheme is confirmed by the fact that, as experienced litigators, they were fully aware that the Knopfs had every right to have their counsel on the call, especially given their intention to obtain an advisory ruling for the purpose of avoiding the Escrow Order, and that substantive *ex parte* communications violated the Knopfs' due process rights.  *United States v. Abuhamrra*, 389 F.3d 309, 321 *et seq.* (2d Cir. 2004).  As experienced litigators, Akerman and Feldman also knew that if a party desired clarification of an  order, the appropriate remedy was to move *on notice* pursuant to CPLR 2221, which governs motions relating to prior orders.  *Arbor Realty Funding LLC v. East 51st St. Dev. Co., LLC*, 67 A.D.3d 559, 559, 890 N.Y.S.2d 14, 14-15 (1st  Dept. 2009); *Grossberg v. Van Bakergem*, 2016 WL 283595, *2 (Sup. Ct., New York Co) (Ramos, J.)  Thus, it was clear that Akerman and Feldman had joined the conspiracy by this time.  Akerman's complicity in the scheme is also confirmed by Feldman's testimony that, before the call was placed to the Appellate

Division, he knew what the advisory ruling would be. The complicity of Esposito's wife is confirmed by the fact that she conducted the call without the participation of the Knopfs' attorneys, and issued an advisory ruling in violation of numerous protocols. She did so even though her position, as Director of the Court's mediation part, did not permit her to advise parties to an appeal as to the meaning of Court orders, especially in cases, like *Sanford v. Knopf*, that had not been referred to mediation.  If, as Feldman's deposition testimony suggests, she already knew about the case, she should have recused herself given her husband's role as one of the attorneys assisting the efforts by Sanford and Pursuit to sell the 67th Street Property and avoid the Escrow Order.

**(vi) The Deprivation of the Knopfs' Due Process Right**
     **to Notice and an Opportunity to Be Heard**

64.   Had the Knopfs had notice of, and an opportunity to participate in, the January 12, 2016 call in which Esposito's wife provided the advisory ruling, they would have been able to proffer the following arguments that the Escrow Order was still in effect:

(a) Justice Sweeny's October 22, 2015 Escrow Order was issued in connection with motion **M-5459**.  Motion **M-5459** was not decided by the November 12, 2015 decision, and the motion decided by the November 12, 2015 decision was a separate, earlier motion (**M-3660**), which was filed in connection with a different appeal.

(b)  The Escrow Order was necessary to ensure that the relief plaintiffs sought on their pending Fourth Appeal – either judgment or a prejudgment attachment – would not be rendered meaningless by defendants' liquidation of the properties and depositing the proceeds overseas, as the Knopfs had successfully argued in opposing defendants' cross-motion to vacate the Escrow Order.  *See* paragraphs 48 - 49, *supra*).  As noted in James M. McGuire and Steven A. Engel, "Stay for A While: CPLR Stay Applications in the First Department," *New York Law Journal*, (August 27, 2012), at p. 1: "[T]he long-standing availability of an interim stay from a single justice reflects two realities: (1) §5519(c) applications may present necessitous circumstances; and (2) during the time it would take for a full panel to be assembled, the appellant could suffer serious and perhaps

irreparable injury[.] *Id.* at. p. 1 (hereinafter, "McGuire article").[4]

(c)  Continuing the Escrow Order until the determination of the Fourth Appeal was thus consistent with CPLR 6210 which permits the Court to issue a restraining order pending the determination of a motion for an attachment, which was the clear intent behind the December 29, 2015 decision that had denied the motion to vacate the Escrow Order.

(d)  As the McGuire article, *supra*, notes: "The key here is that the traditional standards governing the issuance of a temporary restraining order and a preliminary injunction do not govern." *Id.*  In particular, "[CPLR 6301] specifying the grounds for preliminary injunctions speaks only in terms of 'restraining' the commission or continuance of acts[.]" Thomas M.Fleming, *et al.*, *New York Jurisprudence* 2d (Feb. 2016 Update). In other words, CPLR 6301 expressly provides for only prohibitory, rather than mandatory injunctions. TROs of course are by definition prohibitory in nature. *See*, *e.g.*, *Graham v. Board of Supervisors, Erie County*, 49 Misc.2d 459, 462, 267 N.Y.S.2d 383, 387 (Sup. Ct., Erie Co. 1966) (noting that restraining notices are prohibitory in nature, and that prohibitory preliminary injunctions are expressly contemplated under CPLR 6301 but that "a Court' power to issue a mandatory injunction is well-established and has a long history.")

(e)  A motion denying a request for prohibitory preliminary injunction *necessarily* dissolves the temporary restraint in existence at the time. CPLR 6301 (TRO is in effect until the hearing on the preliminary injunction).  However, an escrow Order io a different animal, since the courts recognize that it is in the nature of a *mandatory* injunction. *In re Feit & Drexler, Inc.*, 42 B.R. 355, 359 (Bankr., S.D.N.Y. 1984) ( "mandatory injunction"); *In re Trafalgar Associates*, 53 B.R. 693, 696 (Bankr., S.D.N.Y. 1985) ("Savoy's request for the creation of an escrow account is a request for . . . a mandatory injunction[.]")

(f)  In contrast to a TRO, an escrow order, such as that issued by Judge Sweeny, may be continued notwithstanding the denial of a related preliminary injunction motion. As this Court held in *Fieldstone Capital, Inc. v. Loeb Partners Realty*, 105 A.D.3d 559, 963 N.Y.S.2d 120 (1st Dept. 2013):

> "To the extent plaintiff owners also seek a preliminary order
> requiring defendants to turn over to their possession and control the
> contents of bank accounts that are contested by the parties, the
> circumstances presented in this case are not of such an

---

[4]https://www.dechert.com/files/Publication/db1acdd0-dbd8-403d-afec-0e2feeb280f4/Presentation /PublicationAttachment/7525fc45-a83f-4f35-8954-3e492f3d52b5/070081227%20Dechert%20.pdf, last accessed June 18, 2017.

> extraordinary nature so as to warrant mandatory preliminary relief upsetting the status quo. [Citation omitted.] However, in order to preserve the *status quo, the contested accounts should be frozen and the funds held in escrow pending a determination as to the rights of the parties*."

105 A.D.3d at 560, 963 N.Y.S.2d at 121-122 (emphasis added).

(g)  Had the panel which issued the December 29, 2015 decision intended to deny the motion to vacate the Escrow Orders "as moot" it would have said so expressly, as indicated by other orders on motions decided in the First Department.

- and -

(h) Also, generally, the denial of a motion to vacate is entitled to preclusive effect. *Rosenkrantz v. Steinberg*, 13 A.D.3d 88, 786 N.Y.S.2d 35, 35-36 (1st Dept. 2004) (denial of a motion to vacate is entitled to preclusive effect).  Further, under federal practice, the denial of a motion to vacate a TRO is considered the equivalent of motion granting a preliminary injunction. *E.g.*, 42 Am. Jur. 2d, Injunctions, §289 (Feb. 2016 Update) ("An order denying a motion to vacate and thus continuing a temporary restraining order may have the same effect as a preliminary injunction[.]")   Similarly, in this case the effect of the five judge panel ruling on December 29, 2015 (which included Justice Sweeny) denying the motion to vacate the Escrow Order was intended to extend that order pending the determination of the Knopfs' appeal, as the Knopfs had requested in opposing the request for a *vacatur* of the Escrow Order.

