# EXHIBIT C

**NEW YORK STATE**
Unified Court System

OFFICE OF COURT ADMINISTRATION

LAWRENCE K. MARKS
CHIEF ADMINISTRATIVE JUDGE

SHERRILL SPATZ
INSPECTOR GENERAL

CAROL HAMM
DEPUTY INSPECTOR GENERAL

# CONFIDENTIAL REPORT – DO NOT DISTRIBUTE

To:  Sherrill Spatz
     Inspector General

From:  Carol M. Hamm  *CH*
       Deputy Inspector General

Date:  March 16, 2018

Re:  Melissa Ringel
     Assistant Deputy Chief Appellate Court Attorney
     Appellate Division, First Department
     I.G. Case No.:17-130

## I.   Origin and Nature of Complaint

On July 25, 2017, Presiding Justice Rolando T. Acosta of the Appellate Division, First Judicial Department requested the Inspector General's Office conduct an investigation into the allegations that Melissa Ringel, a Court Attorney and Director of the Pre-argument Conference Program a/k/a Special Master's Program for the Appellate Division, had inappropriate contact with litigants in a matter pending before the Appellate Division.[1] Specifically, it was alleged in a complaint filed, on July 10, 2017, in the United States District Court, Southern District of New York (hereinafter "Southern District"), *Norma and Michael Knopf v. Frank Esposito, Dorsey & Whitney, LLP, Nathaniel H. Akerman, Edward S. Feldman and Michael Hayden Sanford,*[2] that on January 12, 2016, Ms. Ringel purportedly had an *ex-parte* telephone conversation, in her capacity as a court employee, in which she provided an interpretation of an Appellate Division Order. Further, it was alleged that Ms. Ringel's husband, Frank Esposito, a private attorney, was representing one of the parties in another matter.

---

[1] Knopf v. Sanford, Appellate Division, First Judicial Department, Index No. 113227/09.
[2] Knopf v. Esposito, et. al., 17cv04084 (DLC).

26 BROADWAY, 10TH FLOOR, NEW YORK, NEW YORK 10004  •  PHONE: 646-386-3500  •  FAX: 212-514-7158
CHAMM@NYCOURTS.GOV • MAILING ADDRESS: 25 BEAVER STREET, NEW YORK, NEW YORK 10004

Subsequently, on November 15, 2017, Eric Berry, the attorney representing the plaintiffs, Norma and Michael Knopf (hereinafter "Knopfs"), contacted our Office to file a complaint alleging misconduct by Melissa Ringel, in the *Knopf v. Sanford* matter, which had been pending in the Appellate Division, First Department. In his written complaint, dated November 17, 2017, Mr. Berry alleged that Ms. Ringel, in her capacity as a First Department Court Attorney, gave an *ex-parte* "advisory interpretation" of an Appellate Division order, in exchange for Mr. Sanford agreeing to pay Ms. Ringel's husband, Frank Esposito, an attorney's fee of $55,000. According to Mr. Berry, Mr. Sanford used Ms. Ringel's interpretation "to avoid the effect of two previous [Appellate Division] orders, which required the proceeds of any sale of property [by Mr. Sanford] to be paid in escrow to protect the Knopfs' rights to such proceeds." Additionally, Mr. Berry alleged that Ms. Ringel "recruited former First Department Justice James McGuire to appear as [Mr.] Sanford's new counsel, and [Mr.] McGuire's firm, Dechert, LLP (hereinafter "Dechert"), received a $500,000 retainer out of the proceeds of the property sale that Ms. Ringel's advisory interpretation facilitated."

As a part of his complaint, Mr. Berry provided copies of sworn depositions that had been conducted during the time period of June 2017 through September 2017, for the matter pending in the Southern District.[3] The depositions of the following individuals were provided: Michael H. Sanford, Melissa Ringel, Frank Esposito, Michael Phillips, James McGuire, Nathanial Akerman, Edward Feldman and Lori Braverman.[4]

## II.    Background and Investigation

To fully understand the allegations, it is necessary to summarize the underlying complaint. The following facts were obtained from the complaints filed in the Southern District along with other documents provided to our Office by Mr. Berry.[5]

In the late 1990's, the plaintiffs, Norma and Michael Knopf, met Michael Sanford, a stockbroker who was planning on establishing a hedge fund. The Knopfs invested approximately $11.6 million in Mr. Sanford's hedge fund and subsequently made five loans to his other businesses. The dispute between them arose out of two of those loans, which were each made in 2006, to Mr. Sanford's holding company, Pursuit Holding, LLC. (hereinafter "Pursuit") The first loan was for $1,690,860 and was used to purchase a

---

[3] Knopf v. Phillips, et. al., 16cv6601 (DLC), 2016 WL 7192102 (S.D.N.Y. Dec. 12, 2016).

[4] Upon request, copies of the complete depositions are available for review.

[5] Knopf v. Esposito, et. al., 17cv5833 (DLC), 2017 (S.D.N.Y., Dec. 7, 2017); Knopf v. Meister, Seelig & Fein, LLP., 15cv5090 (DLC), 2017 WL 1449511 (S.D.N.Y. April 21, 2017); Knopf v. Phillips, 16cv6601(DLC), 2016 WL 7192102 (S.D.N.Y. Dec. 12, 2016); Knopf v. Meister, Seelig & Fein, LLP., 15cv5090 (DLC), 2016 WL 1166368 (S.D.N.Y. March 22, 2016); Knopf v. Meister, Seelig & Fein, LLP., 15cv5090 (DLC), 2015 WL6116926 (S.D.N.Y. Oct. 16, 2015).

penthouse apartment located at 44 E. 67th Street (hereinafter "67th Street Property") in New York County. The second loan was for $3,250,000 and was used to purchase three condominiums located in New York County. Both loans were made pursuant to written contracts executed by the Knopfs and Pursuit, which provided that in consideration of the loans, Pursuit and Mr. Sanford promised to execute mortgage liens on the properties in favor of the Knopfs, and that, until the mortgage documents were executed, Pursuit would not "sell, hypothecate, or otherwise encumber the properties" without the permission of the Knopfs. However, Pursuit and Mr. Sanford did not repay any portion of either loan and did not execute a mortgage on either property in favor of the Knopfs.

