**BERRY LAW PLLC**
745 FIFTH AVENUE, 5th Floor
NEW YORK, NEW YORK  10151
*Phone  (212) 355-0777*
*Fax  (212) 750-1371*



Eric W. Berry (NY)
*e-mail   BerryLawPllc@gmail.com*

January 19, 2021

Hon. Denise L. Cote, U.S.D.J.  (via ECF)
Sen. Daniel Patrick Moynihan Federal Courthouse
500 Pearl Street, Courtroom 15B
New York, New York  10007

### Amended Letter Motion to Seal Motion to Compel Ringel's Testimony

Your Honor:

The Knopfs request that the Court seal their motion to compel deposition testimony from Melissa Ringel and permit a redacted version of the motion to be filed publicly.  The Knopfs believe that the requested sealing order and redaction is necessary to "preserve the integrity of a government investigation and law enforcement interests. . . [.]"  *In re Applications to Unseal 98 CR 1101(ILG)*, 568 Fed.Appx. 68, 70 (2d Cir. 2014).  A redacted version of the order is attached as Exhibit A.

Respectfully submitted,

/s/ Eric W. Berry
Eric W. Berry

cc: all counsel and *pro se* parties by ECF; Lorraine Nadel, Esq., by email (w/ Exs.)
    Dan Horwitz, Esq. and Michael Ross, Esq., attorneys for Melissa Ringel, by email (w/ Exs.)

The motion to seal is granted.
1.19.2021

_____
DENISE COTE
United States District Judge

EXHIBIT A - Redacted Version of the Motion to Compel

**BERRY LAW PLLC**
745 FIFTH AVENUE, 5th Floor
NEW YORK, NEW YORK  10151
*Phone  (212) 355-0777*
*Fax  (212) 750-1371*

Eric W. Berry (NY)
*e-mail   BerryLawPllc@gmail.com*

January 19, 2021

Hon. Denise L. Cote, U.S.D.J.  (via ECF)
Sen. Daniel Patrick Moynihan Federal Courthouse
500 Pearl Street, Courtroom 15B
New York, New York  10007

**Amended Letter Motion to Compel Ringel's Deposition Testimony**

Your Honor:

The Knopfs request an order overruling Melissa Ringel's objections to deposition questions (*see* Ex. 1) based on a claim of Fifth Amendment privilege against self-incrimination. ███████████████

Ringel's prior deposition in *Knopf v. Phillips*, 16 Civ. 6601 (DLC) is a waiver of the privilege against self-incrimination. *Klein v. Harris*, 667 F.2d 274, 287 (2d Cir. 1981) provides that a "testimonial" waiver occurs "if (1) the witness's prior statements have created a significant likelihood that the finder of fact will be left with and prone to rely on a distorted view of the truth, and (2) the witness had reason to know that his prior statements would be interpreted as a waiver of the . . .  privilege against self-incrimination." *Klein* defines "testimonial" as "voluntarily made under oath in the context of the same judicial proceeding."  *Id.* at 288.

The "meet and confer" session centered on whether this case and *Phillips* are "the same judicial proceeding." They are. The allegations in this case stem from evidence obtained in *Phillips;* occasionally the Court has entered a single order in both cases; and at one point it ordered them to be tried together (ECF 224) before deferring the question of a consolidated trial to later (ECF 228). The Court has limited depositions of witnesses examined in *Phillips* (including Ringel) to two hours (ECF 224), seeming to view them as continuations of those taken in *Phillips*. In such circumstances, the Courts value substance over form and hold that the existence of a different case number or caption does not defeat a showing that the prior testimony was within the same proceeding.  *In re Mudd*, 95 B.R. 426 (Bankr., N.D. Tex. 1989) held that testimony at a §341 examination waived the privilege against self-incrimination in a subsequent adversary proceeding since:

> While it is true that the objection to discharge complaint is a separate adversary proceeding, . . . the subject matter of the adversary – the loss of some $9,000,000.00 from the Liquid Asset Fund – is so interwoven with the main Bankruptcy proceeding that  the two proceedings are part and parcel of each other. This fact is illustrated by the scope of the 2004 examination in question, in which the Trustee seeks information concerning the missing funds. . . [.]

*Id.* at 430-431. *Accord: In re Lederman*, 140 B.R. 49, 54 (Bankr.E.D.N.Y.1992) (debtor's admission

Hon. Denise L. Cote, U.S.D.J.
January 19, 2021
Page 2

made in disclosure schedules evidenced a waiver of the privilege against self-incrimination that was enforceable in subsequent dischargeability adversary proceeding); *In re Gi Yeong Nam*, 245 B.R. 216, 233 (Bankr., E.D. Pa. 2000) (testimony at §341 meeting was a waiver since the "Trustee's [adversary proceeding] to recover a fraudulent conveyance is causally related to the very purpose of the §341 meeting").

A waiver of Fifth Amendment privilege "occurs regardless of whether the person's failure to claim the privilege was . . . knowing and intelligent," *Minnesota v. Murphy*, 465 U.S. 420, 428 (1984),



Ringel's prior testimony was incriminating. Feldman testified that he asked her to clarify whether proceeds could be released to Sanford notwithstanding prior First Department orders. (Ex. 3, at 59:11-60:6.) The questions asked at Ringel's recent deposition sought to flesh out details regarding her disclosures in *Phillips*, and "[d]isclosure of a fact waives the privilege as to details." *Rogers v. United States*, 340 U.S. 367, 373 (1951).

Allowing Ringel to invoke Fifth Amendment privilege now would impermissibly "distort" the record under *Klein*. Her prior testimony was that she did not know that Esposito was paid by Sanford, (Ex. 2, at 37:20-23); that when she received the call that she did not know there was a pending appeal in *Knopf v. Sanford* (*id*., at 44:5-10); and that, on the evening of January 12, 2016, Esposito was surprised to hear about the call (*id.*, at 106:10-15). Subsequently, the Knopfs learned that: Akerman and Feldman called her on her direct line (ECF 129-2, p. 21 of 21); Esposito was paid $50,000 out of the sale proceeds (ECF 167-2, 8 of 11) and used the money immediately to pay a credit card bill (ECF 167-2, pp. 5, 10 and 11); according to documents Judge Glenn reviewed *in camera*, Sanford sent documents to Esposito's home shortly before the call to obtain *Ringel's* view concerning whether Sanford should stipulate to supplement the record in the pending appeal (Ex. 4, pp. 11-13); and, three hours following the January 12 call, Esposito emailed Sanford say "the title company should be satisfied at this point (Ex. 5).

Permitting Ringel to invoke the Fifth Amendment at this stage is prejudicial to the Knopfs, since it permits her to maintain her prior position that she, Esposito and Sanford did not orchestrate

Hon. Denise L. Cote, U.S.D.J.
January 19, 2021
Page 3

the call without being challenged by the new evidence.

Respectfully submitted,

/s/ Eric W. Berry
Eric W. Berry

cc: all counsel and *pro se* parties by ECF; Lorraine Nadel, Esq., by email (w/ Exs.)
    Dan Horwitz, Esq. and Michael Ross, Esq., attorneys for Melissa Ringel, by email (w/Exs.)

EXHIBIT 1

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------x

NORMA KNOPF and MICHAEL KNOPF,

           Plaintiffs,

           -against-

FRANK M. ESPOSITO,
DORSEY & WHITNEY, LLP,
NATHANIEL H. AKERMAN,
EDWARD S. FELDMAN and
MICHAEL HAYDEN SANFORD,

           Defendants.

           Case No: 17 Civ. 5833 (DLC) (SN)

           Hon. Denise L. Cote, U.S.D.J.
           Hon. Sarah Netburn, U.S.M.J.

--------------------------------------------x

           Videoconference Deposition

           December 14, 2020
           10:10 a.m.

        DEPOSITION OF MELISSA RINGEL,

Non-Party Witness herein, pursuant to

Local Rule 33.3(c), held at the above-noted

time and place before Debra J. Gumpel, a

Notary Public of the State of New York.

2

A P P E A R A N C E S :


BERRY LAW PLLC

Attorneys for Plaintiffs

Norma Knopf and Michael Knopf

     745 Fifth Avenue, 5th Floor

     New York, New York 10151

     berrylawpllc@gmailcom

     (212) 355-0777

BY:  ERIC BERRY, ESQ.

     (via videoconference)


FRANK M. ESPOSITO, ESQ.

Defendant Pro Se

     515 Madison Avenue, 15th Floor

     New York, New York 10022

     fesposito@eplawllc.com

     (212) 537-3896

     (via videoconference)

3

1

2   APPEARANCES CONTINUED:

3

4   Defendant Nathaniel Akerman, Esq

5   c/o  Patterson Belknap, LLP

6   Attorneys for Defendants

7   Dorsey & Whitney, LLP and

8   Nathaniel H. Akerman

9        1133 Sixth Avenue,

10       New York, New York 10036

11       (212) 336-2000

12       (via videoconference)

13

14  PATTERSON BELKNAP, LLP (Did Not Appear)

15  Attorneys for Defendants

16  Dorsey & Whitney, LLP and

17  Nathaniel H. Akerman

18       1133 Sixth Avenue

19       New York, New York 10036

20  BY:   JONATHAN H. HATCH, ESQ.

21       jhatch@pbwt.com

22       (212) 336-2000

23

24

25

4

APPEARANCES CONTINUED:


EDWARD FELDMAN, ESQ.

Respondent Pro Se

     99 Madison Avenue, Suite 630

     New York, New York 10016

     edward@feldmanesqs.com

     (212) 685-2277

     (via videoconference)


NADEL & CIARLO, P.C.

Attorneys for Michael Phillips

     527 Madison Avenue, 7th Floor

     New York, New York  10022

BY:  LORRAINE NADEL, ESQ.

     lnadel@ncesq.com

     (212) 317-9500

     (via videoconference)

BY:  ADAM HANAN, ESQ.