65.   Even if Esposito's wife, in her capacity as a court attorney issuing an advisory ruling, found the Knopfs' arguments to be unpersuasive, rejected them, and issued the advisory ruling requested by her husband's clients, had the Knopfs been afforded their due process right to notice and an opportunity to be heard in connection with the telephonic application, they would have known of the intention to sell the 67th Street Property, and been able to apply to an actual justice for a new escrow order and a preliminary injunction.  Any suggestion that the Knopfs would not have been able to protect themselves in such a fashion (had they been included on the call) is without merit. As detailed below, on February 25, 2016, after the Knopfs learned of the sale and failure to escrow the proceeds, they obtained a new escrow order from Appellate Division Justice

23

Karla Moskowitz, and a few weeks later, on March 24, 2016, a full appellate panel issued a

preliminary injunction against any further dissipation of the real estate assets that Pursuit had

acquired with the loans from the Knopfs.  Had the Knopfs had notice of, and an opportunity to be

heard, in connection with the request for an advisory ruling by Esposito's wife, they would have

been able to obtain these new orders *before* the damage was done.

**(vii) The Events Immediately Preceding the Sale of the Property**

66.  In the trial court, the hearing ordered by Justice Braun on the Knopfs' damages began

on January 14, 2016 before JHO Gammerman.  That day, at the request of Sanford and Pursuit

(which was represented by James Prestiano, Esq., yet another of Sanford's lawyers, at the

hearing), JHO Gammerman adjourned the hearing until January 19 because Sanford and Prestiano

had stated that they intended to move before Justice Braun for a jury trial on the damages

question (instead of a hearing before a JHO).

67.  On January 15, 2016 –  three days after the *ex parte* phone conference call in which

Esposito's wife provided the advisory ruling requested by Sanford and Pursuit –  Sanford and

McGuire exchanged emails and McGuire first initiated and then cancelled a Dechert conflicts

check.[5]  At his deposition, McGuire testified that he believes he first spoke with Sanford that day,

or perhaps slightly earlier.  Following Sanford's communication with McGuire on January 15, he

did an about-face and decided not to move for a jury trial even though obtaining a jury trial would

have delayed the determination of the Knopfs damages for approximately 18 months. It is

inconceivable that this change of heart could have occurred without an alternative plan in place,

and the timing raises the inference that the alternative plan was to sell the 67th Street Property in

---

[5]The Knopfs know of the existence of these emails, but not their content, because of a
privilege log supplied by Dechert.

order to pay a substantial retainer to McGuire and Dechert.  Of course, McGuire and Dechert would not be able to immediately request a substantial retainer if the hearing on the Knopfs damages was going to be delayed for 18 months because of the backlog on the jury trial calendar. This indicates that McGuire joined the conspiracy at this time, if not earlier.

68.    After Sanford and Pursuit declined to seek a jury trial, the damages hearing resumed before JHO Gammerman on January 19.  On January 20, Gammerman announced that he was going to recommend that the Knopfs receive judgment in the sum certain amounts of their loans, and scheduled January 28 as the date for the determination of  the interest due under the loan agreements.  However, Sanford did not appear on January 28, and JHO Gammerman rescheduled the hearing for February 8.

**(viii) The Sale of the Property and the Allocation of Proceeds**
 **to Dorsey, Feldman and Dechert**

69.    The advisory ruling that had been issued by Esposito's wife on January 12, 2016 satisfied Phillips, Phillips' lawyers (Braverman), Phillips' advisor (Bronfman) and Phillips' title company (Royal Abstract) that Justice Sweeny's Escrow Order was no longer in effect.  On February 1, 2016 the sale from Pursuit to Phillips closed, and Braverman distributed the proceeds of the sale in accordance with Sanford's instructions, with none of the money going into escrow.

70.    Dorsey (Akerman's firm) and Feldman received fees out of the sale proceeds, Feldman in the amount of $25,000 and Dorsey in an undisclosed amount but, according to Sanford's suggestions in his deposition in the *Phillips* case, approximately $80,000.   Sanford personally received $936,227.32 out of the proceeds and, immediately upon the closing of the sale, emailed McGuire to offer Dechert a $500,000 retainer for appearing as Sanford's and Pursuit's counsel in the *Knopf v. Sanford* case.  (The version of this email Sanford produced was

highly redacted, and the identity of one of the recipients was thereby concealed.  On information and belief, the email was also sent to Esposito, and discusses Esposito's role as a strategist in the case.)  None of the $3 million Pursuit received for PHC was paid to the Knopfs.  Instead, a total of $2,063,773 was paid to various other creditors of Pursuit and Sanford, all of whose rights were either unsecured or inferior to the lien of the Knopfs' constructive trust claim against Pursuit.

**(ix)   The Use of $500,000 from the Sale of the 67th
      Street Property to Retain McGuire and Dechert**

71.  According to various sworn statements by Sanford, in late January and/or early February 2016, Sanford and McGuire had the following communications:

(a) Sanford provided McGuire and Dechert with "detailed" information regarding his finances before retaining them.

(b) Sanford informed McGuire and Dechert that he and Pursuit were selling the 67th Street Property in order to have money to retain attorneys, and Dechert learned that Sanford and Pursuit could only pay, and only intended to pay, a retainer for new counsel out of the proceeds of a sale of the 67th Street Property.

(c) Sanford provided some of the case files to Dechert, which Dechert reviewed.

(d) Dechert requested a $500,000 retainer, which, according to Sanford, was twice what other firms were requesting.

- and -

(e) Sanford conditionally agreed to pay the $500,000 retainer, if Dechert agreed not only to oppose JHO Gammerman's forthcoming report, but also agreed to seek to vacate the December 11, 2014 Appellate Division decision.

72.  In his deposition in the *Phillips* case, Sanford testified that, on February 3, 2016, he and Esposito met with McGuire at Dechert's Manhattan office, and that another Dechert attorney, Jennings Durand, participated in the meeting by video conference. Sanford further testified that Esposito was largely responsible for presenting Sanford's goals and strategic preferences to

26

Dechert.  In his own deposition in the *Phillips* case, McGuire testified that it was likely that he knew by this time that Sanford and Pursuit had obtained the $500,000 needed to pay Dechert's initial retainer from the sale of the 67th Street Property.

**(x)   Dechert's Appearance in the *Knopf v. Sanford* Action**

73.   On February 8, 2016, McGuire and the other Dechert attorney, Jennings Durand, appeared at the damages hearing before JHO Gammerman as the attorneys for Sanford and Pursuit.  That day, JHO Gammerman found that Sanford owed the Knopfs $10,937,850, and that Pursuit was jointly liable for $8,336,488 of that amount.