In 2009, the Knopfs commenced an action against Pursuit and Mr. Sanford in New York County Supreme Court, *Knopf, et. al. v. Sanford, et. al.*, Index No. 113227/2009. In that action, the Knopfs brought claims for breach of contract and sought the imposition of a constructive trust on the properties.[6] On September 18, 2009, in connection with that action, the Knopfs filed notices of pendency against the properties (hereinafter "Initial Notices"). On October 15, 2013, the Appellate Division, First Department extended the Initial Notices for a period of three years, to end on September 17, 2015.[7]

Sometime in 2013 or 2014, Pursuit and Mr. Sanford publicly listed the 67th Street Property for $2.7 million. Shortly thereafter, Michael Phillips, a real estate developer, offered $2.9 million for the property, which subsequently was accepted by Pursuit. At the time of his offer, Mr. Phillips was apparently aware that the Initial Notices were still in place.

Prior to closing the sale of the 67th Street Property, Pursuit made an application to New York County Supreme Court Judge Milton Tingling to cancel the Initial Notices. On December 23, 2014, Judge Tingling cancelled the Initial Notices. Thereafter, the Knopfs took several actions aimed at preventing the sale of the 67th Street Property to Mr. Phillips.[8]

On October 22, 2015, the Knopfs made an emergency application to the Appellate Division requesting an interim stay against the sale of the 67th Street Property. Justice John W. Sweeney Jr., heard the application and issued an Interim Order (hereinafter "October 2015 Order") permitting the sale of the 67th Street Property but requiring the proceeds to

---

[6] On December 11, 2014, the Appellate Division granted summary judgment in favor of the Knopfs on their breach of contract claims.

[7] Knopf v. Sanford, 972 N.Y.S.2d 893, 894 (1st Dep't 2013).

[8] The Knopfs appealed the cancellation of the Initial Notices and the Appellate Division initially issued a preliminary injunction and affirmed the cancellation of the Initial Notices. In July 2015, the Knopfs sought reconsideration of the Appellate Division's prior affirmance of the cancellation of the Initial Notices. On October 6, 2015, the Appellate Division granted the motion of reconsideration and again affirmed the cancellation of the Initial Notices.

be placed in an escrow account pending further order of the Appellate Division. (See Attachment "A") On November 12, 2015, the Appellate Division denied, without opinion, another request by the Knopfs to stay the sale of the 67th Street Property (hereinafter "November 2015 Order"). (See Attachment "B") On November 20, 2015, Mr. Sanford and Pursuit cross-moved to vacate the October 2015 Order. On December 29, 2015 (hereinafter "December 2015 Order"), the Appellate Division denied the Knopfs' request to reargue their stay request, and denied Mr. Sanford and Pursuit's request to vacate the October 2015 Order. (See Attachment "C")

During this period, on January 11, 2016, MH Sanford & Co., LLC (hereinafter MH Sanford & Co."), an entity apparently owned and controlled by Mr. Sanford retained attorney Frank Esposito. Mr. Esposito is the husband to Melissa Ringel.[9] Mr. Sanford gave Mr. Esposito a copy of the December 2015 Order, which Mr. Esposito shared with his wife. After reviewing the December 2015 Order, Ms. Ringel informed her husband that the October 2015 Order, which had required the sale proceeds from the 67th Street Property to be escrowed "pending further court order" was no longer in effect.[10] Additionally, Mr. Sanford asked Mr. Esposito if he could recommend an attorney to represent him in a matter in New York County Supreme Court (hereinafter "Supreme Court"). Shortly thereafter, on January 14, 2016, Melissa Ringel sent an email to attorney, James McGuire, asking whether he would be interested in serving as Mr. Sanford's counsel in the Supreme Court matter. (See Attachment "E") At that time, Mr. McGuire was a partner at Dechert. Furthermore, Ms. Ringel had previously been Mr. McGuire's law clerk when he served as an Associate Justice at the Appellate Division-First Department from 2009 through 2012.[11]

Around the same time, Mr. Sanford was in discussion with two other attorneys, Nick Akerman of Dorsey & Whitney LLP, and Edward Feldman, about the issues surrounding the sale of the 67th Street Property. Subsequently, on January 12, 2016, Messrs. Akerman and Feldman contacted the Appellate Division *via* telephone to obtain a clarification of the December 2015 Order because that Order was preventing Mr. Phillips from getting clear title of the 67th Street Property. When they called the Appellate Division, they requested to speak to a "clerk" for the Court and were transferred to Melissa Ringel. During their

---

[9] Under the retainer agreement, Mr. Esposito agreed to act as general counsel for MH Sanford & Co. and focus on its "corporate vision, business plans and strategic initiatives" as well as to manage outside counsel "in relation to any current and prospective litigations." In return for his services, Mr. Esposito charged MH Sanford & Co. "a project based, non-refundable fee of $55,000 for the six-month term of [the] agreement." Further, Mr. Esposito agreed to wait to be paid until Mr. Sanford could "liquidate" assets. (See Attachment "D")

[10] Ms. Ringel's position at that time was as the Director of the Pre-argument Conference Program at the Appellate Division.

[11] Mr. McGuire resigned as an Associate Justice for the Appellate Division, First Judicial Department on June 28, 2011. Subsequently, he become a law partner at Dechert.

telephone conversation with Ms. Ringel, Messrs. Akerman and Feldman identified themselves as Mr. Sanford's attorneys. According to Messrs. Akerman and Feldman, Ms. Ringel told them that the November 2015 Order "had terminated the effect" of the October 2015 Order.

Immediately following that call, Mr. Feldman wrote a memorandum describing the conversation. In the memorandum, Mr. Feldman stated that Ms. Ringel advised them the October 2015 Order was "only in effect until motion decided." Therefore, once the full panel decided the motion in its November 2015 Order, which denied the restraints, "all restraints were vacated." (See Attachment "F") Subsequently, Mr. Feldman forwarded the memorandum to Mr. Phillips' attorney. On February 1, 2016, the 67th Street Property was sold to Mr. Phillips for $3 million. None of the proceeds of the sale were placed in escrow.