     Adam@mcesq.com

     (via videoconference)

5

1

2    APPEARANCES CONTINUED:

3

4

5    McLAUGHLIN & STERN, LLP

6    Attorneys for Non-Party,

7    Melissa Ringel

8         260 Madison Avenue

9         New York, New York 10016

10   BY: DANIEL J. HOROWITZ, ESQ.

11        dhorowitz@mclaughlinstern.com

12        (212) 455-0448

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    MELISSA RINGEL
2    M E L I S S A   R I N G E L, the witness
3    herein, after having been first duly sworn by
4    a Notary Public of the State of New York, was
5    examined and testified as follows:
6    EXAMINATION BY
7    MR. BERRY:
8         Q      State your name for the record,
9    please.
10        A      Melissa Ringel.
11        Q      What is your current address?
12        A      20 Glendale Drive, Oyster Bay,
13   New York 11771.
14        Q      Ms. Ringel, how are you today?
15        A      I am okay.
16        Q      Ms. Ringel, I'm going to screen
17   share a report issued by the Office of
18   Court Administration in March of 2017.  It's
19   part of Exhibit 104, the first part of
20   Exhibit 104 being a letter from OCA counsel of
21   the First Department.  Can you see the
22   language, "Confidential Report, Do Not
23   Distribute," at the top?
24                    MR. HOROWITZ:  We can see
25               it.
```

7

1                        MELISSA RINGEL

2          Q     Can the witness see it?

3          A     Yes.

4          Q     Can you see the language that's

5     been highlighted here, that Ms. Ringel said

6     the two people on the telephone identified

7     themselves as Michael Sanford's real estate

8     lawyers?  She said one of the callers was

9     Nick Akerman from the Law Firm of Dorsey and

10    Whitney, and the other caller was Ed Feldman.

11    Do you see that language?

12         A     Yes.

13         Q     Thank you.  Did Mr. Feldman and

14    Mr. Akerman identify themselves at the outset

15    of the call you received from them on

16    January 12, 2016?

17         A      On the advice of counsel, and

18    pursuant to my rights under the Fifth

19    Amendment of the United States Constitution,

20    I decline to answer the question.

21                     MR. HOROWITZ:  Counsel, can

22                I request that if the witness

23                asserts her rights under the

24                Fifth Amendment to other questions

25                in the deposition, that it will be

8

MELISSA RINGEL

1

2          understood if she says,

3          "Fifth Amendment," that she is

4          asserting those rights under the

5          Fifth Amendment," and declining to

6          answer the question?  Can we have

7          that understanding?

8               MR. BERRY:  Yes.  As we

9          agreed off the record, if she says

10          "Fifth Amendment," all the

11          participating parties will

12          understand that to mean that she

13          is invoking her rights under the

14          Fifth Amendment of the United

15          States Constitution.

16               MR. HOROWITZ:  Thank you.

17     Q     Ms. Ringel, do you remember the

18  precise words that Mr. Akerman and Mr. Feldman

19  used when they introduced themselves to you in

20  the call?

21     A     Fifth Amendment.

22     Q     Do you remember whether

23  Mr. Akerman or Mr. Feldman offered any

24  explanation at the outset of the call as to

25  who Mr. Sanford was?

9

1                    MELISSA RINGEL

2          A      Fifth Amendment.

3          Q      Did you find that odd?

4          A      Fifth Amendment.

5          Q      I'm sorry.  I withdraw the

6    question.  Did you find it odd that you were

7    receiving a call from Mr. Akerman and

8    Mr. Feldman?

9          A      Fifth Amendment.

10          Q      Did you have any familiarity with

11    the orders that had been issued by the

12    First Department of the latter part of 2015 in

13    the case called Knopf versus Sanford?

14          A      Fifth Amendment.

15                    MR. ESPOSITO:  Objection.

16                Asked and answered.

17                    MR. BERRY:  Are you

18                directing the witness not to

19                answer?

20                    MR. ESPOSITO:  No.

21                    MR. BERRY:  Are you

22                asserting any type of privilege?

23                    MR. ESPOSITO:  You would

24                have to ask her.  I'm noting my

25                objection for the record.

10

```
 1                    MELISSA RINGEL
 2              MR. BERRY:  I'm sorry.  I
 3         minimized the screen.  I thought
 4         that was Mr. Horowitz's objection.
 5              MR. HOROWITZ:  Mr. Berry, I
 6         want to make sure it's complete.
 7         Did you get the witness' answer to
 8         the question?
 9              MR. BERRY:  I do not have
10         the witness' answer.  I heard an
11         objection.  I incorrectly assumed
12         it was yours, and now I know it
13         was Mr. Esposito's.  I did not
14         hear any kind of answer to the
15         question.  So let me ask it
16         again.
17     Q     At the time you received the call
18 from Mr. Akerman and Mr. Feldman, did you have
19 any familiarity with orders that had been
20 issued by the First Department in the latter
21 part of 2015 in the case called
22 Knopf v Sanford?
23              MR. ESPOSITO:  Objection.
24     A     Fifth Amendment.
25              MR. BERRY:  Mr. Horowitz, do
```

11

1          MELISSA RINGEL

2          you believe that it's conceivable

3          that I might be able to ask a

4          question today for which there

5          would not be a Fifth Amendment

6          privilege asserted?

7               MR. HOROWITZ:  I don't know,

8          and I don't mean to make light,

9          but I don't know what you're going

10         to ask.  It's hard for me to

11         answer, ███████████████████████

█    ████████████████████████████

█    █████████████████████████████

█    ████████████████████████

█    ██████████████████████████

█    █████████████████████████████

█    ██████████████████████████████

█    ████████████████████

█    █████████████████████████████

█    █████████████  ████████████████

█    ██████████████████████████

█    █████████

23              MR. BERRY:  Thank you.

24     Q     Ms. Ringel, I'm screen sharing

25     Plaintiffs' 102, which is a copy of the

12

1                    MELISSA RINGEL
2        deposition that you gave in the
3        Knopf v Phillips case on August 15, 2017.
4        Can you see the first page of that deposition
5        transcript?
6              A      Yes, I do.
7              Q      I'm going to show you a question
8        that begins at the bottom of page 43 at line
9        24, where you're asked, "When Mr. Akerman and
10       Mr. Feldman called, did you check to see if
11       there had been any assignment of the
12       Knopf v Sanford appeal from mediation?"  And
13       your answer is, "I did not."  Then below that,
14       beginning on line 5 on page 44, you're asked,
15       Question:  "Did you know whether there was a
16       pending appeal?"  Answer:  "I did not."
17       Question:  "Did you check to see whether there
18       was a pending appeal?"  Answer:  "I did not."
19       Do you see that testimony?
20             A      Yes.
21             Q      Had Mr. Akerman and Mr. Feldman,
22       when they called you on January 12, 2016,
23       stated that there was an appeal scheduled to
24       be argued in a few weeks which would decide
25       whether Mr. Sanford's assets and those of his

1                    MELISSA RINGEL
2    companies should be frozen or instead should
3    be released to him, might you've handled the
4    call differently?
5         A      Fifth Amendment.
6                    MR. HOROWITZ:  Objection.
7                    MR. BERRY:  Is there an
8              assertion of Fifth Amendment
9              privilege?
10                   MR. HOROWITZ:  Yes.
11        Q      Do you believe it's likely you
12   would have handled the call differently?
13                   MR. HOROWITZ:  Objection.
14        A      Fifth Amendment.
15        Q      How do you think you would have
16   handled it?
17                   MR. HOROWITZ:  Objection.
18        A      Fifth Amendment.
19                   MR. BERRY:  Can I find out
20             from Mr. Esposito whether there is
21             any claim of spousal privilege
22             being asserted now?
23                   MR. ESPOSITO:  I'm objecting
24             to the form of the question.  In
25             particular, I'm objecting to the

14

```
 1                    MELISSA RINGEL
 2              fact that these questions have
 3              been asked and answered, as is
 4              evident by the transcript you're
 5              currently sharing with the
 6              deponent and the counsel in this
 7              case.
 8                    MR. BERRY:  Thank you.
 9         Q    Ms. Ringel, I'm returning to the
10    OCA report, Plaintiffs' 104.  Do you see where
11    in this interview it's recounted that
12    Mr. Esposito told you that the Knopfs had
13    obtained summary judgment in the
14    Knopf v Sanford case.  I will highlight that
15    language.
16                    MR. ESPOSITO:  Objection.
17         Q    Do you see that portion of the
18    OCA report?
19                    MR. HOROWITZ:  Mr. Berry,
20              there is nothing that's been
21              highlighted.
22         Q    Can you see it now?
23                    MR. HOROWITZ:  There is a
24              highlighting that begins in the
25              third line of the -- I don't know
```

MELISSA RINGEL

1                                        MELISSA RINGEL

2                    what page this is -- the line that

3                    begins, "Mr. Sanford to return the

4                    funds."  Highlight begins at

5                    "funds," and it ends with the

6                    phrase, "It was clear to her."

7                         MR. BERRY:  Right.

8        Q     Do you see within that

9    highlighting, the sentence that states,

10   "However, her husband told her that summary

11   judgment had been granted to the plaintiffs

12   and that there were two or three motions which

13   were limited."  Do you see that sentence?

14                    MR. ESPOSITO:  Objection.

15       Q     The answer -- do you see that

16   sentence?

17       A     Yes.

18       Q     Did Mr. Esposito tell you in the

19   very first part of January of 2016 that the

20   Knopfs had obtained summary judgment?

21                    MR. ESPOSITO:  Objection.

22       A     Fifth Amendment.

23       Q     Ms. Ringel, I'm showing you what's

24   been marked as Plaintiffs' 106, which is a

25   deposition transcript of an examination given