**(xi)   The Knopfs' Motion to Enforce Justice Sweeny's Escrow Order**

74.   On February 24, 2016, the Knopfs learned that Pursuit had sold the 67th Street Property to Phillips on February 1, 2016, but that none of the money had been escrowed, as required by Justice Sweeny's October 22 Order.  On February 25, the Knopfs filed a motion in the Appellate Division seeking (a) an order requiring that the proceeds of the sale be paid into escrow, as ordered by Justice Sweeny, (b) an injunction against any further dissipation of the proceeds of the sale and (c) contempt remedies under Judiciary Law §753.  On February 25, 2016, Justice Karla Moskowitz issued an interim order which required the "remaining" proceeds to be paid into escrow.  McGuire and another Dechert attorney, Jared Siegel, appeared at the interim application before Justice Moskowitz, and argued that the November 12, 2015 decision had terminated Justice Sweeny's Escrow Order and that the December 29, 2015 decision had denied the motion to vacate the Escrow Order for the unstated reason that it was "moot." Justice Moskowitz, *who was part of the panel that had issued the November 12 decision*,  rejected that argument, saying "we don't deny motions as moot without saying so."  Though this hearing was

conducted in Justice Moskowitz' chambers and not transcribed, Justice Moskowitz' ruling made

it clear that she agreed with the Knopfs that the December 29, 2015 order had continued the

escrow requirement in effect.  The entirety of Justice Moskowitz order was as follows:

> Money remaining as of today at 3:45 pm from sale of 1-bedroom apartment
> shall be placed in escrow *as had been directed by Justice Sweeny in his 10/22/15
> interim order, vacatur or which was denied by this Court's 12/29/2015 Order* (M-
> 5459, M-4940) pending hearing and determination of this motion by full panel and
> determination.
> Expedite motion & decision.
> Pending hearing by full panel, money escrowed shall be escrowed with JP
> Morgan Chase or similar commercial Bank in New York City by close of business
> on 2/29/2016.

(Emphasis added.)  Had the Knopfs been included on the conference call with Esposito's wife,

they could have obtained this type of relief *before* the damage was done.

75.   Pursuit and Sanford paid into escrow only the $436,227.32 portion of  the

distribution which remained in Sanford's account at Citibank. However, Sanford did not disgorge

the $500,000 retainer he had deposited at Dechert, despite the fact that, under the applicable law,

Sanford and Pursuit still owned and controlled the large bulk of that retainer which remained in a

trust account at Dechert, and had not been transferred to the firm's general account.

76.   Thereafter, on March 8, 2016, Pursuit, Sanford and Dechert opposed the Knopfs'

contempt and disgorgement motion based on an advice of counsel defense, arguing in a

submission to the First Department that, on January 12, 2016, two of Pursuit's attorneys had

provided Sanford with legal "memoranda" opining that the October 22, 2015 Escrow Order was

not in effect.  Pursuit, Sanford and Dechert also offered to provide these attorneys' memoranda to

the First Department on an *ex parte* basis.

77.   Later, in proceedings before Justice Braun, Sanford, Pursuit and McGuire revealed

that these so-called "legal memoranda" were actually memos to file that Akerman and Feldman and written concerning a January 12, 2016 call with an unidentified First Department Court Attorney. Before Justice Braun, Sanford, Pursuit and McGuire submitted affirmations from Akerman and Feldman, dated March 16, 2016 and March 14, 2016 respectively. In these affirmations, Feldman and Akerman each stated that on January 12, 2016, they had a conference call with an unidentified Court attorney employed by the First Department (whose identify they did not reveal), and that the Court attorney advised them that Justice Sweeny's Escrow Order was no longer in effect. However, the actual memoranda by Akerman and Feldman were not provided to the Knopfs nor supplied to the Court.

78. Dechert attorneys other than McGuire knew that the December 29, 2015 decision denying the motion to vacate the Escrow Order was extremely relevant, as indicated by a February 19, 2016 email Dechert attorney Jennings Durand sent to McGuire, which stated:

> As Jared [Siegel, a Dechert associate] was working to finish his assessment of the exact status of the various lis pendens and attachment motions on the properties, he came across the attached 12/29/2015 Appellate Division order that denies a plaintiff's motion for reargument and, *troublingly*, denies "defendants' cross motion for vacatur of the interim order dated October 22, 2015."

(Emphasis added).

79. On March 24, 2016, the Appellate Division issued an order on the Fourth Appeal which prohibited Pursuit "from transferring, or further diminishing, impairing or encumbering the properties it acquired with real estate loans from plaintiffs, including but not limited to the property located at 10 Bedford St., New York, New York, *as well as any proceeds derived from the sale of such properties prior to the date of this order*[.]" *Knopf v. Sanford*, 137 A.D.3d 662 26 N.Y.S.3d 866 (1st Dept. 2016) (emphasis added). However, by that time the 67th Street

Property had been sold and all but a small fraction of the proceeds dissipated.  Had the Knopfs been given an opportunity to participate in the call with Esposito's wife, they would have been able to obtain this order *before* the damage was done.

80.   Following the decision of the Fourth Appeal, and while the Knopfs' contempt and disgorgement motion was *sub judice*, on May 16, 2016, a First Department clerk named Dan Ramos apparently contacted McGuire and requested the memoranda – *i.e.*, the Akerman and Feldman memoranda – which McGuire had previously proffered to the First Department on an *in camera* basis, as discussed above in paragraph 71.  On May 17, 2016, McGuire and Dechert provided Akerman and Feldman memoranda to the First Department on an *in camera* and *ex parte* basis.  The Knopfs filed a letter, which was copied to Dechert by email, protesting the *in camera* submission and demanding that the Court order the memoranda to be disclosed to them.  However, the Court did not rule on that request and the Clerk's office has since informed the Knopfs that it has no record of that letter being received.  In his deposition in the *Phillips* case, McGuire testified that in his phone call with Ramos there was no discussion of whether the Court was requesting the Akerman and Feldman memoranda on an *in camera* basis.

81.   McGuire testified at his deposition in the *Phillips* case that he proffered and submitted the Akerman and Feldman memoranda to the First Department on an *in camera* basis – rather than providing these memoranda to the Knopfs – because these memoranda identified the Court Attorney (Esposito's wife) by name, and he believed that her identity presented an issue relating to the "internal affairs" of the First Department.

82.  Sanford testified in his deposition that McGuire had told him that the *in camera* submission was necessary because McGuire feared that the Knopfs would find out that the court

attorney had previously acted as McGuire's  law secretary and would use that fact aggressively in

the ensuing litigation over the sale of the 67th Street Property.   Sanford also testified in his

deposition that McGuire told him that he was submitting the Akerman and Feldman memoranda

on an in camera basis because he didn't want to "throw" the Court attorney "under a bus."

83.  McGuire confirmed in his deposition in the *Phillips* case that at no point in time and

in no fashion did he ever disclose to the First Department that the Court Attorney who had

provided Akerman and Feldman with the advisory ruling had been his law secretary.

84.  McGuire confirmed in his deposition in the *Phillips* case that, at no point in time and

in no fashion, did he ever disclose to the First Department that the Court attorney who had

provided Akerman and Feldman with the advisory ruling was married to a lawyer employed by

Sanford and Pursuit.