Following the sale, on February 4, 2016, Mr. McGuire's law firm, Dechert, accepted $500,000 out of the proceeds of the 67th Street Property sale as an initial retainer to represent Mr. Sanford and Pursuit in the Supreme Court matter.[12]

On February 25, 2016, after learning of the sale of the 67th Street Property and the failure to escrow the proceeds, the Knopfs moved to disgorge the $500,000 retainer given to Dechert from the proceeds of the sale of the 67th Street Property and asked that it be placed into an escrow account. Additionally, they requested that contempt sanctions be brought against Mr. McGuire and Dechert. On the same day, the Knopfs also obtained an interim order from an Appellate Division Justice requiring any proceeds remaining from the sale to be placed in escrow.[13]

On March 24, 2016, the Appellate Division issued a preliminary injunction against any further dissipation of the real estate assets that Pursuit had acquired with loans from the Knopfs.[14] Pursuit and Mr. Sandford have since paid $436,227.32 of the sale proceeds into an escrow account. Pursuit, Mr. Sanford and Dechert opposed the Knopfs' motion for disgorgement and contempt, arguing that Messrs. Akerman and Feldman had provided Mr. Sanford with legal memoranda on January 12, 2016 opining that the October 2015 Order

---

[12] On February 8, 2016, Judicial Hearing Officer Ira Gammerman in New York County Supreme issued a report finding that the Knopfs were entitled to damages against Mr. Sanford in the amount of $10,937,850, and held that Pursuit was jointly liable for $8,336,488 of that amount.

[13] The February Order stated the following: "Money remaining as of today at 3:45 pm from sale of 1-bedroom apartment shall be placed in escrow as had been directed by Justice Sweeny in his 10/22/15 interim order, vacatur of which was denied by this Court's 12/29/2015 Order (M-5459, M-5942) pending hearing and determination of this motion by full panel. Expedite motion & decision. Pending hearing by full panel, remaining money shall be escrowed with JP Morgan Chase or similar commercial bank in New York City by 2/19 – close of business."

[14] Knopf v. Sanford, 26 N.Y.S. 3d 866 (1st Dept. 2016)

was no longer in effect. In affirmations prepared in opposition to the motion, Messrs. Akerman and Feldman each explained that an unidentified court attorney employed by the Appellate Division advised them in a conference call on January 12, 2016, that the October 2015 Order was no longer in effect.

On June 16, 2016, the Appellate Division denied the Knopfs' motion for contempt and for disgorgement of Dechert's $500,000 retainer. (See Attachment "G") Within hours, the Appellate Division issued a revised order that included an explanation of the denial. (See Attachment "H")[15]

Subsequently, on June 21, 2017, the Knopfs learned that the court attorney mentioned in Mr. Feldman's memorandum was Melissa Ringel. Then, on June 26, 2017, during the deposition of former Appellate Division Justice James McGuire it was revealed the role Ms. Ringel's husband, Mr. Esposito, played in the matter.[16] The Knopfs filed an action in the Southern District that Mr. Sanford conspired with three attorneys; Messrs. Esposito, Akerman and Feldman to obtain an "*ex-parte* advisory opinion" from Ms. Ringel, an attorney employed at the Appellate Division, First Department.[17] On December 7, 2017, Justice Denise L. Cote issued an Opinion and Order in that matter. (See Attachment "I")

## A. Interview

### 1. Susanna Rojas, Clerk of Court for Appellate Division – First Department

On August 18, 2017, Appellate Division, First Judicial Department, Clerk of the Court, Susanna Rojas was interviewed at her office.

Ms. Rojas explained that Melissa Ringel is the court attorney in charge of the Pre-Argument Conference a/k/a Special Master's programs at the Appellate Division. In that role, Ms. Ringel is responsible for conducting and scheduling settlement conferences. The special masters, who are usually retired judges, work for UCS on a voluntarily basis and are appointed by the court. The Special Master's Program is overseen by former Appellate Justice, Leo Milonas, who is also a resource for Ms. Ringel regarding any issues that need clarification.

---

[15] The revised June 2016 Order provided in relevant part: "Plaintiffs-appellants seek an order of contempt against defendants and their counsel for allegedly violating a temporary restraining order issued by a single justice of this Court on October 22, 2015 (TRO);. . . The motion for contempt is denied because the TRO was vacated once plaintiffs' prior motion for a preliminary injunction was denied (People v. Asiatic Petroleum, 45 AD2d 835, 836 (1ˢᵗ Dept. 1974)." When Mr. Berry met with our Office regarding his complaint, he alleged that changes to the original Court Order were suspicious and asked that our Office investigate the reason for the amended Order.

[16] Mr. McGuire's deposition on June 26, 2017, pages 24, 65 and 66.

[17] Knopf v. Esposito, et. al., 17cv5833 (DLC), 2017 (S.D.N.Y., Dec. 7, 2017).

Ms. Rojas said she first became aware of the allegations concerning Ms. Ringel's involvement in the *Knopf v. Sanford* matter, when Mr. Berry, the attorney for the Knopfs, filed a motion to hold James McGuire, an attorney representing Mr. Sanford, in contempt for violation of the October 2015 Order. In his responding motion papers, Mr. McGuire alleged that the attorneys for Mr. Sanford had contacted the Appellate Division *via* telephone and spoke with a court attorney, not identified by name, who informed them the October 22, 2015, Interim Order was no longer in effect. Mr. McGuire further stated in his motion papers that this information had been provided to him in a memorandum prepared by one of the attorneys, who was a party to the telephone call. However, Ms. Rojas said Mr. McGuire, arguing attorney work product, did not attach a copy of the memorandum in his motion papers. Thereafter, the court, with notice to all parties, requested the memorandum be submitted for an in-camera review.