```
 1                   MELISSA RINGEL
 2   by Evan Glassman on May 30, 2018.  Can you see
 3   the exhibit?
 4        A     Yes.
 5                   MR. HOROWITZ:  Mr. Berry,
 6              what we see is the cover page.
 7        Q     Can you see the exhibit sticker at
 8   the bottom?
 9        A     Yes.
10        Q     The highlighted language beginning
11   at page 21, line 5, of Mr. Glassman's
12   deposition.  Can you read from page 21, line 5
13   to page 22, line 13.  Read it to yourself.
14   And when you need me to page forward, let me
15   know and I will page forward it.
16                   MR. ESPOSITO:  Objection.
17        A     You can page forward.
18        Q     Thank you.  And again, just to
19   line 13.
20        A     I'm done.
21        Q     Do you recall speaking to
22   Mr. Glassman about a case that Mr. Esposito
23   had and needed backup for?
24                   MR. ESPOSITO:  Objection.
25        A     Fifth Amendment.
```

1              MELISSA RINGEL

2              MR. BERRY:  I think to

3         expedite this, and maybe

4         facilitate all of us going on to

5         more productive endeavors, can we

6         take a five-minute break, and Mr.

7         Horowitz, would you call me on my

8         cell phone, the same number you

9         called me today, and during this

10        five minutes, maybe you and I can

11        have a conversation about how to

12        streamline the process going

13        forward so we can all get off this

14        deposition, in which it doesn't

15        appear that a lot of testimony is

16        going to be provided.

17              MR. HOROWITZ:  Okay.

18              MS. NADEL:  Ten minutes is

19        more realistic.

20              MR. BERRY:  Back in ten

21        minutes.

22              (Whereupon, a brief recess

23        was taken from 10:26 a.m. to 10:39

24        a.m.)

25              MR. BERRY:  Mr. Horowitz and

18

MELISSA RINGEL

1 MELISSA RINGEL

2           I had a discussion off the record,

3           and correct me if I am misstating

4           what we agreed to, I am going to

5           ask no more than three questions,

6           and then we're going to put on the

7           record a stipulation that we have

8           agreed to, and then the other

9           parties represented at this

10          deposition will have an

11          opportunity either to cross or to

12          make any comments or perhaps join

13          in the stipulation.  So we assume

14          that at least the Knopfs'

15          questioning will be over with in a

16          few minutes.  I just have a couple

17          more questions.

18     Q     Ms. Ringel, can you see the first

19 page of a deposition transcript of the

20 examination of Nathaniel Akerman that occurred

21 on September 6, 2019?

22     A     Yes.

23     Q     I'm directing your attention to

24 page 100, lines 6 through 12, in which I asked

25 Mr. Akerman.  Question:  "Do you believe it

1                    MELISSA RINGEL

2     would have been improper to proceed with the

3     call had you been told by Ms. Ringel that her

4     husband, like you, was a lawyer from Mr.

5     Sanford?"  And the answer is, "Yes, I would

6     have thought that there would be a conflict

7     and I wouldn't have continued."  Do you agree

8     with Mr. Akerman that there was a conflict of

9     interest that should have terminated the call?

10                    MR. ESPOSITO:  Objection.

11          A     Fifth Amendment.

12          Q     Ms. Ringel, I'm showing you again

13    what's been marked as Plaintiffs' 102, which

14    is the deposition you gave on August 15, 2017.

15    In particular, I am directing your attention

16    to page 105, at the bottom, and at which point

17    you're asked the question:  "Prior to

18    receiving the litigation hold notice, was

19    there anything else that was said between you

20    and Mr. Esposito about your conversations with

21    Mr. Akerman and Mr. Feldman beside what you

22    described already?"  Going on the next page,

23    the answer is, "No, not that I recall."  And

24    then the following questions were asked and

25    answers given.  Question:  "On the evening of

```
1                    MELISSA RINGEL
2      January 12, 2016, you told him that you gave
3      them the same information that you had given
4      him."  Answer:  "That he had and I discussed."
5      Question:  "That he and you discussed."
6      Question:  "Did he say anything in response to
7      that?"  Answer:  "I don't recall what he
8      said."  Question:  "Did he say anything in
9      response?"  Answer:  "In response to my
10     telling him that I received a call?"
11     Question:  "Yes."  Answer:  "He seemed
12     surprised, but I don't recall what he said."
13     Is that still your recollection that on the
14     evening of January 12th, when you spoke about
15     the call you received from Mr. Akerman and
16     Mr. Feldman with Frank Esposito, that he
17     seemed surprised that you had received that
18     call?
19                    MR. ESPOSITO:  Objection.
20          A     Fifth Amendment.
21          Q     Mr. Ringel, I'm screen sharing
22     what's been previously marked as Plaintiffs'
23     Exhibit 125.  Can you see the exhibit?
24          A     Yes.
25          Q     Do you see at the top,
```

1                    MELISSA RINGEL

2     Mr. Esposito is e-mailing Mr. Sanford on

3     January 12, 2016, at 1:59 p.m., which I think

4     was about three hours after you received a

5     call from Mr. Akerman and Mr. Feldman, at

6     which point, and in this e-mail, Mr. Esposito

7     states, "The title company should be satisfied

8     at this point."  Did you have a conversation

9     with Mr. Esposito about the call you received

10    from Akerman and Feldman prior to 2:00 p.m. on

11    January 12th?

12                    MR. ESPOSITO:  Objection.

13          A       Fifth Amendment.

14                    MR. BERRY:  We're going to

15                put the stipulation on the record.

16                Mr. Horowitz, tell me if I get any

17                part of it wrong.

18                    Mr. Horowitz and I have

19                entered into a stipulation, which

20                is as follows:  To the extent the

21                Knopfs would have asked any

22                further questions today about the

23                allegations in the Second Amended

24                Complaint in the Knopf v Esposito

25                case about the information

|   |   |
|---|---|
| 1 | MELISSA RINGEL |
| 2 | included in the OCA report that |
| 3 | was filed with Judge Cote in March |
| 4 | or April of 2016, and/or the |
| 5 | deposition exhibits that have been |
| 6 | pre-marked that's been circulated |
| 7 | today, it's agreed that a Fifth |
| 8 | Amendment privilege would be |
| 9 | asserted by Ms. Ringel. |
| 10 | We have further agreed that |
| 11 | to the extent that the Knopfs want |
| 12 | to make a motion to compel, we |
| 13 | will do that on paper after |
| 14 | research and after good faith |
| 15 | communications with Mr. Horowitz. |
| 16 | And that would be the conclusion |
| 17 | of the Knopfs' examination for |
| 18 | today, subject to any rulings by |
| 19 | the Court. |
| 20 | If any of the defendants |
| 21 | want to begin cross examination |
| 22 | now, they're free to do so.  If |
| 23 | any defendants want to join in the |
| 24 | stipulation, they're free to do |
| 25 | so.  And if any defendants want to |

                    MELISSA RINGEL

1

2       make any other comments, they're

3       free to do so.

4              Mr. Horowitz, do you agree

5       with that?

6              MR. HOROWITZ:  Yes, we agree

7       with the stipulation.  The only

8       thing I want to make sure -- I

9       think you did fine -- I just want

10      to make it clear that to the

11      extent that you're going to make

12      any kind of motion, and I'm not

13      saying you are, but that motion

14      will be consistent with Judge

15      Cote's local rules, and we will

16      have an opportunity to meet and

17      concur before any such motion is

18      made.

19             MR. BERRY:  That's my

20      intention, of course.

21             MR. HOROWITZ:  We agree to

22      the stipulation.

23             MR. BERRY:  Do any of the

24      defendants want to cross-examine

25      Ms. Ringel?  Do any of the

```
 1                    MELISSA RINGEL
 2             defendants want to join in the
 3             stipulation?
 4                    MR. FELDMAN:  I would like
 5             to ask a question or two.
 6                    MR. BERRY:  That's fine by
 7             me.
 8                    MR. FELDMAN:  If anybody
 9             else would like to ask a question
10             in the interim --
11                    MS. NADEL:  This is
12             Lorraine Nadel.  I Just have about
13             five or six questions.  I just
14             want a five-minute break before I
15             begin, so Ed can go first.
16   EXAMINATION BY
17   MR. FELDMAN:
18        Q    Ms. Ringel, can you confirm that
19   you have never met me?
20        A    Fifth Amendment.
21        Q    If that's your position with
22   regard to that, then I'll have no more
23   questions.
24                    MS. NADEL:  Can I just have
25             five minutes?
```

```
 1                    MELISSA RINGEL
 2                   (Whereupon, a brief recess
 3              was taken from 10:54 a.m. to 10:58
 4              a.m.)
 5  EXAMINATION BY
 6  MS. NADEL:
 7       Q    I just have a couple of questions
 8  for you, and they're in connection with three
 9  people related to some of the work in this
10  matter.  Do you know Michael Phillips?
11       A    Fifth Amendment.
12       Q    Have you ever spoken to
13  Michael Phillips?
14       A    Fifth Amendment.
15       Q    Do you know Lori Braverman?
16       A    Fifth Amendment.
17       Q    Have you ever spoken to
18  Lori Braverman?
19       A    Fifth Amendment.
20       Q    Matt Bronfman, do you know
21  Matt Bronfman?
22       A    Fifth Amendment.
23       Q    Have you ever spoken to
24  Matt Bronfman?
25       A    Fifth Amendment.
```

1              MELISSA RINGEL

2              MS. NADEL:  Thank you so

3      much.

4              MR. FELDMAN:  We have no

5      questions.

6              MR. ESPOSITO:  No questions.

7              MR. BERRY:  Does anybody

8      else have any questions?  Does

9      anybody else have any comments?

10     Does anyone have an objection if

11     we table the deposition?

12             MS. NADEL:  No objection.

13             MR. BERRY:  Mr. Feldman, do

14     you have an objection if we table

15     the deposition at this point?

16             MR. FELDMAN:  No.  I just

17     would like to see the final stip

18     when it's provided.

19             MR. BERRY:  I'm sorry, Mr.

20     Feldman, I didn't hear you.

21             MR. FELDMAN:  I said no, but

22     I would like to have the

23     stipulation sent to myself and

24     obviously everyone else when it's

25     provided.