85.  In this fashion, McGuire breached his obligation to report to the Court that the

advisory opinion discussed in the Akerman/Feldman memoranda was manufactured evidence, and

resulted from communications tainted by serious improprieties and conflicts of interest.

**(xii)   The Two Versions of the June 16, 2016 Order Denying the Knopfs'**
**        Motion to Hold Dechert, Pursuit and Sanford In Contempt**

86.  On June 16, 2016, the First Department published an order denying the Knopfs'

motion for contempt and for disgorgement of Dechert's $500,000 retainer.  Like nearly all First

Department decisions on motions, it did not provide any reason for the outcome. The decision

was released at approximately 12:00 noon, when the First Department issued its motion decisions,

as is customary, by publishing them as a single PDF file on its website.

87.  Later on June 16, 2016, and within hours of the release of the original order (but

unbeknownst to the Knopfs at the time), a revised version of the order was filed. The revised

31

version, unlike the original version, set forth a reason for the denial of the Knopfs' contempt and

disgorgement applications and, as it turned out, its reasoning was identical to that which

Esposito's wife, the Court Attorney, had provided to Akerman and Feldman in their *ex parte* call.

88.   The revised version of the June 16, 2016 order was not "released" by the Court – that

is, there was no new PDF uploaded onto the Court's website at the time, and the Revised Order

was not picked up by the services and appellate printers that closely monitor the First

Department's rulings.   According to affidavits and testimony in related actions, neither McGuire

nor any other attorney at Dechert was aware of the revised order until late April 2017, ten months

after it was issued.  Likewise, the Knopfs' attorneys were not aware of the revised order.  During

the intervening period, the *original* version of the June 16, 2016 order was repeatedly used,

attached, cited and relied upon by Dechert and Phillips in related litigations.

89.   The Knopfs first became aware of the revised version of the June 16, 2016 order

when Sanford (again *pro se* after Dechert withdrew as his counsel) submitted it in opposition to a

discovery motion in the *Phillips* case.

**(xiii)  The Unusual Circumstances and Characteristics
Of the Revised Version of the June 16, 2016 Order**

90.   Upon inquiry, the personnel in the First Department clerk's office confirmed that the

revised version of the June 16, 2016 Order was entered on the afternoon of June 16, just hours

after the release of the original version.  The Clerk's office also stated that the "Orders

Department" – *i.e.*, "the Motions and Orders Department" of the Court was the source of the

change.

91.  While the original version of the June 16, 2016 Order included the standard

introductory dependent clause used by this Court on its motion decision – "Plaintiffs-appellants

having moved. . . ." and "defendants having cross-moved," the "having moved"/"having cross-moved" language does not appear in the revised version.  Approximately 50,000 orders on motions are included in the PDFs linked to the First Department's website.  The "having moved" introductory dependent clause is included in all of them, except for the revised version of the June 16, 2016 Order.

92.  Likewise, while the original version had the absolutely standard language in this Court's motion decisions:  "Now, upon reading and filing the papers with respect to the motion, and due deliberation having been had thereon, it is      Ordered. . . . ,"  the revised version lacks this standard language.

93.   These circumstances would appear to contradict the information that the revision came from the Court's Motions and Orders Department, since presumably one of the roles of that Department is to conform the Court's written rulings to its customary and standard format and style.

94.  A possible explanation for why the revised order was filed immediately following the release of the original order relates to McGuire's *in camera* submission of the Akerman and Feldman memoranda on May 16, 2016, which was long after the briefing had closed on the Knopfs' motion for contempt and disgorgement.

95.  A year later, on June 21, 2017, Feldman's memorandum to file regarding the January 12, 2016 conference call with the Court attorney was produced to the Knopfs in the *Phillips* case, and the Knopfs learned the Court Attorney's identity for the first time. On June 26, 2017, McGuire testified at his deposition in the *Phillips* case, that this Court attorney was Esposito's wife and McGuire's own former law secretary.  As previously noted, at his deposition McGuire

also testified that Esposito had introduced him to Sanford in early January 2016.   This was the first the Knopfs had known of the connections between Esposito, McGuire and Esposito's wife.

96.   The Feldman memoranda revealed that the reasoning supplied by the second version of the June 16, 2016 decision was identical to that which Esposito's wife had stated in her January 12, 2016 conversation with Feldman and Akerman, at least according to the account provided in Feldman's memo.   Specifically, the Feldman memorandum, *verbatim*, described the views of Esposito's wife as follows:

> "1.   The October 22, 2015 Interim Order with restraints was only in effect until motion decided.
> 2.   *Once full panel decided motion and entered the November 12, 2015 Order denying the restraints, all restraints were vacated.*
> There was no need for the motion to remove interim restraints as they were already gone.   The motion was denied as a matter of law as there were no restraints to vacate and, thus the motion requested relief that could not be granted."

97.   Identically, the "reasoning" supplied by the revised version of the June 16, 2016 order, verbatim, is as follows:  "The motion for contempt is denied *because the TRO was vacated once plaintiffs' prior motion for a preliminary injunction was denied*."   (The order denying the "prior motion for a preliminary injunction" *is* the "November 12, 2015 Order" discussed in Feldman's memorandum to file.)

98.   Thus, a possible explanation for the prompt amendment of the June 16, 2016 order is that the Akerman/Feldman memoranda which were provided to the Court on an *in camera* basis on May 17, 2016 (long after the briefing on the motion had closed) did not reach the attention of the Court's Motions and Orders Department until immediately after the original June 16 decision had been issued, and that these memoranda  prompted the revision.   (Of course, that would not explain the linguistic singularity of the revised version, as described in paragraphs 86-87, *supra*.)

99.   To the extent that the First Department relied upon the advisory ruling by Esposito's wife as grounds *for denying the Knopfs' contempt application*, the Knopfs were further denied their due process rights. This is because McGuire, Dechert and Sanford conspired to conceal from the First Department Justices the information that the Court Attorney who authored the advisory ruling was married to an attorney, Esposito, whom Sanford and Pursuit had retained precisely for the purpose of avoiding the Court-ordered restrictions upon the sale of the 67th Street Property.

100.   To the extent that the First Department relied upon the advisory ruling by Esposito's wife as grounds *for revising its original June 16, 2016 order*, the Knopfs were further denied their due process rights.  This is because McGuire, Dechert and Sanford conspired to conceal from the First Department Justices the information that the Court Attorney who had authored the advisory ruling was married to a lawyer, Esposito, whom Sanford and Pursuit had retained precisely for the purpose of avoiding the Court-ordered restrictions upon the sale of the 67th Street Property.

101.   Because the original ruling did not state its reasoning, as a matter of law, it would have not have preclusive effect in related litigation over the sale of the 67th Street Property, such as the *Phillips* case.  *See*, *e.g.*, *Owens v. Treder*, 873 F.2d 604, 610 (2d Cir. 1989) (finding that a Second Department order which did not set forth the reasoning behind the ruling did not preclude further litigation of the issue).

102.    To the extent that the Court relied upon the view of Esposito's wife as basis for issuing the revised version of the June 16 order, the Knopfs were further denied their due process rights since the Court should have been made aware that the Court Attorney who provided the advisory ruling was married to a lawyer, Esposito, whom Sanford and Pursuit had retained

precisely for the purpose of removing the restraints on the 67th Street Property.