Ms. Rojas said when she initially read Mr. McGuire's motion about the conversation Mr. Sanford's attorneys had with an Appellate Division court attorney, she assumed the attorneys had spoken with Lauren Holmes, Assistant Deputy Chief Appellate Court Attorney since only court personnel in the Clerk's Office would speak with attorneys on this type of matter. According to Ms. Rojas, to avoid litigants speaking directly with the justices or their staff, only Ms. Holmes, Ms. Rojas or Eric B. Schumacher, the Deputy Clerk, would usually speak with any attorneys who contacted the Appellate Division for clarification on pending matters.

Shortly thereafter, sometime in April or May 2016, Ms. Rojas said the memorandum of the telephone conversation was sent to the court. Prior to the in-camera review by the judge, Ms. Rojas said she read the memorandum, and noted that Melissa Ringel was mentioned as the attorney from the Appellate Division who spoke with the attorneys on the *Knopf* matter. Meanwhile, Eric Berry, the attorney for the plaintiffs Knopfs, opposed the in-camera review by the court, but requested, in the alternative, should the court review the memorandum, a copy be provided to him. Ms. Rojas said after receiving Mr. Berry's letter in opposition of an in-camera review, the judge decided not to review the memorandum and the motion was sent back.

After reading the memorandum, Ms. Rojas said she had a meeting with Ms. Ringel, whereby she asked her why she spoke with the attorneys in this matter since this type of case would have never been handled by the Pre-argument Conference Program. According to Ms. Rojas, Ms. Ringel told her when the attorneys contacted her they only asked her a simple procedural question about whether an interim order was still in effect if the motion was decided. Ms. Ringel said she advised the attorneys that once the court decides a motion, any interim orders would no longer be in effect. She told Ms. Rojas she did not have the copies of the motions the attorneys were referring to, and had only answered a "quick question."

Then, Ms. Rojas asked Ms. Ringel why the attorneys would have contacted her directly and why she did not immediately transfer the call to the Clerk's Office. Ms. Ringel explained to Ms. Rojas that one of the parties in the matter had contacted her husband, Frank Esposito, who is an attorney, and asked him to handle the case. Her husband declined to handle the matter, but recommended three attorneys, one of whom was James McGuire. Ms. Rojas told Ms. Ringel the appearance was "not good" because she was Mr. McGuire's former law clerk when he was an Associate Justice in the Appellate Division, and by Ms. Ringel speaking to these attorneys it created an appearance of inappropriate contact. She told Ms. Ringel she should not be answering questions or providing legal advice to litigants. Further, she told Ms. Ringel, if she did not know where to transfer such a call, she should call Ms. Rojas. Although Ms. Rojas said it was classified as legal advice, she described the advice given by Ms. Ringel as more of a "hybrid" of both legal advice and procedural information.

When asked, Ms. Rojas said Ms. Ringel never mentioned that her husband had been retained by one of the parties in the matter. According to Ms. Rojas, she later learned that Ms. Ringel's husband was representing one of the parties when she read the federal court complaint.

In May or June 2017, Ms. Ringel asked to meet with Ms. Rojas to discuss an email Ms. Ringel received from Mr. Berry with an attached subpoena, requesting Ms. Ringel's appearance for a deposition in a matter pending in federal court. After reviewing the subpoena, Ms. Rojas told Ms. Ringel the subpoena was regarding action Ms. Ringel had taken in her individual capacity, and not as a court employee. Ms. Rojas contacted Counsel's Office and spoke with Lee Adlerstein about the subpoena. When Mr. Adlerstein asked Ms. Rojas if Ms. Ringel was acting in her capacity as an employee, Ms. Rojas told him no. Ms. Rojas said it was her understanding that Ms. Ringel was told to pick up the subpoena and Mr. Adlerstein informed Mr. Berry and Ms. Ringel that Counsel's Office would not be representing her. Shortly thereafter, Ms. Rojas said she discussed the matter with Presiding Justice Tom, who referred the matter to this Office.

## B. Telephone Records for January 12, 2016 for Appellate Division

A review of the telephone records for Melissa Ringel's office number[18] revealed that on January 12, 2016, three telephone calls from the telephone number of the law firm of Dorsey & Whitney[19] were made to Ms. Ringel's office telephone number. (See Attachment "K") The first incoming telephone call occurred at 10:13 a.m., and lasted 8 seconds. The second telephone call occurred at 10:44 a.m., and was 3 minutes and 56 seconds in duration. The final telephone call occurred at 2:11 p.m., and lasted for 24 seconds. According to our Division of Technology, Telecommunication Department, the

---

[18] Ms. Ringel's telephone number is 212-340-0539.
[19] Dorsey & Whitney's main telephone number is 212-415-9200.

incoming telephone calls from Dorsey & Whitney's telephone number were made directly to Ms. Ringel's telephone number and were not transferred from an internal number within the Appellate Division, First Department.  Further, a review of the telephone records for same date of the Appellate Division, First Department's main telephone and the Clerk's Office's number revealed no telephone calls were received from the law firm of Dorsey and Whitney.[20] (See Attachment "L")

## C.  Depositions

1.      Nathaniel (a/k/a "Nick") Akerman Deposition

On August 11, 2017, Nick Ackerman was deposed in the matter of *Knopf v. Phillips*. His attorney, Jonathan M. Herman, of Dorsey & Whitney, LLP., was present. Mr. Akerman is a partner in the law firm of Dorsey & Whitney. Additionally, Mr. Akerman stated that he had represented Mr. Sanford in the *Knopf v. Sanford* matter and another matter involving a dispute with Mr. Sanford's prior lawyers, Meister, Seelig and Fein, LLP. In his deposition, Mr. Akerman answered questions regarding his January 12, 2016 telephone call to the Appellate Division.

Mr. Akerman acknowledged that on January 11, 2016, Mr. Sanford asked him to check with the Appellate Division's Clerk's Office regarding previous court orders issued in the *Knopf v. Sanford* matter. The following day, January 12, 2016, Mr. Akerman said he spoke *via* telephone with Edward Feldman, an attorney representing Mr. Sanford in the sale of the 67th Street Property. Mr. Akerman said while they were talking on the telephone, he "patched in" the Clerk's Office for the Appellate Division. When asked the telephone number he called, Mr. Akerman said he called the "[G]eneral Clerk's number for the Appellate Division" which he "believed [he] got [the telephone number] on the website."