```
 1                    MELISSA RINGEL
 2             MR. BERRY:  Right.  I will
 3        circulate the transcript to
 4        everybody.
 5             Is that it?  Is there any
 6        objection if we end the meeting
 7        now?
 8             MR. FELDMAN:  No.
 9             MR. BERRY:  Ms. Gumpel, will
10        you expedite production of the
11        transcript?
12             THE REPORTER:  Yes, of
13        course.
14             MR. BERRY:  I will e-mail
15        Cindy.
16             THE REPORTER:  Is anybody
17        else ordering the transcript?
18             MR. FELDMAN:  You said
19        you'll be circulating it.
20             (Continued on next page.)
21
22
23
24
25
```

# EXHIBIT 2

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - x

NORMA KNOPF and MICHAEL KNOPF,
                                   Case No.:
               Plaintiffs,      1:16-cv-06601
                                 (DLC)
MICHAEL PHILLIPS and PURSUIT HOLDINGS,
LLC, and MICHAEL H. SANFORD,

              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - x

                      745 Fifth Avenue,
                      5th Floor
                      New York, New York

                      August 15, 2017
                      2:15 p.m.


           DEPOSITION OF MELISSA RINGEL, held

at the above-noted time and place, before

Debra Gumpel, a Notary Public within and for

the State of New York.

2

A P P E A R A N C E S:


ERIC W. BERRY LAW OFFICE
Attorneys for Plaintiffs
        745 Fifth Avenue, 5th Floor
        New York, New York 10151

BY:  ERIC W. BERRY, ESQ.



NADEL & CIARLO, ESQS.
Attorneys for Defendant,
MICHAEL PHILLIPS
        3 East 54th Street, 16th Floor
        New York, New York 10022

BY:  LORRAINE NADEL, ESQ.
E-Mail: lnadel@mcesq.com

BY:  ADAM HANAN, ESQ.
E-Mail: adam@mcesq.com



MICHAEL S. ROSS, ESQ.
Attorney for Melissa Ringel
        60 East 42nd Street, 47th Floor
        New York, New York 10165

BY:  MICHAEL S. ROSS, ESQ.
E-Mail:  michaelross@rosslaw.org.

                 ***        ***        ***

16

| 1 | MELISSA RINGEL |
| 2 | Binghamton? |
| 3 | A    I graduated from Binghamton in |
| 4 | 1994. |
| 5 | Q    When did you graduate from |
| 6 | Cardozo? |
| 7 | A    1997. |
| 8 | Q    What was your first job out of law |
| 9 | school? |
| 10 | A    I worked for a firm called |
| 11 | Bronfman, Gilbert and Ross. |
| 12 | Q    Was that 767 Third Avenue then? |
| 13 | A    Yes, it was. |
| 14 | Q    How long did you work at Bronfman, |
| 15 | Gilbert and Ross? |
| 16 | A    Approximately six months. |
| 17 | Q    What did you do after leaving |
| 18 | Bronfman, Gilbert and Ross? |
| 19 | A    I went to work for a firm called |
| 20 | LaRossa, Mitchell and Ross. |
| 21 | Q    That was James M. LaRossa's |
| 22 | firm? |
| 23 | A    Yes. |
| 24 | Q    How long did you work at Mitchell |
| 25 | LaRossa's firm? |

37

                    MELISSA RINGEL

1          Q      What were they?

2          A      I believe it was a $50,000

3   retainer.

4          Q      Do you recall when you first

5   learned there was a $50,000 retainer?

6          A      I don't believe I learned that

7   until after I was served with a subpoena to

8   testify in this case.

9          Q      From whom did you learn there was

10  a $50,000 retainer?

11         A      From my husband.

12         Q      Did he tell you whether it had

13  been paid?

14         A      He did not.

15         Q      Do you have any information about

16  whether any portion of that retainer has been

17  paid?

18         A      I do not.

19         Q      Do you know whether your husband

20  has ever received any money from Mr. Sanford

21  or any of Mr. Sanford's companies?

22         A      I don't know.

23         Q      Have you had any discussion with

24  Mr. Esposito about it?

44

1                    MELISSA RINGEL

2     any assignment of Knopf V. Sanford appeal for

3     mediation?

4              A      I did not.

5              Q      Did you know whether there was a

6     pending appeal?

7              A      I did not.

8              Q      Did you check to see whether there

9     was a pending appeal?

10             A      I did not.

11             Q      Can you tell me, the best of your

12    ability, what was said during the

13    conversation?

14             A      I recall that they asked -- they

15    identified themselves.  They told me they had

16    some questions about an order in the case.  I

17    didn't know what their questions were, and my

18    initial reaction was to tell them that they

19    should call the clerks office.  They then

20    asked me who they should specifically speak

21    with, and I said I didn't know.  At that point

22    they asked me if I was familiar with the order

23    I was speaking about. I said yes, I am. I

24    don't recall what they asked me next, but I do

25    recall that it appears to be a procedural

106

1                    MELISSA RINGEL

2          A     No, not that I recall.

3          Q     On the evening of January 12,

4     2016, you told him that you gave them the same

5     information that you had given him, that --

6          A     That he and I discussed?

7          Q     That he and you discussed.  Did he

8     say anything in response to that?

9          A     I don't recall what he said.

10         Q     Did he say anything in response?

11         A     In response to my telling him that

12    I received a call?

13         Q     Yes.

14         A     He seemed surprised, but I don't

15    recall what he said.

16         Q     Was that the last the two of you

17    ever spoke about it until receiving the

18    Litigation Hold Notice?

19         A     Yes.

20               (Continued on next page.)

21

22

23

24

25

# EXHIBIT 3

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - x

NORMA KNOPF and MICHAEL KNOPF,

                                 Case No.:

               Plaintiffs,      1:16-cv-06601

                                    (DLC)

MICHAEL PHILLIPS and PURSUIT HOLDINGS,
LLC, and MICHAEL H. SANFORD,

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - x

                         745 Fifth Avenue,
                         5th Floor
                         New York, New York

                         June 29, 2017
                         1:05 p.m.


         30(b)6 DEPOSITION OF EDWARD S.

FELDMAN, ESQ., pursuant to Subpoena, held at

the above-noted time and place, before Debra

Gumpel, a Notary Public within and for the

State of New York.

1                    EDWARD FELDMAN

2        A      Michael Hayden Sanford, et. al.

3        Q      So it appears from this December

4   29th Order that some Interim Order dated

5   October 22, 2015 had been denied on December

6   29th --

7                    MR. HANAN:  Objection.

8                    MR. BERRY:  If you could let

9              me finish the question.

10                   Withdrawn?

11       Q      Do you see that, according to the

12  December 29, 2015 Order that's been marked as

13  Exhibit 11, the Motion to Vacate an October

14  22, 2015 Interim Order had been denied?

15                   MR. HANAN:  Objection.

16       A      I see what the Order says.

17  However, you refreshed my recollection.

18       Q      That's my job.

19       A      And I recall now specifically that

20  was the certain I had, and one of the reasons

21  for the conference call with Melissa Ringel,

22  and she clarified specifically, and again,

23  with the attitude is, you should know this as

24  a matter of law, that the reason the second

25  motion was denied was because it was mute,

60

                    EDWARD FELDMAN
1
2   that the previous order had resulted in the
3   removal of the restraints, so the second
4   motion was denied as not being necessary and
5   mute. That was the clarification we
6   required.
7        Q     Is your recollection refreshed now
8   what she said her position within the Court
9   was?
10       A     No.  I just remember, again,
11  repeating what I said, we got transferred to
12  her as the person who had this file, knew
13  about this file, whatever, and she was fully
14  aware of the issues, and we talked to her, but
15  she was very specific.  That motion was denied
16  because it was mute, because there was nothing
17  to -- no restraints to vacate, because they
18  had already been vacated by a previous Order,
19  whatever that Order was. I guess the previous
20  Order was the Order of November 12th, which
21  was attached to my affirmation, which you
22  marked as Exhibit 32.
23       Q     Did you challenge her
24  interpretation at all?
25                    MR. HANAN:  Objection.

# EXHIBIT 4

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

PURSUIT HOLDINGS (NY), LLC,

Debtor.

Case No. 18-12738 (MG)
Chapter 7

**ORDER OVERRULING IN PART AND REQUIRING IN CAMERA REVIEW IN PART
OF SANFORD AND ESPOSITO OBJECTIONS TO PRODUCTION OF DOCUMENTS
BASED ON ATTORNEY-CLIENT PRIVILEGE, COMMON INTEREST PRIVILEGE
AND ATTORNEY WORK PRODUCT PROTECTION**

This Order resolves many of the issues concerning objections to production of documents

by Michael Hayden Sanford ("Sanford") and attorney Frank Esposito ("Esposito") in response to

document production requests by counsel to Deborah J. Piazza, Esq., the Chapter 7 Trustee in

this case (the "Trustee"). Sanford is the principal of the debtor, Pursuit Holdings (NY), LLC

("Pursuit"). Sanford also has several other businesses, including MH Sanford & Co., LLC

("MHS&Co."). The documents at issue consist of email communications between Sanford and

Esposito. Sanford does not argue that these communications are subject to the attorney-client

privilege of Pursuit. That argument would clearly fail, as it is undisputed the Trustee now

controls the attorney-client privilege and work product protection of Pursuit and has waived the

privilege or protection with respect to any documents or information that were subject to

Pursuit's attorney-client privilege or work product protection.

The issue here is whether the requested documents and information are protected by

Sanford's or MHS&Co.'s (and not Pursuit's) attorney-client privilege, common interest

privilege, and/or work product protection, to the extent it has not been waived, in which case the

documents and information are protected from discovery. The resolution of this issue depends

on an examination of the email communications and the context surrounding them.  Sanford

appears in this matter *pro se*, but his arguments and filings reflect considerable sophistication.

All of the documents and information at issue relate to a long-running dispute between

Sanford or Pursuit, on the one hand, and Michael and Norma Knopf and Delphi Capital

Management, secured creditors of the Debtor (collectively, the "Knopfs"), on the other hand.

The disputes between Sanford, Pursuit, and the Knopfs have been the subjects of years of state

and federal court litigation in the trial and appellate courts in New York.  The Knopfs hold large

unsatisfied judgments against Pursuit and Sanford.  I will only address the prior litigation to the

extent necessary to resolve the privilege issues here.

As explained below, most of the privilege objections asserted by Sanford and Esposito

are easily resolved by the Court.  Sanford provided the Court for *in camera* review with copies of

documents as to which he claims privilege or protection.  In reaching its rulings embodied in this

Order, those documents have been reviewed by the Court.  As to a few of the documents to

which Esposito has objected, some of the objections cannot be resolved without the Court's *in*

*camera* review of those documents.  This Order requires that copies of those documents be sent