103.   Because the Court Attorney who provided the advisory ruling that the First Department apparently relied upon was married to a lawyer for Sanford and Pursuit, the advisory opinion was tainted evidence.  Since the tainted evidence the Court relied upon was submitted on an *in camera* basis, the denial of the motion should not be accorded collateral estoppel effect. *Rodrigues v. City of New York*, 193 A.D.2d 79, 87-88, 602 N.Y.S.2d 337, 343 (1st Dept. 1993) (finding that an order did not have collateral estoppel effect since it had been issued "after conducting an *ex parte* discussion with the prosecutors, *in camera*," and therefore the "plaintiffs were denied a full and fair opportunity to contest that decision.")

104.   The reasoning provided by Esposito's wife and adopted by the revised version of the June 16, 2016 order is incorrect for the reasons stated above in paragraph 59, *supra*, as Justice Moskowitz agreed in her February 25, 2016 ruling and in her comments when the parties convened in her Chambers that day, as described in paragraph 69, *supra*.

105.   In such circumstances, the revision of the order was not only detrimental to the Knopfs (because of the potential adverse preclusive effect of the revised order, see *Rodrigues*, *supra*) but also unfairly so, since the Knopfs were never afforded an opportunity to challenge the advisory ruling of the Court Attorney, let alone point out that her ruling was suspect since she was married to a lawyer for Sanford and Pursuit.

## E.  CLAIMS FOR RELIEF

### FIRST CLAIM:

### CONSPIRACY TO VIOLATE 42 U.S.C. §1983
**(against Esposito, Sanford, Dorsey, Akerman and Feldman)**

106.  Paragraphs 1 - 105 are repeated and realleged as if set forth fully herein.

107.   Title 42, section 1983 of the United States Code provides:

  Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, . . .

108.  One of the "rights . . . secured by the Constitution and laws" is the Fourteenth Amendment right to due process.  The Fourteenth Amendment provides that:  ". . . .no state . . . deprive any person of life, liberty, or property, without due process of law."

109.   Esposito's wife is an employee of the State of New York and her employment designation at the time she provided the advisory ruling was either Deputy Chief Appellate Court Attorney or Principal Appellate Court Attorney. She also had the title of the Director of the Pre-Argument Conference Program a/k/a Special Master's Program, a mediation service offered by the First Department.

110.  At the time Esposito's wife issued the advisory ruling the Knopfs had a protected property interest in the lien of their constructive trust claim against and the lien of their equitable mortgage covering the 67th Street Property.  The Knopfs could only be legally deprived of this property interest in accordance with due process of law.  *Fuentes v. Shevin*, 407 U.S. 679, 2 S.Ct. 1983, 1997 (1972).

37

111.   Esposito's wife was acting under color of state law when she issued the advisory ruling that the First Department's October 22, 2015 and December 29, 2015 orders did not require the proceeds from a sale of the 67th Street Property to be paid into escrow.

112.   As stated in *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487 (1985):

> The essential requirements of due process, and all that respondents seek or the Court of Appeals required, are notice and an opportunity to respond. The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement.

470 U.S. at 546, 105 S.Ct. at 1495.

113.   Esposito's wife, while acting under color of state law, deprived the Knopfs of their property without notice of an opportunity to be heard when she issued the *ex parte* advisory ruling requested by her husband's clients, Sanford and Pursuit, that the First Department's October 22, 2015 and December 29, 2015 orders did not require the proceeds from a sale of the 67th Street Property to be paid into escrow.

114.   Had the Knopfs attorneys been made aware of the *ex parte* telephone application for an advisory ruling, they would have been able to demonstrate that the First Department's October 22, 2015 and December 29, 2015 order did, in fact, require that the proceeds from the sale of the 67th Street Property be paid into escrow, for the reasons set forth in paragraph 59, *supra*.

115.   Even if Esposito's wife, in her capacity as a court attorney issuing an advisory ruling, found the arguments set forth in paragraph 59 to be unpersuasive, rejected them, and still issued the advisory ruling requested by Esposito's clients (Pursuit and Sanford), had the Knopfs been afforded their due process right to notice and an opportunity to be heard in connection with Akerman and Feldman's request for that ruling, the Knopfs would have known of the intention to

sell the 67th Street Property, and been able to apply to an *actual* First Department Justice for a new escrow order, such as that they obtained on February 25, 2016 (after the sale) and a preliminary injunction, such as that which they obtained on March 24, 2016.

116.  Private actors, such as Esposito, Dorsey, Akerman, Feldman and Sanford, are liable under section 1983 if they conspire with state officials to violate a citizen's rights or willfully join a conspiracy which also includes the participation of a state actor, such as Esposito's wife.

117.  Esposito, Sanford, Dorsey and Akerman, Feldman and McGuire reached an understanding with Esposito's wife to deprive the Knopfs of their right to notice and an opportunity to be heard, and willfully participated in and collaborated with Esposito's wife in the conspiracy.

118.   As a result of defendants' conspiracy and conduct the Knopfs were deprived of their due process rights of notice and an opportunity to be heard.

119.  Defendants' conspiracy and conduct was intended to deprive the Knopfs of their due process rights to notice and an opportunity to be heard.

120.   Defendants knew that, under the circumstances, their conspiracy and conduct was likely to result in an injury to the Knopfs' property interest.

121.  As a result of defendants' conspiracy and conduct, the Knopfs were deprived of the value of the 67th Street Property.

122.   The agreement between Sanford and Esposito to take whatever steps were available to avoid the judicial restrictions and restraints regarding the sale of the 67th Street Property is admitted by Sanford in his deposition, and that agreement was formed in late 2015 or early 2016 in meetings that took place between Sanford and Esposito in either Oyster Bay, New York or

Cold Spring Harbor, New York.  This conspiracy also included Esposito's wife (who joined it no

later than January 12, 2016), Akerman (who joined it no later than January 12, 2016) and

Feldman (who joined it no later than January 12, 2016) and non-party McGuire (who joined it no

later than January 15, 2016).  The conspiracy continued through May 17, 2016, when McGuire

provided the memoranda by Akerman and Feldman describing the advisory ruling by Esposito's

wife to the First Department on an *in camera* basis in opposition to the Knopfs' motion for

contempt and disgorgement, without disclosing to the First Department Justices that the Court

Attorney who had rendered the advisory ruling was married to a lawyer for Sanford and Pursuit.

123.   The knowing participation of Esposito's wife, the Court Attorney, in the conspiracy

to deprive the Knopfs of their protected property interest without notice and an opportunity to be

heard is established and indicated by the events and circumstances described herein, including the

following:

      (a) Her marriage to Esposito, and Esposito's disclosure to Sanford in late 2015 that she was employed as a First Department Court attorney at the same time Sanford and Esposito were discussing Sanford's possibly engaging McGuire as his (and Pursuit's) litigation counsel in the *Knopf v. Sanford* action.

      (b) The fact that she was previously a  law secretary for McGuire, whose firm, Dechert, received a $500,000 retainer out of the proceeds of the sale of the 67th Street Property.