The following are excerpts from Mr. Akerman's deposition that pertain specifically to the January 12, 2016, telephone conversation with the Appellate Division:

Q      Do you recall who picked up?
A      Somebody picked up. I don't know who the person was.
Q      Do you recall what the person who picked up said?
A      No. I certainly would have confirmed it was the Clerk's Office.

---

[20] The Appellate Division, First Department's main telephone number is 212-340-0400.  The Clerk's Office main number is 212-340-0422.  Both telephone numbers are listed on the public website for the Appellate Division. Under the Pre-argument Conference Program, Ms. Ringel is listed as the Special Master.  The only telephone number provided on the public website for the Pre-argument Conference Program is Clerk Tracey Crump's telephone number: 212-340-0513.

Q       Did you say anything to the person who picked up the call?

A       Yes.

Q       What did you say?

A       I said, I have a couple of orders in front of me. I gave the index number, and the dates, and I said, I just needed to know what the status was of the temporary order, would you be able to tell me that.

Q       What did the person you were speaking to say?

A       That person then sent the call over to somebody else.

Q       Did somebody else pick up?

A.      Yes.

Q       What did the person who picked-up after the call was sent over say?

A       I went through it again. I had three orders in front of me. I went through those very methodically. This person, there was some time that passed. I was assuming that she was looking at the court record in the file, and then I asked questions.

Q       How much time passed?

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *

A       Some time passed between me talking through what I was interested in. It must have been – I don't know. A minute and a half or two, just that my statement about what I was interested in.

Q       So you made your statement about what you were interested in, and then some time passed? Is that correct?

A.      Well, time passed after that for sure.

Q       While this person on the other end was silent?

A       Yes, but I have a sense that the person was gathering the file, looking at the file itself, because it wouldn't make sense, because of the responses I was getting. She had in front of her what I had in front of me.

Q       Do you recall what you had in front of you?

A       I think one of the orders was this one that you have attached to Exhibit 79, and there was another order that denied the preliminary injunction motion, and then there was another order that denied another motion, but I have to see them in from on me to be able to tell you exactly.

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *

Q       Exhibit 3 is an October 22, 2015 Interim Order, Exhibit 55 is a November 12, 2015 Order by a full panel, and Exhibit 11 is the December 29, 2015 Order. Were those three documents that you have in front of you when you had the telephone conversation?

A       Yes.

10

Q       Did the person who picked up state what his or her position was?

A       Not when she picked it up. It was only at the end of the call.

Q       At the end of what did she say her position was?

A       She was in the Clerk's Office and she was an attorney.

Q       She didn't say if she was in the Court's mediation part or pre-argument part?

A       No.

Q       Can you tell me, to the best of your ability to recall what you said to her after she picked up?

A       After she picked up, I recited the – this is the second time I recited – the index numbers and the dates of the orders.

Q       Go ahead. Did she identify herself by name?

A       No, not at this point. I believe it was at the end of that either Mr. Feldman or I asked for her name.

Q       Can you remember, to the best of your recollection, what you said, describing the case to her, describing the orders to her.

A       There is no case that was described. It was simply the orders, and my question was simply between Exhibit 3 [October 22, 2015 Order] and Exhibit 55 [November 12, 2015 Order] what was the impact of Exhibit 55 on Exhibit 3, and what was the status of the preliminary relief that was in Exhibit 3, and she stated that Exhibit 55, that the status was that Exhibit 3 is no longer in effect.

Then I asked her, with respect to Exhibit 11 [December 29, 2015 Order], where the cross motion for vacatur of the Interim Order dated October 22, 2015 is denied, the question is – let me try to think – what impact that had on the interim relief, and she said none, because it was moot, that the Exhibit 55 basically superseded and the further order of the Court, that basically nullified what was the Exhibit 3.

* * * * * * * * * * * * * * * *

Q       Do you now understand that the Court Attorney you were speaking to is named Melissa Ringel?

A       I understood that at the end of the conversation, where either I or Mr. Feldman asked for her name.

* * * * * * * * * * * * * * * *

Q       Did she ask you who you represented?

A       She didn't have to. I told her that I represented Michael Sanford.

Q       Did she tell you at the time that her husband was an attorney for Mr. Sanford?

A       No.

11

2.  Edward S. Feldman Deposition

On June 29, 2017, Edward S. Feldman was deposed in the matter of *Knopf v. Phillips.* Mr. Feldman has his own law firm, Feldman & Associates, PLLC. In his deposition, Mr. Feldman answered questions regarding his January 12, 2016 telephone call to the Appellate Division. Mr. Feldman said he was engaged sometime in 2012 or 2013 by Mr. Sanford to represent him on the sale of his 67th Street Property.

In his deposition, Mr. Feldman said he met Mr. Akerman through Mr. Sanford.  It was his understanding, from Mr. Sanford, that Mr. Akerman was handling the issue of the restraints on the 67th Street Property, which had been raised by the title company. He said he had two or three telephone conversations with Mr. Akerman in January 2016, when they were getting ready to close on the 67th Street Property. During their first telephone conversation, Mr. Akerman told Mr. Feldman, it was his understanding that the restraints had been lifted because there had been a decision denying the motions. In a second telephone conversation, Mr. Akerman told Mr. Feldman he had been advised by the Appellate Division that the restraints were dissolved as a matter of law.