to the Court in hard copy for *in camera* review.  The Court will review and then rule on the

remaining objections.

This matter arises from Sanford's Declaration Attaching Privilege Log and Related

Material (ECF Doc. # 128); Emails A–E submitted by email for *in camera* review, the Trustee's

and the Knopfs' Joint Reply in Support of the Trustee's Request for an Order that Sanford and

Frank Esposito ("Esposito") Produce to the Trustee Items 1–7 on Esposito's Privilege Log and

Any Documents Submitted *In Camera* That Are Relevant to the Trustee's Potential Claims

Against Esposito and Not Privileged (the "Joint Reply," ECF Doc. # 132); and Sanford's

Declaration Requesting Two Days to Respond to the Trustee's and Knopfs' Joint Reply (ECF
Doc. # 134).

For the reasons explained below, the Court **ORDERS** that Esposito produce items 1–3,
and 7 identified on his privilege log for *in camera* review.  As for Items 4, 5, (where Items 4 and
5 appear to be Email E on Sanford's privilege log) and Item 6 on Esposito's privilege log (where
Item 6 appears to be Email D on Sanford's privilege log), the Court **ORDERS** that Sanford <u>and</u>
Esposito each produce these emails.  Finally, the Court **ORDERS** that Sanford produce Emails
A–C; those Emails are relevant and are not privileged.

### I.  Brief Background

On October 22, 2020, the Trustee filed the Trustee's Application for Entry of an Order
Pursuant to Fed. Rules of Bankr. P. 2004 and 9016 Authorizing a Document Subpoena to be
Served on Michael H. Sanford.  ("Application," ECF Doc. # 107-1.)  The Application arises out
of the Chapter 7 estate's potential claims for avoidance and recovery of allegedly fraudulent
transfers made by the Debtor to Esposito and his law firm, Esposito Partners, LLC.  (*Id.* ¶¶ 7–
10.)  Specifically, the Trustee believes that Sanford, in his capacity as the owner and
representative of Pursuit, paid Esposito in connection with Pursuit's efforts to sell the 67th Street
property to the buyer, Michael Phillips ("Phillips") on or about January 4, 2016.  (*Id.* ¶ 11.)  It
further appears to the Trustee that between December 29, 2015, and February 3, 2016, Sanford
and Esposito communicated by email and other means regarding the sale of the 67th Street
property and the $50,000 payment Esposito requested and received out of the proceeds of that
sale.  (*Id.*)

A post-judgment examination of Sanford in the state court matter, *Knopf v. Sanford*,

Index No. 652743/2018 (N.Y. Sup. Ct. Mar. 6, 2019), on November 1, 2019 (following relief

from stay), raises questions about whether Pursuit's $50,000 payment to Esposito was either a

"finder's fee" or a payment for the assistance of Esposito's wife, Melissa Ringel ("Ringel"),

rather than fair consideration for attorney services.  (ECF Doc. # 107-1 at 4, ¶ 12.)  The

Application lists the following excerpts of Sanford's post-judgment examination in support of

Esposito acting as Pursuit's attorney:

- *See id*., Ex. 5 at 25:23–26:1 (Sanford's acknowledgment that the First Department denied his motion to vacate an escrow requirement relating to the sale proceeds on December 29, 2015.)
- *Id*. at 39:10–39:17 (relating to the meeting between Sanford and Esposito on January 4, 2016);
- *Id*. at 40:19–41: 20 (Sanford's testimony that he did not want to move for re-argument of the December 29, 2015 order and therefore met with Esposito instead);
- *Id*. at 46:17–47:5 (Sanford's admission that he discussed with Esposito possible alternatives to moving for reargument of the December 29 order on notice);
- *Id*. at 49:4–49:16 (Sanford's testimony that Esposito told him that there were people working upstairs at the First Department who Sanford could call for an advisory opinion);
- *Id*. at 87:25–88:21 (Sanford's suggestion that he paid Esposito $50,000 as a finder's fee or referral fee for locating Dechert, LLP to appear as his attorney in his case with the Knopfs).
- *Id*. at 132:7–132:22 (Most importantly, Sanford testified that on January 11, 2016, Esposito solicited the $50,000 payment by saying: "by the way, your life is going to get better soon, because there was no question in my mind or in his that anyone at the First Department would tell my lawyers, there is no restraint [against selling the 67th Street property].")  The next day, January 12, 2016, Sanford obtained from Esposito's wife—in her capacity as Court attorney—an *ex parte* opinion that here was "no restraint" against selling the 67th Street property, as this Court noted in its March 12, 2019 decision).  ECF Doc. # 67, p. 9 n.3 13.

In the Application, the Trustee requested the following documents (the "Discovery

Request"):

          1. Communications between Michael Hayden Sanford ("Sanford") and Frank M. Esposito ("Esposito") sent or received between December 29, 2015 and February 3, 2016 inclusive, including but not limited to any emails.

          2. Any attachments to emails between Sanford and Esposito sent or received between December 29, 2015 and February 3, 2016 inclusive.

          3. Documents provided or shown by Sanford to Esposito at their meeting in the Oyster Bay, New York area on January 4, 2016.

(ECF Doc. # 107-1 at 18.)

        In their December 3, 2020, letter, the Trustee and the Knopfs further request:

          (A) his emails to and from Mr. Esposito during the December 29, 2015 through February 3, 2016 period that concern Pursuit's 67th Street apartment or the First Department orders relating to that apartment, since the Trustee has waived Pursuit's attorney client privilege under *CFTC v. Weintraub*, together with

          (B) a privilege log compliant with Fed. R. Civ. 45(e)(2)(A)(ii) for any emails to or from Mr. Esposito that Mr. Sanford asserts relate solely to other matters.

(ECF Doc. # 118 at 2.)

        This Court held a hearing on December 8, 2020, regarding the Application. After hearing Sanford's, the Trustee's, and the Knopfs' respective arguments, this Court ruled in favor of the Trustee, allowing the Trustee to serve a document subpoena on Sanford. The Court also required Sanford to file a privilege log and to submit to this Court any documents withheld on grounds of privilege for *in camera* review. The Court also signed an order on December 10, 2020 authorizing the Trustee to serve a document subpoena on Esposito. (ECF Doc. # 123.)

## II.    Timeline of events between December 29, 2015, and January 16, 2016

In July 2017, the Presiding Justice of the First Department asked the Inspector General of the New York State Office of Court Administration ("OCA") to investigate the Knopfs' allegations; and that following a thorough investigation, the Inspector General's Office issued a March 16, 2018, report that confirmed many of the Knopfs' allegations made in their complaint. *Knopf v. Sanford*, N.Y.S.3d 777, 784 (N.Y. Sup. Ct. 2019). In considering the privilege issues, it is useful to review a timeline of events based on the OCA Report, as discussed in depth by the New York Supreme Court in *Knopf v. Sanford*:

- Beginning in August 2015 and continuing through January 2016, Sanford engaged in ongoing discussions with Frank Esposito about the possibility of Sanford's retaining Esposito to perform transactional legal services for some of Sanford's companies. (*See* Esposito Deposition, Index No. 153821/2019, NYSCEF No. 111, at Transcript (Tr.) 51-56.) Esposito's wife, Melissa Ringel, was then the special master in charge of the First Department's Pre-argument Conference Program, also called the Special Master's Program or the Office of the Special Master, which mediates cases on appeal. (OCA Report at 6.) Ringel had been employed in various roles at the First Department for about 15 years. (OCA Report at 14.)
- After Justice Sweeny imposed an escrow requirement on selling the PHC and after the First Department denied vacatur of that requirement, Sanford expressed disagreement with the First Department's orders to Esposito and gave him a copy of the November 2015 and December 2015 Orders. (*See* OCA Report at 15.) Esposito then discussed Sanford's concerns with Ringel, who asked to see the orders. (*Id.*) Ringel stated in a January 17, 2018, interview with the OCA Inspector General's Office, though, that Esposito gave her the November 2015 and December 2015 Orders, but not the October 2015 Order that restricted Sanford's use of the sale proceeds, which Esposito got from Sanford. (*Id.*)
- Also on January 11, Ringel called Evan Glassman, Esq., a litigation partner at Steptoe & Johnson LLP, to inquire whether Glassman would be interested in working with Esposito on a pending matter. Glassman told Ringel that he did not have time to discuss her inquiry. He was extremely busy due to an impending court hearing in another case, he said. (*See* Excerpts from Glassman Deposition, NYSCEF No. 177 at Tr. 29, 31.) That same day, Sanford instructed his attorneys, Akerman of Dorsey & Whitney (litigation counsel) and Feldman (real-estate counsel Sanford retained in connection

with the PHC sale), to call the First Department to clarify the meaning of the Court's December 2015 Order. (OCA Report at 7.)

- On January 12, Akerman and Feldman called Ringel on her direct line at the First Department. They called Ringel's number at least three times that day. They spoke with her for several minutes on one of those occasions about the relationship among the Court's October, November, and December 2015 Orders — without opposing counsel on the line. (*See* OCA Report at 17, 19, and Attachment J.) Akerman gave testimony regarding the call at a deposition in *Knopf v Phillips*, No. 16-CV-06601, an action before Judge Denise L. Cote in the U.S. District Court for the Southern District of New York. Akerman testified that he had been speaking with Feldman on the phone and that he then called the First Department and patched in the person who answered. (Excerpts from Akerman Deposition, NYSCEF No. 174, at Tr. 22.) Akerman also testified that when he and Feldman reached Ringel, he described to her the October 2015 and November 2015 Orders and asked her how the November Order affected the October Order and what the October Order's status was. (OCA Report at 11.) Akerman testified that it seemed as though Ringel had the orders in front of her when she told him that the November 2015 Order had "basically nullified" the October 2015 Order and that the December 2015 Order had no effect on the October 2015 Order because that order had already been nullified. (*Id*.)

- In spring 2016, the First Department Clerk of Court, Hon. Susanna Molina Rojas, asked Ringel informally about the circumstances of the January 12 call. Ringel told Rojas that she had merely answered "a simple procedural question" by advising Akerman and Feldman "that once the court decides a motion, any interim orders would no longer be in effect." (OCA Report at 7.) Ringel later told the Inspector General's Office that she had informed Akerman and Feldman that "the interim order [i.e., the October 2015 Order] was no longer in effect once there was a summary judgment by the bench." (*Id*. at 17.)

- Immediately after the conference call with Ringel, Feldman wrote a memorandum to file memorializing the call. He forwarded his memorandum to Phillips's title company. (OCA Report at 14.) Feldman's memo stated that Ringel "confirmed" to him and Akerman that the "October 22, 2015 Interim Order with restraints was only in effect until motion decided" and that "[o]nce full [First Department] panel decided motion and entered the November 12, 2015 Order denying the restraints, all restraints were vacated." (OCA Report at 15 & Attachment D.) Akerman, who wrote a substantively identical memorandum about the call, gave his memorandum to Pursuit. (*See* Ackerman Aff., NYSCEF No. 190, at ¶¶ 5-7.) These memorandums, relying entirely on Ringel's legal opinions, allowed the sale of the PHC to close three weeks later in violation of the First Department's October 2015 escrow order.