      (c)  Sanford's deposition testimony that Esposito agreed to defer payment for his services in assisting in the Knopf litigation and locating counsel until Sanford was in the position to liquidate an assets, and the economic benefit to Esposito's wife if Sanford was able to pay Esposito.

      (d) Her failure to recuse herself from any involvement in the *Knopf v. Sanford* matter, even though she knew or should have known that it concerned her husband's clients, and a matter in which he was actively involved.

      (e) The fact that, as Feldman testified, she knew about the case,

and didn't have to have it explained to her and could immediately
state without hesitation that the December 29, 2015 decision denied the
motion to vacate the October 22 escrow order only because that motion
was moot.

(f) The fact that, as Feldman testified, Akerman knew what
the outcome the inquiry to the Appellate Division would be
prior to the time it was made.

(g) The failure of McGuire or any of Sanford's lawyers to  disclose
to the Knopfs of the First Department Justices, Esposito's role, or the
identity of Esposito's wife as the Court attorney who issued the advisory
interpretation, or her  prior employment as McGuire's law secretary.

(h) Her issuing an advisory ruling in an *ex parte* communication with only
one side of a case on the phone, even though court attorneys are not judges, are not
authorized to issue interpretations – advisory or otherwise – and are not permitted
to provide advice – *ex parte* or otherwise  – to a party.

- and -

(i)  Her failure to decline the call from Akerman and Feldman or
decline their request for an advisory ruling, even though neither Akerman
or Feldman had any case that had been referred to the First Department's
mediation part, where she worked.

124.   Esposito's knowing participation in the conspiracy to deprive the Knopfs of their

protected property interest without notice and an opportunity to be heard is established and

indicated by the events and circumstances described herein, including the following:

(a)  Any breach of his obligation to advise his wife that he had
been retained to assist in a case that was being actively litigated in the
First Department so that she could recuse herself if it came before her.

(b) The fact that, as Feldman testified, Esposito's wife
wife knew about the case, and didn't have to have it explained to her
and could state without hesitation that the December 29, 2015 decision
denied the motion to vacate the October 22 escrow order only because
that motion was moot.

(c)  The fact that, as Feldman testified, Akerman knew what
the outcome of the inquiry to the Appellate Division would be

prior to the time it was made.

(d) Any communication with McGuire about the possibility of Dechert and McGuire appearing as attorneys for Sanford and Pursuit in the *Knopf v. Sanford* action without informing McGuire about the plan to obtain an improper advisory ruling from Esposito's wife in order to free up the funds needed to retain counsel.

(e)  Participating in the strategy meeting at Dechert on February 3, 2016 where the means that had been employed to obtain the $500,000 requested by Dechert as an initial retainer were discussed, or participating in that meeting without disclosing that information to Dechert, so as to avoid the possibility that Dechert would decline the engagement in on the grounds that it would involve the use of manufactured evidence and an ongoing conspiracy to deprive the Knopfs of their due process rights.

- and -

(f) Any failure to disclose to Akerman and Feldman that he had assisted Sanford in conceiving this strategy and that his wife was a court attorney employed in the First Department.

125.  Sanford's knowing participation in the conspiracy to deprive the Knopfs of their protected property interest without notice and an opportunity to be heard is established and indicated by the events and circumstances alleged herein, including the following:

(a) His decision to retain Esposito for the purposes of removing or avoiding the judicial restraints and restrictions against the sale of the 67th Street property specifically because Esposito's wife was a court attorney employed by the Court which had issued the restraints.

(b) His direction to Akerman and Feldman to engage in an improper *ex parte* communication to the First Department in order to obtain an improper advisory ruling of previously issued orders.

(c) The fact that, as Feldman testified, Esposito's wife wife knew about the case, and didn't have to have it explained to her and could immediatey state without hesitation that the December 29, 2015 decision denied the motion to vacate the October 22 escrow order only because that motion was moot.

(d)  The fact that, as Feldman testified, Akerman knew what the outcome of the inquiry to the Appellate Division would be prior to the time it was made.

(e) The fact that, as Feldman testified, Esposito's wife wife knew about the case, and didn't have to have it explained to her and could state without hesitation that the December 29, 2015 decision denied the motion to vacate the October 22 escrow order only because that motion was moot.

(f) Any failure to disclose to Akerman and Feldman that Esposito had assisted him in conceiving this strategy and that Esposito's wife was a court attorney employed in the First Department.

(g) His failure to request that Holwell, Schuster & Goldberg, LLP, the attorneys who had moved on his behalf to vacate the October 22, 2015 Escrow Order and who had opposed the Knopfs' Fourth Appeal (which was pending at that time), initiate or participate in the call to the Appellate Division.

(h) Any decision on his part to agree to pay Esposito for Esposito's services (in forming the strategy to remove the restraints against the sale of 67th Street) only in the event that money was generated by a sale of the 67th Street Property.

(i) Any failure to disclose to McGuire or Dechert the existence of the December 29, 2015 decision or the advisory opinion by Esposito's wife at or prior to the time he retained Dechert.

- and -

(j)  Participating in the strategy meeting at Dechert on February 3, 2016 where the means that had been employed to obtain the $500,000 requested by Dechert as an initial retainer were discussed, or participating in that meeting without disclosing that information to Dechert, so as to avoid the possibility that Dechert would decline the engagement in on the grounds that it would involve the use of manufactured evidence and an ongoing conspiracy to deprive the Knopfs of their due process rights.

126.  Akerman's knowing participation in the conspiracy to deprive the Knopfs of their

protected property interest without notice and an opportunity to be heard is established and can be

indicated from the events and circumstances described herein, including the following:

43

(a) His violation of the rules prohibiting *ex parte* communications with the Court regarding substantive matters when he contacted Esposito's wife in her capacity as Court attorney.

(b)  The fact that, as Feldman testified, Akerman knew what the outcome of the inquiry to the Appellate Division would be prior to the time it was made.

(c)  The fact that he called an attorney in the First Department's mediation department to get an advisory ruling, behavior that would be inexplicable if he was not part of the conspiracy.

(d) Any failure on his part to explain to Esposito's wife, the Court Attorney, that the October 22, 2015 Escrow Order and the December 29, 2015 decision denying the motion to vacate the Escrow Order were both issued in connection with motion **M-5459**, while the November 12, 2015 decision – which Akerman may have suggested overrode the Escrow Order – was issued in connection with a separate, and earlier motion (M-3660).

(e) Any failure to explain to Esposito's wife, the Court Attorney, that he was not attorney of record for any pending appeal or for any case that had been assigned to the Court's Pre-Argument Conference or mediation part.

(f) Any failure to point out that the other attorney on the call was not an attorney for the Knopfs but, instead, another lawyer for Sanford and Pursuit.

(g) Any failure to point out to Esposito's wife, the Court Attorney, that defendants had already made *and lost* the argument that the November 12, 2015 decision on Motion **M-3660** overrode the Escrow Order.

(h) Any failure to point out that, in opposing the motion to vacate the October 22, 2015 Escrow Order, that the Knopfs had successfully argued that the Escrow Order should remain in place pending the determination of their Fourth Appeal (in which the Knopfs were seeking either entry of judgment or a prejudgment attachment).