The following are excerpts from Mr. Feldman's deposition that pertain specifically to the January 12, 2016 telephone conversation with the Appellate Division:

Q      What is the next conversation you remember?
A      We then had a – he called me, and I did a file memo, which I gave to Judicial title, either Judicial or – the title company. I did a file memo, and I gave a copy of it where he called me and said he was advised by the Appellate Division that the restraints were dissolved as a matter of law, and I said, fine, and then when he knew I was on the phone, he called the Appellate Division, and we excuse me. And he asked for the clerk, and we got transferred once or twice, and we talked to this nice lady. We said she was the Court Attorney, whatever, and she confirmed, yes, that the denial of the motion resulted in the dissolution of all restraints, and we can close. Thank you. I wrote file memo to that effect, sent it to the title company, and I believe we closed shortly thereafter.
Q      Did it seem like she had any prior knowledge of the case or did Mr. Akerman have to describe it to her?
A      No. She knew – my impression was, she was – and again, it's a year and a half ago. She was either the law clerk, Court Attorney of the Judge, who had either decided the motion or whatever, and she knew exactly what it was. Gave her the index number. She knew exactly what it was, and yes, those restraints are gone.
Q      Do you remember the name of the Judge?
A      No.

Q      Who was doing the talking? You were speaking to the people who answered the phone at the Appellate Division. Was it you or Mr. Akerman? Did you get routed to the right person?

A      Mr. Akerman.

Q      Was he asking for a particular name or position or what?

A      No. He asked for the clerk – I believe he asked for the clerk for either the index number or the Judge that was – had the decision. I didn't have it in front of me, but he didn't ask for a particular person. Just asked for the position.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Q      How did you know this person is a court attorney?

A      Only because that's who was referred to, and she identified herself as such.

Q      Did she identify herself as working for a particular judge?

A      I only recall [sic].

Q      Did she mention she was in the mediation part?

A      No.

Q      Did she say that she was the head of mediation of the First Department?

A      No. I don't remember the word mediation at all.

Q      Did she say she was Special Master at the First Department?

A      No, not that I recall. Absolutely not.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Q      Do you recall whether Mr. Akerman described the lawsuit to this individual or whether she already knew about it?

A      She was familiar with the order and the action. He didn't describe anything to her.  The question was, we have got this Order, the title company needs to know does this dissolve.

Q      But she knew about this case?

A      Oh, yeah, when she pulled it up. I'm assuming she has more than one case on her plate.

Q      She pulled it up?

A      Well, he gave her the index number and she referred to the Order.

Q      Was there any discussion about how many different motions were pending at the time?

A      No, no.

Q      Was there any discussion about which motion sequence the Order you were asking about was part of?

A      I don't recall.

Q      Was there any discussion about whether one Order had superceded or overwritten another?

A      I recall the conversation. It was very short, very succinct. The question was, are there any restraints – based upon the Orders, are there any restraints on the sale of the property. She indicated that the restrains that had been issued previously as matter of law were dissolved. I do recall – I specifically asked her, is there anything that prevents us from transferring the property.  She said no. We closed.

Q      You said orders. You're asking her about more than one word[sic]?

A      Yeah, because as I understand the situation, there was a previous Order which had restraints, and there was another motion, and the Order that I saw referred to – and I don't recall the dates of them, obviously – referred to something that said, motion denied, but it didn't specifically say restraints granted an Order dated so and so hereby dissolved. That was the question I had.

Q      You were asking her about how many different orders?

A      I was asking her whether there was any restraints. I didn't go into the whole lawsuit or Appellate Division, because from what I had gathered, it was very convoluted and complicated in multiple motions. I had a very simple question, can I close?

Q      Do you recall the name of the Court Attorney you were speaking with?

A      I have to refer to my file.

Q      Was it Melissa Ringel?

A      That sounds familiar. I think it was Melissa.

During the deposition, when asked by Mr. Berry, Mr. Feldman acknowledged forwarding the memorandum he prepared, which summarized the January 12, 2016, conversation between himself, Ms. Ringel and Mr. Akerman to the title company.

**D.      Interview of Melissa Ringel**

On January 17, 2018, Melissa Ringel was interviewed at the Inspector General's Office. Her attorney, Michael Ross, was present for the interview. Ms. Ringel said that she has been with Appellate Division, First Department for approximately 15 years. During that time, she has held several different positions. Since December 2015, she has been the Special Master and Director of Pre-argument Mediation Program. Prior to her present position, she had been a legal editor from 2012 through 2015. From 2009 to 2012, she was the Law Clerk for Associate Justice James McGuire. Lastly, from December 2002 to 2009, she was a court attorney assigned a certain number of appeals every two weeks, usually two or three.

As the Special Master, she supervises one clerk and 30 volunteer Special Masters as well as handling her own cases. Her direct supervisor is Clerk of Court Susanna Rojas. The program only handles certain cases, which are sent to them from the Clerk's Office.

Ms. Ringel said she is married to Frank M. Esposito, an attorney, who is a solo practitioner specializing in corporate law and acting as general counsel to a few corporations. While her husband has an office in New York County, she said he mostly works from his home office in Oyster Bay.

Ms. Ringel acknowledged that at one time Michael Sanford was a client of her husband's, however, she said he was no longer one of her husband's clients. She recalled that her husband was retained by Mr. Sanford in December 2015 or in January 2016, as an attorney for a corporation called M.H. Sanford, Inc. According to Ms. Ringel, Mr. Sanford had contacted her husband seeking some legal representation, however, her husband was not a litigator. They discussed him assisting Mr. Sanford with getting his hedge fund back on track. Ms. Ringel said she did not know the specific terms of the retainer agreement between her husband and Mr. Sanford, however, later she learned the retainer fee was $50,000. She said her husband received some of the money, however, it was less than the fully agreed upon retainer fee.[21]

According to Ms. Ringel, when her husband initially met with Mr. Sanford, he told Mr. Esposito that the First Department had gotten a decision in his case all wrong. Ms. Ringel said when her husband told her about Mr. Sanford's complaint regarding the court's decision, she thought it was "absurd" that Mr. Sanford thought the First Department had made an incorrect decision. A day or two later, Ms. Ringel said she asked her husband for copies of the court orders that Mr. Sanford claimed were wrongly decided, so she could review them.[22] Her husband then provided Ms. Ringel with copies of a couple of the orders on motions, which Mr. Sanford had previously given him. She said the dates of the orders were November 12, 2015 and December 29, 2015. She does not recall her husband showing her the October 2015 Order.