- On January 14, two days after Akerman and Feldman's call with Ringel, Glassman called Ringel back. They discussed whether Glassman would be

willing to help Esposito with the litigation matter Ringel mentioned to Glassman on January 11. (NYSCEF No. 177, at Tr. 29, 31.) Glassman ultimately declined to act as Esposito's co-counsel.

- Also on January 14, Ringel used her court email account to contact James M. McGuire, Esq., at Sanford's request, relayed through her husband, Esposito, to ask whether McGuire would be interested in helping Esposito represent Sanford in the Knopf litigation. (*See* OCA Report at 18; January 14 Emails.) McGuire was then a partner at the Dechert, LLP, law firm ("Dechert"). From 2005–2011, McGuire served as an Associate Justice of the Appellate Division, First Department. Ringel served as McGuire's Principal Law Clerk for three years. (OCA Report at 4.)
- Esposito also telephoned McGuire in early January 2016 to ask whether McGuire and Dechert would represent "MH Sanford & Company and other corporate defendants in certain litigation." (Esposito Deposition, Index No. 153821/2019, NYSCEF No. 111, at Tr. 71.) McGuire later agreed to join Sanford's team.
- On January 16, 2016, Sanford made an initial payment of $5000 to Esposito's firm. (Checks Made to Esposito at 2, NYSCEF No. 187.)
- On February 1, 2016, the sale of PHC closed for $3 million. Neither Pursuit nor Sanford put any of the proceeds into escrow (OCA Report at 5), in violation of the First Department's October 2015 Order.

*Id.* at 790–793.

### III. Esposito's Privilege Log, Items 1–3, & 7 – Require *In Camera* Review

Subpoenas were served on both Sanford and Esposito covering many or most of the same documents. (*See* ECF Doc. ## 121, 124.) While Sanford has objected that he should not be required to produce documents or information that has been requested and can be produced by other parties, that objection is overruled. The Trustee is entitled to see <u>all</u> documents requested by the subpoenas in the possession, custody, and control of each person upon whom a subpoena is served. This assures that any notations marked on a document by any person who possesses a copy have been produced, and that documents have not been altered.

In their Joint Reply, the Trustee and Knopfs request Items 1–7 of Esposito's privilege log. Esposito's privilege log vaguely provides that attorney-client privilege applies to the items without any assertation as to whether MHS&Co., Pursuit, or Sanford asserts the privilege.

Item 1 from Esposito's privilege log, a January 4, 2016, email from Sanford to Esposito, appears to be relevant. (ECF Doc. # 128-1 at 3.) Esposito's privilege log details that the subject of Item 1 is an explanation and description of MHS legal needs and asserts that attorney-client privilege applies. However, in an earlier November 1, 2020, deposition (Joint Reply Ex. 7), Sanford testified that he met with Esposito on January 4, 2016, to explore with Esposito the possibility of obtaining clarification of the meaning of the First Department orders *impacting Pursuit's ability to sell the apartment* without making a motion. (*Id*. at 40:19–41:20.) The Trustee and the Knopfs assert that there is an inference that any email between Sanford and Esposito on the day of the meeting also relates to Pursuit's apartment.

Item 2 from Esposito's privilege log is a January 5, 2016 email, from Sanford concerning a "collection of .pdf documents" and "logistics." (ECF Doc. # 128-1 at 3.) According to Ringel's 2017 deposition, "a day or two" after Esposito's January 4, 2016, meeting with Sanford, she looked at the First Department orders. (Joint Reply Ex. 8 at 30:9–30:12.) In her interview with OCA, Ringel stated that she "asked for copies" of the orders Sanford was complaining of at that time. (*Id*. Ex. 9 at 15.) Given that the communications between Sanford and Esposito occurred at the precise time that Ringel was becoming involved, these emails *appear to be about Pursuit's apartment*.

Item 3 from Esposito's privilege log is a January 6, 2016, email from Sanford to Esposito described as a "general thank you." (ECF Doc. # 128-1 at 3.) This email was also provided at or about the time Ringel was becoming involved in the matter. That email appears to concern Sanford's intent—the principal inquiry in a fraudulent conveyance action. *In re Sharp Intern. Corp.*, 403 F.3d 43, 56 (2d Cir. 2005) ("'[T]o prove actual fraud under §276, a creditor must show intent to defraud on the part of the transferor.'" (citation omitted)).

Item 7 refers to retaining James McGuire on behalf of Sanford, and "the transmission of engagement funds." (ECF Doc. 128-1 at 4.) If "transmission of funds" refers to transferring the $50,000 to Esposito, then it is relevant to the Trustee's potential claims against Esposito since it would concern Sanford's intention in causing Pursuit to pay Esposito the $50,000. If the email refers to paying McGuire and Dechert, it is likewise relevant because, on that same day according to Sanford, McGuire declined an engagement (Joint Reply Ex. 13 at 5) solely because Sanford did not have sufficient money on hand to retain him. (*See id*. Ex. 6 at 163:2–163:7.) If the email shows that Sanford intended to use the proceeds from a sale of the 67th Street property to pay McGuire and Dechert, it remains relevant to those claims as indicative of Esposito's knowledge that Sanford planned to use Ringel's opinion to persuade Phillips to close, notwithstanding the First Department orders.

Sanford states that he "has no objection whatsoever to Esposito producing emails he does not possess to the Court for an *in-camera* review." (ECF Doc. # 128 ¶ 8.) Accordingly, the Court **ORDERS** that Esposito produce Emails 1–3, 7 to the Court for an *in camera* review.

## IV. Email E - Esposito's Privilege Log, Items 4 & 5 – Require Production

Sanford asserts attorney-client privilege, common interest privilege, and a relevance objection. With respect to the relevance objection, Sanford explains:

> email references a person [Frank Esposito] will show the Compendium to for their procedural knowledge of records on appeal. I voluntarily provided the email in an investigation (see ECF Doc 120, pg41- 42). The Court should determine if disclosure is appropriate / necessary in this action.
>
> \* privilege asserted only with [Frank Esposito], not person referred to

(ECF Doc. # 128-1 at 818.)

In New York, the attorney-client privilege is not absolute. *Hoopes v. Carota*, 531 N.Y.S.2d 407, 409 (3d Dep't 1988), *aff'd*, 543 N.E.2d 73 (N.Y. 1989). Because it "constitutes an 'obstacle' to the truth-finding process," its "invocation . . . should be cautiously observed to ensure that its application is consistent with its purpose" *Matter of Jacqueline F.*, 391 N.E.2d 967 (N.Y. 1979). The fact that a communication occurs between a lawyer and a client is not enough; rather, the information must be a confidential communication for the purpose of obtaining legal advice. *Matter of Priest v. Hennessy*, 409 N.E.2d 983 (N.Y. 1980). Furthermore, the party asserting the privilege has the burden of bringing the information sought within the privilege. *Id.* at 70.

In the first message of the email chain labeled as "Email E," Sanford forwarded a message to Esposito on January 7, 2016, at 3:59 p.m., commenting: "fyi: on pending Feb 2016 Appeal.." The forwarded message is an email from Berry to his, MHS&Co.'s, Pursuit's, and Sanford Partners' appellate counsel (Attorneys Daniel Goldberg and Karen Sebaski of Holwell Shuster), requesting that Holwell Shuster immediately send over a compendium of exhibits to attach to a proposed stipulation. The subject of that email is "stipulation re record."

This forwarded email is most likely the same forwarded email in Item 4. The subject of Item 4, sent on January 7, 2016, is "Forward of 1/6/16 email from Daniel Goldberg to MHS regarding 1/6/16 email from Eric Berry to Daniel Goldberg and Karen Sebaski re: "stipulation re record" and concomitant "e-mail chain including strategy." (ECF Doc. # 128-1 at 3.) The Trustee and Knopfs correctly surmise in their Joint Reply that Item 4 was prompted by an email sent by the Knopfs' counsel on January 6, 2016 (Joint Reply Ex. 10), which was about the Knopfs' pending appeal in which they sought an order of attachment against Pursuit, and the Knopfs' concerns that Pursuit was trying to delay that appeal. That appeal was decided in the

11

Knopfs' favor on March 24, 2016. *Knopf v. Sanford*, 26 N.Y.S.3d 866 (1st Dep't 2016) (". . .

Pursuit . . . is prohibited from transferring, or further diminishing, impairing or encumbering the

properties it acquired with real estate loans from plaintiffs, including but not limited to the

property located at 10 Bedford St., New York, New York, as well as any proceeds derived from

the sale of such properties prior to the date of this order").

    In response to the forwarded email, Esposito stated on January 7, 2016, at 3:15 p.m.:

> Can you email the stuff you want to fedex? I'm going to Hershey and
> won't be back in my office for days.

(Email E at 1.) Critically, in an email sent to Esposito January 7, 2016, at 3:28 p.m., Sanford

replies, in relevant part:

> That's the problem: it's a probted, bound Compendium of Exhibits and too
> big to email.
> Is there another address I could FedEx to (or should I send to a friend in
> Oyster Bay?), so M can get a look. Her opinion whether or not to demand
> inclusion is crucial.

(*Id.*) It is highly likely that the "M" referred to in this email is none other than Esposito's

wife, *Melissa* Ringel, who was, at the time the email was sent, a First Department special

master. For instance, in response to Sanford's inquiry about which address to send the

Compendium of Exhibits to "so M can get a look," Esposito stated, on January 7, 2016 at

3:30 p.m.:

> Send it to me at 20 Glendale Drive Oyster Bay Cove, NY 11771

(*Id.*)

    The fact that Esposito told Sanford to send it to his own address in Oyster Bay further

suggests that M is Esposito's wife. Furthermore, according to Ringel's 2017 deposition, "a day

or two" after Esposito's January 4, 2016 meeting with Sanford, she looked at the First

Department orders. (ECF Doc. # 7, Ex. 8 at 30:9–30:12.) Thus, this email chain occurred right around the time that Ringel was looking into Sanford's case.

Sanford has also been deceptive about what Email E concerns. Sanford vaguely states in his declaration that this document includes a statement about Esposito referring him to another person who might be able to provide assistance regarding the same concerns that led him to contact Esposito. According to the Knopfs, in conferences aimed at resolving these issues without further assistance of the Court, Sanford stated to the Knopfs' counsel that the email only identifies the attorney by a single initial.

On the contrary, there is no statement made by Esposito referring him to an attorney. Sanford has deliberately left out that the statement that references an attorney's initial was a statement made by him himself and not Esposito. Ordinarily, whether an attorney was consulted, fee arrangements, and the identity of the lawyer or the client are not deemed confidential communications. *Priest v. Hennessy*, 409 N.E.2d 983, 986 (N.Y. 1980); *Matter of Jacqueline F.*, 391 N.E.2d 967, 969–70 (N.Y. 1979); *Arnold Constable Corp. v. Chase Manhattan Mortg. & Realty Tr.*, 309 N.Y.S.2d 422, 423 (1st Dep't 1977).