- and -

(i) His failure to insist to Sanford that the call to Esposito's wife, the Court Attorney, be made by a lawyer at Holwell, Schuster & Goldberg, LLP, the firm that represented Sanford and Pursuit in connection with the pending appeal and which had made the unsuccessful motion to vacate the Escrow Order.

127.  Feldman's knowing participation in the conspiracy to deprive the Knopfs of their

due process right to notice and an opportunity to be heard is established and can be indicated from

the events and circumstances described herein, including the following:

(a) His violation of the rules prohibiting *ex parte* communications with the Court regarding substantive matters when he contacted Esposito's wife in her capacity as Court attorney.

(b) Any failure on his part to explain to Esposito's wife, the Court Attorney, that the October 22, 2015 Escrow Order and the December 29, 2015 decision denying the motion to vacate the Escrow Order were both issued in connection with motion **M-5459**, while the November 12, 2015 decision – which Akerman may have suggested overrode the Escrow Order – was issued in connection with a separate, and earlier motion (M-3660).

(c) Any failure to explain to Esposito's wife, the Court Attorney, that he was not attorney of record for any pending appeal or for any case that had been assigned to the Court's Pre-Argument Conference or mediation part.

(d) Any failure to point out that the other attorney on the call was not an attorney for the Knopfs but, instead, another lawyer for Sanford and Pursuit.

(e) Any failure to point out to Esposito's wife, the Court Attorney, that defendants had already made *and lost* the argument that the November 12, 2015 decision on Motion **M-3660** overrode the Escrow Order.

(f) Any failure to point out that, in opposing the motion to vacate the October 22, 2015 Escrow Order, the Knopfs had successfully argued that the Escrow Order should remain in place pending the determination of their Fourth Appeal (in which the Knopfs were seeking either entry of judgment or a prejudgment attachment).

- and -

(g) His failure to insist to Sanford that the call to Esposito's wife, the Court Attorney, be made by lawyer at Holwell, Schuster & Goldberg, LLP, the firm that represented Sanford and Pursuit in connection with the pending appeal and which had made the unsuccessful motion to vacate the Escrow Order.

128.   Non-party McGuire's knowing participation in the conspiracy to deprive the Knopfs

of their due process right to notice and an opportunity to be heard is established and indicated by

the events and circumstances described herein, including the following:

45

(a) His agreement, on behalf of Dechert, to accept a $500,000 retainer knowing that the money was available only because of an *ex parte*, improper and incorrect advisory ruling of a First Department Court Attorney who was acting in excess of her authority, and violating the recusal rules, in providing that interpretation.

(b) Upon learning that the $500,000 fee Dechert had received had resulted from the violation of Justice Sweeny's Escrow Order, refusing to disgorge that fee despite Justice Moskowitz' order that all "remaining funds" be paid into escrow.

- and -

(c) Submitting the Akerman and Feldman memoranda describing the advisory ruling provided by Esposito's wife to the First Department in opposition to the Knopfs' contempt and disgorgement motion, without disclosing that the Court Attorney who issued the advisory ruling described in these memoranda was married to a lawyer for Sanford and Pursuit (Esposito), without disclosing that this Court Attorney had previously been his law secretary when he served on the First Department and without disclosing that the advisory ruling was manufactured and tainted evidence.

129. But for the conspiracy to obtain the advisory ruling by Esposito's wife (which, in turn, convinced Phillips and his title company to close on the sale of the 67th Street Property without paying the proceeds into escrow), the Knopfs would have been able to execute on the full value of the 67th Street Property.

130. But for the *in camera* submission of Esposito's wife's advisory ruling without any disclosure to the First Department or to the Knopfs that it was rendered by the wife of a lawyer for Sanford and Pursuit, the Knopfs would have succeeded in requiring Dechert to disgorge its $500,000 retainer into escrow.

131. But for the *in camera* submission of Esposito's wife's advisory ruling without any disclosure to the First Department or to the Knopfs that it was rendered by the wife of a lawyer for Sanford and Pursuit, the First Department would not have revised the original June 16, 2016

order, in order to adopt the reasoning set forth in the advisory ruling rendered by Esposito's wife, thereby imbuing the decision with potential preclusive effect to the detriment of the Knopfs' position in related litigation.

132.  The Knopfs have been injured in their business and property by the foregoing conspiracy and violation of section 1983.

133.  The Knopfs have no other remedy for the foregoing violation of their due process rights since the common law absolute immunity afforded Esposito's wife based upon her quasi-judicial role precludes recovery against the State under the Court of Claims Act.

### SECOND CLAIM:

### <u>VIOLATION OF NEW YORK JUDICIAL LAW §487</u>
### (against Dorsey, Akerman and Feldman)

134.    Paragraphs 1 - 133 are repeated and realleged as if set forth fully herein.

135.  New York Judiciary Law §487 provides that:

> An attorney or counselor who:
>      1. Is guilty of any deceit or collusion, or consents to any deceit or
>  collusion, with intent to deceive the court or any party; * * *
> Is guilty of a misdemeanor, and in addition to the punishment prescribed
> therefor by the penal law, he forfeits to the party injured treble damages, to
> be recovered in a civil action.

136.  Dorsey, Akerman and Feldman violated Judiciary Law §487 by knowingly and intentionally colluding with Sanford and Esposito's wife to obtain Esposito's wife's advisory ruling as part of a plan to convince Phillips and Phillips' title company to close on the purchase of the 67th Street Property, as alleged herein.  Later, this tainted and incorrect advisory ruling was used to deceive the actual Justices of the First Department who relied on it in one or both of their June 16, 2016 decisions denying the Knopfs' motion for contempt and to have Dechert disgorge

its $500,000 retainer into escrow.

137.   Alternatively, Akerman and Feldman violated Judiciary Law §487 by deceiving Esposito's wife and manipulating her into rendering the advisory ruling in the following fashion:

(a) Falsely representing to her that they were calling about a case that had been referred to the Pre-Argument Mediation Program or failing to inform her that the case they were calling about had not been referred to the Pre-Argument Mediation Program.

(b) Falsely representing to her that both sides of the case were on the call with her when, in fact, both of them represented Sanford and Pursuit, and no attorney for the Knopfs was on the call.

(c)  Failing to inform her that the case involved clients of Esposito, her husband, and that the advisory ruling she was asked to provide would directly benefit her husband's clients.

(d) Falsely representing to her that they were counsel of record in connection with either the pending appeal or Motion **M-5459**  when, in fact, they were not and, instead, Holwell, Goldberg & Schuster, LLP were the attorneys for Sanford and Pursuit in those matters.

(e) Falsely asserting to her that the November 12, 2015 ruling was issued in connection with the same motion (**M-5459**) that had resulted in both the October 22, 2015 Escrow Order and the December 29, 2015 ruling that had denied the motion to vacate the Escrow Order, when, in fact, the November 12 ruling had decided a prior motion (**M-3660**).

(f) Failing to disclose to her that the argument that the November 12, 2015 ruling overrode or mooted the October 22, 2015 Escrow Order had already been made and rejected by the Court.