Ms. Ringel said her husband told her Mr. Sanford had been embroiled in litigation, which had negatively impacted his hedge fund. Further, based on conversations with her

---

[21] In his deposition, Mr. Esposito objected to answering any questions regarding the amount he was paid by Mr. Sanford for his legal services, asserting attorney-client privilege. However, in documents received from Mr. Berry, Mr. Esposito received an initial payment from Mr. Sanford of $5,000 on January 19, 2016. Then, following the sale of the 67th Street Property, Mr. Esposito received two checks from Mr. Sanford. The first check was for $10,000 and it was dated February 6, 2016. The second check was for $92,500, and it was dated February 8, 2016. Both checks were deposited in Esposito Partners, PLLC (Escrow Account) at Chase Bank.

[22] In Mr. Esposito's deposition taken on August 11, 2017, he denied disclosing to Mr. Sanford that his wife was an attorney at the Appellate Division.

husband, Ms. Ringel understood that the plaintiffs had loaned money to Mr. Sanford to make investments, and a disagreement had ensued about the length of time it has taken for Mr. Sandford to return the funds. She knew there was an issue regarding properties, but does not believe her husband had all the details about the matter. However, her husband told her the summary judgment had been granted to the plaintiffs and there were two or three motion orders, which were limited. The court denied Mr. Sanford's motion and denied the cross motion. Ms. Ringel said it was clear to her that Mr. Sanford was not aggrieved by any order that denied the cross motion. Ms. Ringel said she conveyed her understanding of the orders to her husband, however, she does not know if he shared that information with Mr. Sandford.[23]

Ms. Ringel said she never worked on Mr. Sanford's case nor had she reviewed the Appellate Division court file. She said as soon as she read the court orders, which she believed was around January 2016, she had a clear understanding about what had occurred and informed her husband, that Mr. Sanford was not aggrieved.

*January 12, 2016 Telephone call*

Ms. Ringel acknowledged she received a telephone call from Mr. Sanford's attorneys on January 12, 2016, but could not recall the specific time of day, and thought it may have been in the early afternoon. She said the call had been transferred to her telephone line from another extension in the Appellate Division.[24] Ms. Ringel explained she knows when a call is transferred internally because the number it is being transferred from is displayed on the screen on her telephone. However, she was unable to recall specifically the number at the Appellate Division it had been transferred from. She said the main number for the Appellate Division, which is posted on the court's website is 212-340-0400. This is the same telephone number listed for the Pre-argument Conference Program. Further, she said the internal phone directory for the court is not public. Ms. Ringel said she has had the same telephone number, 212-340-0539, for the past 15 years. She said that number is not listed on the public website for the court.

Ms. Ringel said the two people on the telephone identified themselves as Michael Sanford's real estate attorneys. She said one of the callers was Nick Akerman from the law firm of Dorsey & Whitney and the other caller was Edward Feldman. She does not know

---

[23] In Mr. Esposito's August 11, 2017, deposition, Mr. Berry asked Mr. Esposito; "Did you ever speak with Mr. Sanford about your conversations with your wife about the First Department only rarely making errors?" To which, Mr. Esposito replied; "No. I did not reiterate what my wife had told me to Mr. Sanford. I might have said to him, you know, it's exceedingly rare that the First Department makes errors, but I didn't attribute that to my wife."
[24] In her August 15, 2017 deposition, there was no testimony by Ms. Ringel that the telephone call had been transferred internally to her telephone line.

which one of the two attorneys spoke to her since she had never met or spoken to either attorney prior to that telephone conversation.

When asked whether they stated the reason for their call, Ms. Ringel said she recalled they had a question and she suggested they speak with someone from the Clerk's Office. However, Ms. Ringel said she had never received a telephone call of this nature and did not know who to forward the call to in the Clerk's Office. After Ms. Ringel hesitated in answering the question, one of the attorneys "pressed" her on whom they should speak to about their question. Ms. Ringel said they were asking about a specific court order and she knew what they were asking because she had previously seen the order. She said she was trying to be "polite" to them, but "could not wait to get off" the telephone, because she was "uncomfortable" someone involved with the case she discussed with her husband had contacted her. She did not ask how they had her telephone number. However, she said the information she provided the attorneys was something all attorneys should know. They only wanted to know what the denial of the cross motion meant. She said she told them the interim order was no longer in effect once there was a summary judgement by the bench.

Ms. Ringel acknowledged, when asked by the attorneys, she provided her name. She said that generally when she answers her telephone she does not identify herself by name, but simply says "hello." She described the telephone conversation as very short, about two to three minutes in duration. She further said she did not look up the case on the Appellate Division database during their conversation nor did she have copies of the court orders they were referencing. The attorneys never asked her how she was familiar with the orders.

When shown the Appellate Division telephone records indicating there were three telephone calls made to her direct telephone number on January 12, 2016, from the main telephone number of the law firm of Dorsey & Whitney, Ms. Ringel denied receiving three calls and said she only had that one telephone conversation with Mr. Sanford's attorneys, which lasted approximately three minutes. Further, Ms. Ringel denied receiving any telephone messages from the attorneys. She said she did not have any pending matters with Dorsey & Whitney, so she was not sure why someone from that law firm would have called her telephone number. When asked how they would have had her direct number, Ms. Ringel said she was not sure because she had never heard of them and she never provided her direct line to them during their one telephone conversation. As for the earlier telephone call at 10:13 a.m., Ms. Ringel surmised the attorneys may have been listening to her recorded message since she does not recall being in her office at that time and thought she may have been in a conference. She also denied receiving the 2:11 p.m. telephone call.

Lastly, Ms. Ringel said her husband never told her he provided Mr. Sanford with her direct telephone number.