There is also nothing to indicate that this email relates to matters of MHS&Co. Indeed, the email used by Sanford is mhs@sanfordpartners.com, which appears to be an email address used for Sanford Partners, LP. On the contrary, the information suggests that Sanford was acting in his capacity as a corporate officer of Pursuit in communicating with Esposito. Sanford has not met his burden in showing that the communication was for the purpose of obtaining legal advice on behalf of MHS&Co.

Given that no privilege applies and that the communications are highly relevant, the Court **ORDERS** the production of Items 4 & 5/Email E.

## V.        Email D – Esposito's Privilege Log, Item 6 – Require Production

Sanford asserts work product protection and common interest privilege with regard to the redacted section of Email D.  He explains in his declaration that his thought processes should be "redacted because otherwise his analysis and work product, as his own attorney at a multiparty inquest, would lose the normal protections otherwise afforded to someone in his situation where he is communicating with another attorney about a matter of common interest."  (ECF Doc. # 128 ¶ 22.)

In the unredacted Email D (with the requested redaction in italics), Sanford states, in an email sent to Esposito on January 13, 2016:

> stress.
>
> *bastards could usurp the appellate div. and the appeal they made of Braun ordering an inquest by rushing this inquest (the computer created it after they filed NOI last mo and I haven't had anyone appearing to move to vacate on behalf of corporate entities). If Gammerman ignores Braun's direction that this inquest should be before a jury and denies Pursuit's new counsel's request for (30) days to get up to speed (and worse - Jim can't appear tomorrow and is instead sending a 25yr old kid from his office - all he has), we're screwed. Knopf could get a "sum certain" number and rush to put a lien on props*
>
> any advice?

(Email D.)  The italicized portion is relevant in that it shows that Esposito had detailed knowledge of the appeal, which would further implicate him in Sanford's fraudulent scheme.  In particular, Ringel testified in her 2017 deposition that she did not know about the Knopfs' pending appeal when she received Akerman's call.  This email goes to further show that Esposito withheld information from Ringel as part of the alleged scheme.

This email also supports the Knopfs' theory that Sanford was looking to buy more time between Ringel's anticipated advisory ruling and the decision on the Knopfs' appeal to close the

sale to Phillips, since if the Knopfs prevailed on the appeal while the property remained unsold,

the scheme would have been foiled. Thus, the Trustee's and Knopfs' claims of Sanford's and

Esposito's fraudulent acts are at least colorable, and the information they seek is not only

relevant, but specific.

On the other hand, Sanford's arguments have little merit. Sanford's position is that he

was not asking Esposito for legal advice as Pursuit's counsel. (ECF Doc. # 128 ¶ 20.) If the

substance of Sanford's conversation with Esposito related principally to Sanford's official duties

or Pursuit's general affairs, Esposito was dealing with Sanford on behalf of Pursuit. *See Sieger

v. Zak*, 874 N.Y.S.2d 535, 538 (2d Dep't 2009) (finding that the corporation could not assert

attorney-client privilege where the communications listed on the defendants' second privilege

log were principally made on behalf of a shareholder in his individual capacity); *Brandman v.

Cross & Brown Co. of Fla.*, 479 N.Y.S.2d 435, 437 (N.Y. Sup. Ct. 1984) (examining the nature

of the work by the attorney, whether the work was seemingly done on behalf of the corporation,

and whether it benefited the corporation in determining whether the corporation's

communications were protected by attorney-client privilege). The email primarily concerns the

lien on Pursuit's property, a matter that is related to Sanford's official duties or Pursuit's general

affairs. Counter to Sanford's arguments, his seeking advice on Pursuit's legal matters,

irrespective of the legal advice actually obtained, is sufficient to bring this within Pursuit's

attorney-client privilege, which again is waived. *U.S. Postal Service v. Phelps Dodge Refining

Corp.*, 852 F. Supp. 156, 163 (E.D.N.Y. 1994) ("The attorney-client privilege would apply to

such documents if they contained communications intended to be confidential and a dominant

purpose of the communication was to obtain legal advice."); *Cuno, Inc. v. Pall Corp.*, 121 F.R.D.

198, 201 (E.D.N.Y. 1988) ("The cases are uniform in the patent field that where the primary

purpose is securing legal advice, the privilege will be upheld despite the inclusion of technical

data in the communication.").

Sanford cannot withhold information under the guise of privilege, especially where he

solicited and/or obtained legal advice concerning matters directly impacting upon the interests of

Pursuit. A fiduciary has a duty of disclosure to the beneficiaries whom he is obligated to serve

as to all of his actions. *Hoopes v. Carota*, 531 N.Y.S.2d 407, 409 (3d Dep't 1988), *aff'd*, 543

N.E.2d 73 (N.Y. 1989) ("The salient factor on this issue is that defendant, both in his capacity as

a trustee and as a corporate officer and director, was the fiduciary of plaintiffs. In any of these

roles, defendant was not entitled to shield absolutely from his beneficiaries the communications

between him and his attorneys regarding pertinent affairs of the trust and of the corporation

(which, in any event, are inextricably intertwined . . . ."). Sanford cannot subordinate the

interests of Pursuit, which is directly affected by the advice sought, to his own private interests.

(*Id.*)

As such, Sanford has not met his burden in showing that the email is protected by

common interest privilege and work product protection as his own attorney. Therefore, the

Court **ORDERS** the production of Email D/Item 6 without any redaction.

## VI.     Emails A, B, and C – Are Relevant and Not Privileged

The Trustee and Knopfs do not claim in their Joint Reply that Emails A, B, and C are

relevant, but ask that the Court to require production of any documents that are provided for *in

camera* review that are found to be relevant. "When the discovery sought appears relevant, the

party resisting the discovery has the burden to establish the lack of relevance by demonstrating

that the requested discovery (1) does not come within the scope of relevance as defined under

Fed. R. Civ. P. 26(b)(1), or (2) is of such marginal relevance that the potential harm occasioned

by discovery would outweigh the ordinary presumption in favor of broad disclosure." *Horizon*

*Holdings, LLC v. Genmar Holdings, Inc*., 209 F.R.D. 208, 211 (D. Kan. 2002). "However, when

a request for discovery is overly broad on its face or when relevancy is not readily apparent, the

party seeking discovery has the burden to show the relevancy of the request." *Bonanno v.*

*Quizno's Franchise Co*., 255 F.R.D. 550, 553 (D. Colo. 2009).

Upon review of these documents, the Court finds that Emails A, B, and C directly

concern the fraudulent transfer claims against Esposito; they may also be relevant to show that

Sanford's intent in speaking to Esposito was to solicit advice regarding Pursuit's claims,

ultimately leading to the alleged scheme. Those documents may also support showing that

Sanford was acting in his capacity as a corporate officer for Pursuit in communicating with

Esposito. In any case, the objecting party bears the burden to show requested discovery is not

relevant. *Id*. That burden has not been met. Sanford asserts the attorney-client privilege, work

product protection, and common interest privilege for both Emails A and B. The Court

concludes that the attorney-client privilege does not apply.

Sanford explains that Emails A and B concern:

> *Pro Se* Sanford discussing his litigation strategy representing himself at the
> upcoming inquest with [Frank Esposito], who is general counsel for
> Sanford's wholly-owned MHS&Co., a Pursuit Creditor.

(ECF Doc. # 128-1 at 818.) Emails A and B are part of the same chain of emails sent between

Sanford and Esposito on January 18, 2016. That email chain does not indicate in any way that

Esposito is only representing MHS&Co. For instance, in the initial email of the chain, Sanford

discusses Pursuit's liability several times, explaining away various theories of liability asserted

by the Knopfs. In fact, the email explains that liability should rest with Sanford and MHS&Co.

17

It is also unclear how *Pro Se* Sanford and MHS&Co have a common interest, as Sanford has previously asserted.

It also appears that there is an attachment to Email A and B labeled "06-12-13 Berry Summary Judgement Reply.PDF." However, Sanford did not produce this attachment. The Court **ORDERS** that Sanford submit the attachment to the Court for *in camera* review. The Court also **ORDERS** that Sanford produce all attachments to the emails as well.

Sanford explains that the subject of Email C, sent from Frank Esposito to Dechert Attorneys on February 3, 2016, at 7:38 p.m., is follow-up communication after meeting at Dechert's offices with Sanford and Esposito, in which Dechert requests additional documents to review in anticipation representation of Sanford and his companies. Sanford asserts attorney-client privilege, work product protection, and common interest privilege.

Dechert requested the following documents:

> **For immediate review on the inquest issue (based on your recounting of the relevant proceedings):**
>
> a. 2/17/2015 Knopf memorandum seeking severance and judgment against Pursuit only
> b. 3/12/2015 Pursuit response (filed by Meister)
> c. 7/23/2015 transcript
> d. 9/8/2015 stipulation giving the corporate entities 90 days to find counsel (expiring 12/8/2015)
> e. 12/8/2015 transcript
> f. 12/8/2015 stipulation giving more time to get an attorney
> g. 1/15/2016 Knopf memorandum now saying that inquest involves judgment against not just Pursuit but also Sanford personally
> h. __/__ 2016 Sanford appellee's brief (by Dan Goldberg) relating to inquest proceedings

(Email C.) Sanford is vague as to why any privilege applies to this email. The email explicitly refers to Pursuit and its litigation matters several times.

Esposito responded to this email on February 3, 2020: "Thank you, gentlemen." (*Id.*) This email is relevant in showing that Esposito was involved in Pursuit's matters, including the inquest issue. It suggests Esposito was actively helping Sanford delay the attachment of the lien on Pursuit's property to effectuate the scheme.

Accordingly, the Court **ORDERS** Sanford to produce Emails A–C.

### VII.    Sanford's Prior Testimony Has Waived Any Claim of Privilege

Even if privilege applies, the Court concludes that Sanford's prior testimony has waived the privilege. The Trustee and the Knopfs cite the following relevant excerpts of Sanford testimony at his November 24, 2020, deposition in *Knopf v. Esposito*, 17 Civ. 5833 (DLC), in which Sanford testified how he and Esposito reached an agreement that Pursuit's other attorneys could call Esposito's wife for an *ex parte* interpretation concerning the First Department rulings that created an impediment to an escrow free sale of Pursuit's apartment:

> [MR. SANFORD] . . . when I asked Mr. Esposito simply who can get this information confirmed if dissolved, because if we walk into the lower level [of the First Department] as Phillips' counsel wanted to do, it was their idea, not mine. I said we wanted to wait until the truth came out. I've been waiting for years sell Pursuit's properties to pay for counsel.