- and -

(g) Failing to inform her that the Knopfs had successfully argued to the Court that the

October 22, 2015 Escrow Order should remain in place until the determination of their Fourth

Appeal in which they sought either entry of judgment or a pre-judgment attachment.

138.   Alternatively, Akerman and Feldman violated Judiciary Law §487 by submitting

false affirmations to Justice Braun, dated March 16, 2016 in the case of Akerman and March 14,

2016 in the case of Feldman. These affirmations materially misrepresented their conversation

with Esposito's wife in a fashion that cannot be known until Esposito's wife is deposed in this

case.

139.  As a result of these violations of Judiciary Law §487, the Knopfs have been

damaged in the business and property in the amount of at least $2 million.

### THIRD CLAIM:

### FRAUD AND DECEIT
### (against Dorsey, Akerman, Feldman,
### Esposito and Sanford)

140.    Paragraphs 1 - 139 are repeated and realleged as if set forth fully herein.

141.   An actionable fraud and deceit occurs where a fraud committed upon a Court "is

part of a larger scheme" or the fraud on the Court is a "means to accomplish a fraudulent scheme

that is greater in scope than the issues that were determined" in the proceeding in which the fraud

on the Court was committed.

142.  *As an alternative to the Knopfs' conspiracy allegations*, Akerman and Feldman

made numerous misrepresentations to Esposito's wife, who was assuming the role of a judicial

officer during the phone call on January 12, 2015, as alleged herein.

143.   As a result of the misrepresentations by Akerman and Feldman, Esposito's wife

issued the improper and erroneous advisory ruling, and based on that improper interpretation,

49

Sanford, Feldman and Akerman represented to Phillips attorney, Braverman, and Phillips title company, Royal Abstract, that there was no requirement that the proceeds of the sale be paid into escrow.

144.   The misrepresentations by Akerman and Feldman to Esposito's wife were "merely a means to the accomplishment of a larger fraudulent scheme," aimed at selling the 67th Street Property to Phillips.

145.   The misrepresentations by Akerman and Feldman to Esposito's wife were part of a fraudulent scheme that was greater in scope than the issues before the Appellate Division at the time since the scheme included not only misleading Esposito's wife, but also persuading Phillips and Royal Abstract to close on their purchase of the 67th Street Property without requiring the proceeds to be paid into escrow.

146.   Sanford and Esposito aided and abetted the fraud and deceit by inducing or facilitating Esposito's wife's communication with Akerman and Feldman.

147.   Sanford aided and abetted the fraud and deceit by directing Akerman and Feldman to make the call and instructing them to communicate with Esposito's wife regarding the meaning of the Appellate Division rulings, and whether there was any escrow requirement or restriction on the sale of the 67th Street Property.

148.   As a result of the foregoing fraud and deceit, the Knopfs have been damaged in their business and property in the amount of at least $2 million.

**FOURTH CLAIM:**

**FRAUDULENT CONVEYANCE IN VIOLATION OF ARTICLE 10
OF THE NEW YORK DEBTOR AND CREDITOR LAW
(against Dorsey, Akerman and Feldman)**

149.   Paragraphs 1 - 148 are repeated and realleged as if set forth fully herein.

150.   Pursuit was insolvent on or about February 1, 2016, the date fees from the sale of the property were paid to Dorsey, Akerman and Feldman.  The fees Feldman received were in the amount of $25,000.  On information and belief (based on Sanford's deposition testimony in the *Phillips* case), the fees Dorsey and Akerman (together) received were in the amount of approximately $80,000.

151.   Pursuit's  liabilities at the time were:

$8,330,000 - The Knopfs' claims with contractual and statutory interest.
   40,000 -   New York Real Estate taxes owed on 10 Bedford Street
  100,000 - legal fee owed to Jeremy Havens
   38,940 - legal fee owed to Cohen, Tauber
   50,000 - owed to Meister Seelig & Fein

$8,558,940  Total Liabilities

37.   Pursuit's sole assets immediately prior to paying Dechert the $500,000 fee were the three condominium units at 10 Bedford Street, and the $926,227 it had remaining on hand following the sale of PHC.

38.   According to a historical appraisal prepared by Michael Pavlakos, Certified Appraiser, the value of the 10 Bedford Street as of January 6, 2015 can be estimated at between $2.7 million and $3 million.  Since various market studies confirm that the townhouse market held steady or declined slightly between early 2015 and early 2016, Pursuit's assets as February 2016, were no more than:

$926,227 cash on hand
$3,000,000 value of 10 Bedford Street
Total Assets $3,926,227

152. Thus, Pursuit's liabilities exceeded its assets by approximately $4.6 million when it paid the fees to Dorsey, Akerman and Feldman on or about February 1, 2016.

153. Pursuit was a defendant in an action for money damages and incapable of paying any future judgment against it, and thus the sale of PHC to Phillips at less than fair market value will result in a fraudulent conveyance within the meaning of Debtor and Creditor Law §273-A when Pursuit fails to satisfy the money judgment the Knopfs will eventually obtain.

154. Following the sale of PHC to Phillips, Pursuit possessed unreasonably small capital for its operations and, accordingly, the sale was a fraudulent conveyance within the meaning of Debtor and Creditor Law §274.

155. The sale of PHC to Phillips was made at a time when Pursuit knew it was likely to incur debts beyond its ability to pay them as they matured, and was therefore a fraudulent conveyance within the meaning of Debtor and Creditor Law §275.

156. Dorsey, Akerman and Feldman did not provide fair consideration for the fees they received since they did not receive those fees in good faith, as required under Debtor & Creditor Law §272(b). Dorsey, Akerman and Feldman cannot establish the requisite good faith since they received these fees in connection with a conspiracy to violate the Knopfs' due process right to notice and an opportunity to be heard, as alleged herein, and as a result of their own violations of Judiciary Law §487, as also alleged herein.

WHEREFORE, the Knopfs demand judgment as follows:

(1) On the First Claim, compensatory damages to be determined at trial but in any event

no less than $2 million.

(2) On the Second Claim, compensatory damages to be determined at trial but in any event no less than $2 million, trebled to no less than $6 million in accordance with Judiciary Law §487.

(3) On the Third Claim, compensatory damages to be determined at trial but in any event no less than $2 million, together with punitive damages to be determined at trial but in any event no less than $4 million.

(4) On the Fourth Claim, a judgment pursuant to Debtor and Creditor Law 278(1)(a) requiring Dorsey, Akerman and Feldman to disgorge any fees they received out of the proceeds of the sale of the 67th Street Property.

- and -

(4) Costs, interest and attorneys fees as permitted under law.

Dated:  New York, New York           Berry Law PLLC
       August 2, 2017                    /s/ Eric W. Berry
                                       By: _____
                                           Eric W. Berry
                                 745 Fifth Avenue, 5th Floor
                                 New York, New York  10151
                                 (212) 355-0777

                                 Paykin Krieg & Adams, LLP
                                    /s/ Joseph N.  Paykin
                                 By: _____
                                         Joseph N. Paykin
                                 2500 Westchester Avenue, 1st Floor
                                 Purchase, New York 10577
                                 (212) 725-4428

                               *Attorneys for Plaintiffs  Norma Knopf*
                                    *and Michael Knopf*