As for James McGuire's involvement in the matter, Ms. Ringel said her husband contacted her and asked if she could reach out to Mr. McGuire and ask if he would appear as Mr. Sanford's attorney on the matter before Judge Ira Gammerman in New York County Supreme Court. According to Ms. Ringel, this case was related to the Appellate Division, First Department matter. It was a hearing for damages for which Mr. Sanford did not have an attorney representing him. She said that Mr. Sanford had asked her husband if he knew anyone that could handle the matter or whether he could recommend an attorney friend. Ms. Ringel said her husband asked her if she knew any attorneys and she suggested Mr. McGuire. Thereafter, her husband told Mr. Sanford they would reach out to him to see if he was available. Ms. Ringel said she emailed Mr. McGuire from her work email account and informed him of the request and told him to contact her husband. However, Ms. Ringel said Mr. McGuire turned down the opportunity to represent Mr. Sanford at the hearing before Judge Gammerman, however, she said he did represent Mr. Sanford on another matter.

Ms. Ringel said she did not speak with anyone at the Appellate Division about the telephone call.[25] In June 2016, she had a meeting with Clerk of the Court Susanna Rojas, who told her that her name was mentioned in a memorandum submitted in a pending Appellate Division matter, indicating that Ms. Ringel had spoken to them regarding a question on a court order. Ms. Ringel said she told Ms. Rojas she did receive a telephone call, but did not know why the attorneys called her or how they even got her direct telephone number. Ms. Ringel told Ms. Rojas her recollection of their telephone conversation, that she informed the attorneys that "interim relief ends when the full bench decides the motion." According to Ms. Ringel, Ms. Rojas told her if in the future she should receive this type of telephone call she was to refer the matter to the Clerk's Office. She said she further informed Ms. Rojas about her husband's involvement as Mr. Sanford's attorney. Ms. Ringel said she does not recall if Judge McGuire's name came up during their conversation.

Thereafter, from 2016 to 2017, Ms. Ringel said she did not speak to anyone at the Appellate Division about the Sanford matter. Then, in July 2017, Eric Berry, the attorney for the Knopfs sent Ms. Ringel an email at her work address regarding a litigation hold. Ms. Ringel said she informed Ms. Rojas about it. At that time, Ms. Rojas told Ms. Ringel

---

[25] In his deposition, Mr. Esposito said his wife, Ms. Ringel, told him about the call later that evening. She told him she received an "odd call "at work from Mr. Sanford's attorneys regarding the order they had previously discussed. She told her husband she just stated a procedural fact to the attorneys, that interim relief ends when the full panel decides the motion.

she would have to report the matter to the Presiding Justice and would get back to her. Following their conversation, Ms. Ringel received a subpoena from Mr. Berry, which was served upon her and her husband at their residence in Oyster Bay. Ms. Ringel said she was also served at work. After being subpoenaed, Ms. Ringel spoke with Lee Adlerstein at Office of Court Administration's Counsel's Office. Given the nature of the subpoena, Counsel's Office informed Ms. Ringel they declined to represent her. Ms. Ringel retained attorney Michael Ross. On August 15, 2017, Ms. Ringel said she was deposed by Mr. Berry in the matter pending in the Southern District.

Following our interview, on February 1, 2018, Michael Ross sent a letter to our office and addressed some of the issues raised during Ms. Ringel's interview. Specifically, Mr. Ross stated Ms. Ringel was not aware there were two additional telephone calls to her office telephone number from the law firm of Dorsey & Whitney on January 12, 2016. In his letter, Mr. Ross noted that the initial call to Ms. Ringel's telephone number at 10:13 a.m. was 8 seconds, which he stated was the duration of her recorded voice mail message. Further, he claimed Ms. Ringel was unware of the third telephone call from the law firm of Dorsey & Whitney at 2:11 p.m. According to Mr. Ross, Ms. Ringel was not in her office at that time and was attending a mediation conference down the hallway in the conference room. (See Attachment "J")

### III.   Conclusion and Recommendation

Based on a review of the interviews and relevant evidence, the allegation that Ms. Ringel had an *ex-parte* conversation with attorneys in an Appellate Division pending matter was found substantiated. Clearly, once Ms. Ringel realized the attorneys were representing Mr. Sanford, she should have terminated the call or at the very least forwarded the call to the Clerk's Office. Given her vast work experience in the Appellate Division, Ms. Ringel's explanation for not knowing to whom she should forward the telephone call was not credible. Further, although Ms. Ringel felt "uncomfortable" speaking to the attorneys, she nonetheless, choose not to disclose her conversation to anyone within the Appellate Division and waited until it was discovered by her supervisor, Ms. Rojas. Moreover, when she spoke with Ms. Rojas, Ms. Ringel did not immediately disclose her husband's involvement in the matter or that he had been retained as an attorney for one of Mr. Sanford's business entities. While she may have told Ms. Rojas her husband had been contacted be one of the parties in the matter, Ms. Ringel failed to mention to Ms. Rojas that she had prior knowledge about the court orders the attorneys were inquiring about since her husband had shown her copies of the court orders he obtained from his client, Mr. Sanford. Indeed, when questioned by Ms. Rojas regarding the conversation with Mr. Sanford's attorneys, Ms. Ringel's attempted to minimize the information she provided and purposely omitted her intimate connection with the matter.

In addition, the telephone records for Ms. Ringel's direct telephone number at the Appellate Division belie the statements given by Ms. Ringel in the interview with our Office, and the deposition testimony of both Mr. Akerman and Mr. Feldman. Indeed, they all claimed the telephone call was transferred from an internal telephone line within the Appellate Division. However, the telephone records indicate that the three telephone calls from Dorsey & Whitney were made directly to Ms. Ringel's work number. When questioned about the two additional telephone calls, Ms. Ringel failed to adequately explain how it could have occurred. Moreover, if the calls had been made to another telephone number at the Appellate Division, as Ms. Ringel claims, there is absolutely no reason they would have been transferred to Ms. Ringel's direct number given her position at the Appellate Division.

Ms. Ringel's involvement in this matter is extremely troubling and at the very least created an appearance of impropriety and reflects poorly on the impartiality of the court. Further, Ms. Ringel compounded her involvement in the matter by recommending Mr. McGuire, a former Associate Justice of the Appellate Division, and her former supervisor, as an attorney for Mr. Sanford.