> It wouldn't make a difference to me if it was a week or a month, I just wanted a real lawyer. And Esposito, maybe it was malpractice, but Esposito said anyone can provide this. Esposito then gave a phone number, which he conveyed was an upstairs number. Now, it appears, Esposito may have given his wife's phone number, which is probably why OCA took her to task.

(Joint Reply Ex. 6 at 69:11–70:4.)

Sanford further testified:

> [MR. SANFORD] . . . I asked him can we contact someone else. And maybe he committed malpractice. There's nothing else nefarious here. He said anyone can. He was wrong. Did he ask his wife; I suppose he did. Maybe she [w]as wrong, maybe that was malpractice. Maybe that's what

> OCA got upset about, that she should have hung up the phone when anyone called about a matter she was aware of. And was she aware, she was, because I asked Esposito how could I complain about Lauren Holmes what she did on this day describing Sanford Exhibit 1.

(*Id*. at 77:21–78:10.)

> [MR. SANFORD] . . . I kept on saying clerk, call the clerk's office, procedural thing, just confirm, because Mr. Esposito told me that they could whip out a computer, and it would be obvious, because they keep a track of all of the decided motions.

(*Id*. at 140:23–141:5.)

> Q. And you gave [Nathaniel Akerman] the number that turned out to be the one that was answered by Ms. Ringel; is that correct?
> A. No, I'm not saying that. I gave him a number that Frank Esposito gave me when I called Frank and said what number my lawyers called to the clerk's
> office, and he gave me a number.

(*Id*. at 141:15–141:22.)

> Q. Before you received that with 1:59 e-mail on January 12th did you have any 16 reason to think that the call would end up being answered by Ms. Ringel?
> A. I thought it was a possibility. I asked Frank if she felt it was a problem and he said no, she is allowed to. I was worried about every single problem. I said what if it goes upstairs and she gets the call. I asked him these questions. I wanted to think about every single potential for a problem.

(*Id*. at 169:14–169:24.)

Regarding his communications with Esposito on behalf of MHS&Co., Sanford testified:

> That's the real causation for what happened. Ringel [sic: probably "Holmes"] refused to do her job forcing the defendants in the Knopf v. Sanford case to return to find basically clarification from the Court and I, acting upon advice of counsel, MH Sanford counsel, Esposito said you can just call, Pursuit's lawyers can just call the court, and that's all they did. There was no ill-intent here anywhere.

(*Id*. at 148:3–148:11.)

Sanford has also stated that the activity that Esposito and Ringel were discussing regarding the phone call and her advisory opinion related to Esposito's work for MHS&Co.

> Frank didn't solicit a bribe. That's just bullshit. Frank was simply trying to assist MH Sanford & Company doing his job and he didn't know what he was doing.
> And he got a bit greedy and wanted the money as fast as possible and maybe did things that weren't appropriate and I wish he hadn't.

(*Id*. at 213:4–213:11; *see id*. at 153:22–154 ("I think Esposito gave me a number, I don't know what number it was, and it did go directly to his wife, that is true, which I don't know, I really don't, if that happened, maybe because she felt she and her husband would get all this money from me hiring MH Sanford & Company hired them[.]").)

Given Sanford's testimony regarding communications with Esposito, the Court concludes that any assertion of privilege by MHS&Co. or Pursuit has been effectively waived.

## VIII.   The Communications Fall Within the Crime-Fraud Exception

Even if the communications are privileged, the Court concludes that they fall within the Crime-Fraud Exception.  To establish that a communication is within the crime-fraud exception to the attorney-client privilege, the party seeking to overcome the privilege need not allege a violation of either Title 18 of the United States Code (Crimes and Criminal Procedure) or the New York Penal Law.  Instead, all that is required is substantial evidence supporting an actual fraudulent conveyance.  *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1039, 1041 (2d Cir. 1984) (finding that the crime-fraud exception was satisfied, because "the advice was sought in furtherance of a fraud that is not necessarily a violation of the criminal code," and "[t]he record is adequate . . . to support a conclusion that AG's sale of its

stock in International may be a fraudulent conveyance within the purview of New York's

statutory ban[,]" citing Debtor and Creditor Law §276).

The Joint Reply is persuasive in citing other decisions finding the same transactions to be

fraudulent conveyances. For instance, in *Knopf v. Phillips*, 802 F. App'x 639 (2d Cir. 2020),

which is based on the same transactions that underlie the Trustee's potential claims against

Esposito, the Court of Appeals for the Second Circuit reinstated the Knopfs' allegations that the

sale to Phillips was a fraudulent conveyance under Debtor and Creditor Law §276. *Id*. at 642

("New York law contemplates that a transaction may be either actually or constructively

fraudulent."); *Id*. at 643 ("An actually fraudulent conveyance . . . is one made with actual intent

to defraud,. . . [.]"); *Id*. at 644 ("The Knopfs submitted evidence . . . that Phillips . . . knew of the

various court orders that had restricted the sale of the PHC. . . [.]") In *Phillips*, the Court of

Appeals reversed a grant of summary judgment. The Court of Appeals therefore necessarily

found that there was substantial evidence supporting the claim, which in turn means that the

communications at issue are within the crime-fraud exception.

In a 2019 decision, Justice Lebovits held that the crime-fraud exception (known as the

"wrongful act" exception under New York law) applied regarding Sanford's assertion of

attorney-client privilege:

> This court must ask whether the Knopfs' evidence, taken as a whole,
> establishes probable cause to believe that a wrongful act was committed –
> whether by Sanford or by the other individuals involved – and that
> communications among and between Sanford, Akerman, Feldman, Ringel,
> McGuire, Esposito, and others furthered that wrongful act. This court
> concludes that the Knopfs have met that burden.

*Knopf v. Sanford*, 106 N.Y.S.3d 777, 820 (N.Y. Sup. Ct. 2019).

The crime-fraud exception thus applies here as well.

## IX.    Conclusion

For the reasons explained above, all of Sanford's and Esposito's objections based on

attorney-client privilege, work product protection, or common interest privilege are overruled,

*except* that Esposito is **ORDERED** to provide the Court with copies of items 1, 2, 3 and 7 on his

privilege log for *in camera* review; as to those documents only, the Court reserves decision

whether attorney-client privilege applies.  All other documents must be produced in unredacted

form to the Trustee by Sanford and/or Esposito on or before February 1, 2021.


**IT IS SO ORDERED.**

Dated:    January 15, 2021
          New York, New York


                            _____*Martin Glenn*_____
                              MARTIN GLENN
                         United States Bankruptcy Judge

# EXHIBIT 5

From:        "Frank Esposito" <fesposito@eplawllc.com>
Subject:     Re: one more tidbit..
Date:        Tue, January 12, 2016 1:59 pm
To:          "Michael Hayden Sanford" <mhs@sanfordpartners.com>

---

The Title company should be satisfied at this point.

On Jan 12, 2016, at 8:21 AM, Michael Hayden Sanford <mhs@sanfordpartners.com> wrote:

> Ok, we will
>
> Sent from my iPhone
>
> On Jan 12, 2016, at 6:16 AM, Frank Esposito <fesposito@eplawllc.com> wrote:
>
>> Ok. Let's touch base later and discuss options.
>>
>> On Jan 11, 2016, at 8:20 PM, Michael Hayden Sanford <mhs@sanfordpartners.com> wrote:
>>
>>> new Federal yes (it should be over soon); big one, for right now I need him or else I default. Jim wasn't the person I envisioned going to trial on my case..
>>>
>>> Sent from my iPhone
>>>
>>> On Jan 11, 2016, at 8:06 PM, Frank Esposito <fesposito@eplawllc.com> wrote:
>>>
>>>> Ok, so are we using Jim to litigate these cases?
>>>>
>>>> On Jan 11, 2016, at 7:46 PM, Michael Hayden Sanford <mhs@sanfordpartners.com> wrote:
>>>>
>>>>> I don't know. One of (2) ways:
>>>>>
>>>>> (a.) he went to trial support last week (I checked with them after Christmas and he had not filed for an inquest from the July 2015 Braun decision, which he was directed to do; I figured he preferred to instead take his chances that appellate sees it his way and awards a "sum certain" on contract claims rather than risk a jury smelling the rottenness of what's up..).
>>>>>
>>>>> If he did go recently, he may have played the "elderly card" (when I called trial support specifically asked me if "anyone elderly involved, because we expedite in a few weeks if that is the case..") and didn't notify me of his application. If this is what it's about (I'm doubtful), then we're at the actual inquest stage now (I am totally unprepared) or at a pre-conference to schedule for it.. (I'm not sure, I've never done this before)

Plfs' Ex. 125                                                          Pursuit000322

OR

(b.) the computer created this initial status/scheduling conference because he filed a NOI on 12/9/15, the day after Braun ended the stay of proceedings (because I didn't have counsel) and set a next appearance date for Feb 16th - which I had thought was my hard deadline by which to engage counsel to appear..

So, I need Jim Prestiano to now also file an appearance tomorrow (he just did Federal today as a favor) and request an adjournment (fortunately Jim has a court conflict in Riverhead on Thur) for (30) additional days as he is newly appearing and has to review the file, especially re (i) necessary open discovery as we may need to vacate NOI and we do have a (ii) deposition tentatively scheduled and that may lead to (iii) additional counterclaims bring filed.. and we have yet to move for (iv) summary judgment and intend to request a briefing schedule from lower court on this subject next month..

essentially we're not nearly ready to schedule a trial on the 2009 case and in any event all of the companies have newly appearing counsel that need to get up to speed with this big file. So, please adjourn to at least week of Feb 22nd.

That's my plan so far..


Sent from my iPhone

On Jan 11, 2016, at 7:15 PM, Frank M. Esposito <fesposito@eplawllc.com> wrote:

> I had a trial in front of Gammerman once.  He's pretty good, and smart.  He shoots from the hip.  How could he have set something for this Thursday?
>
> Best regards,
>
> Frank M. Esposito, Esq.
>
> Esposito Partners
>
> 275 Madison Avenue
> 14th Floor
> New York, NY 10016

Pursuit000323

(212) 537-3896
(888) 533-9995

(646) 304-5624 (fax)
fesposito@eplawllc.com


This message and its attachments are
sent from a law firm and may contain
information that is confidential and
protected by privilege from disclosure.
If you are not the intended recipient,
you are prohibited from printing,
copying, forwarding or saving them.
Please delete the message and
attachments without printing, copying,
forwarding or saving them, and notify
the sender immediately.


-------- Original Message --------
Subject: one more tidbit..
From: Michael Hayden
Sanford
<mhs@sanfordpartners.com>
Date: Mon, January 11, 2016
6:20 pm
To: Frank Esposito
<fesposito@eplawllc.com>

today the 2009 case got
assigned a JHO to meet with
parties this Thursday (scary)
because Berry asked for an
inquest on damages / or
because he filed NOI last mo.
(I need to vacate as u
know)..

It got assigned to Ira
Gammerman, who, at 87, still
may remember Mr. Berry..

pls see attached


Sent from my iPhone

**Attachments:**

Pursuit000324

**untitled-[1].plain**

| | |
|---|---|
| Size: | 4.7 k |
| Type: | text/plain |

Pursuit000325