```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------- X
                                         :
NORMA KNOPF, individually and as a       :    17cv5833(DLC)
Distributee and the Executor Named in    :
Michael Knopf's Last Will                :    OPINION AND ORDER
                                         :
                    Plaintiff,           :
          -v-                            :
                                         :
FRANK M. ESPOSITO, DORSEY & WHITNEY,     :
LLP, NATHANIEL H. AKERMAN, EDWARD S.     :
FELDMAN, and MICHAEL HAYDEN SANFORD,     :
                                         :
                    Defendants.          :
                                         :
---------------------------------------- X
```

APPEARANCES:

For the plaintiffs:
Eric Berry
Eric W. Berry, PC
5 Columbus Circle, 8th Floor
New York, NY 10022

Gary Greenberg
Gary Greenberg, Esq.
666 Fifth Avenue, 27th Floor
New York, NY 10103

For defendant Edward Feldman:
Edward Feldman
Feldman & Associates, P.L.L.C.
33 East 33rd Street, Suite 802
New York, NY 10016

DENISE COTE, District Judge:

    Plaintiff Norma Knopf[1] ("Knopf") has moved for summary

judgment on her claim of conspiracy to violate § 1983.  Knopf

---

[1] Michael Knopf -- who was previously a plaintiff in this action -- died on January 10, 2021.  An Order of April 12 granted a

claims that defendants Frank Esposito ("Esposito") and Edward Feldman ("Feldman") and others conspired with Esposito's wife -- a state court employee -- to violate Knopf's Fourteenth Amendment due process rights.  Esposito and Feldman have filed cross-motions for summary judgment.  In this Opinion, Feldman's motion for summary judgment is granted.

**Background**

The following facts are undisputed unless otherwise noted. On January 23, 2006, Michael Knopf agreed to loan money to Michael Sanford ("Sanford") and Sanford's company Pursuit Holdings, LLC ("Pursuit") so that Pursuit could complete its purchase of condominium unit Penthouse C at 44 East 67th Street (the "Penthouse").  Sanford acknowledged receipt of $1,690,860 from the Knopfs in an email of February 9.  In his email, Sanford also stated: "Pursuit will provide you with a mortgage on Penthouse C," and "I guarantee that until which time you and I execute agreements with respect to the loan for Penthouse C, I will not offer for sale, mortgage, hypothecate or otherwise encumber Penthouse C."

In 2009, the Knopfs sued Sanford and Pursuit in the Supreme Court of the State of New York, New York County (the "trial

---

motion to substitute Norma Knopf, individually and as distributee and the executor named in Michael Knopf's last will. This Opinion refers to Michael and Norma Knopf as the "Knopfs" and Norma Knopf as "Knopf."

court") for repayment of the 2006 loan. The complaint asserted claims for breach of contract and breach of fiduciary duty and sought the imposition of constructive trusts on the Penthouse and other properties that Pursuit had purchased with additional loans from the Knopfs. The Knopfs also filed notices of pendency against the Penthouse. The trial court denied the Knopfs' motion for summary judgment on all claims in 2013, but the New York Appellate Division reversed the trial court on December 11, 2014 and granted summary judgment to the Knopfs on all loan agreements. See Knopf v. Sanford, 1 N.Y.S.3d 18 (1st Dept. 2014). The Opinion of December 11 did not determine damages and denied the Knopfs' motion for summary judgment on the constructive trust claim. On December 23, the trial court terminated the notices of pendency against the Penthouse on the ground that the Knopfs had failed to demonstrate that money damages would be inadequate.

A series of motions, appeals, and orders related to the Penthouse were filed and issued in early to mid-2015. On July 23, 2015, the trial court denied the Knopfs' motion for entry of judgment or a prejudgment attachment. The Knopfs appealed this decision to the Appellate Division, First Department. On July 24, the Knopfs moved the First Department to preliminarily enjoin the sale of the Penthouse pending the determination of the appeal.

The First Department issued three orders in the final months of 2015 that are central to Knopf's § 1983 claim. An Interim Order of October 22 (the "October 2015 Order") stated that the Penthouse may be sold with "proceeds to be placed in escrow pending further court order." An Order of November 12 (the "November 2015 Order") denied the Knopfs' motion for a preliminary injunction barring any sale of the Penthouse. On November 20, Pursuit moved to vacate the October 2015 Order. An Order of December 29 (the "December 2015 Order") denied Pursuit's motion to vacate the October 2015 Order.

After the First Department denied the motion to vacate the October 2015 Order, Sanford and his then-attorney Daniel Goldberg considered moving for re-argument. At the time, Pursuit had agreed to sell the Penthouse to Michael Phillips ("Phillips"). Phillips' title company was concerned "because the Knopfs kept on suing and placing notice[s] of pendency" on the Penthouse. Specifically, Phillips' title company wanted to know whether the restraint placed on the Penthouse in the October 2015 Order had been dissolved.

In January 2016, Sanford retained Esposito, who is an attorney. On January 11, Esposito emailed Sanford a retainer agreement that required Sanford to pay a non-refundable fee of $55,000 upon the execution of the agreement. Sanford signed and returned the retainer to Esposito the same day.

Also on January 11, Sanford notified Feldman and Nathaniel Akerman ("Akerman") by email of his construction of the Appellate Division's October and November 2015 Orders. Sanford took the position that the November 2015 Order dissolved the October 2015 Order and no longer required the proceeds from a sale of the Penthouse to be placed in escrow. Akerman is a litigator who represented Pursuit briefly in connection with a related action filed by the Knopfs. Feldman is a real estate attorney who had been retained by Pursuit in 2013 to assist in the sale of Penthouse.

Around this time, Sanford asked Akerman to call the First Department to ask if any restraints remained on the sale of the Penthouse. Esposito provided a telephone number for the First Department to Sanford, who passed the telephone number along to Akerman. Feldman and Akerman coordinated to find a time to call the First Department. Feldman emailed Akerman:

> I need to set up a time for a conference call with the counsel to [Phillips' title company] and the Appellate Division Clerk to confirm that no restraints exist on the sale to Michael Phillips. Once I know when everyone is available I will call the clerk to get her time and availability.

On January 12 at 9:48 a.m., Akerman emailed Feldman that he was available during the day but "now would be best for our quick call." Feldman emailed back a few minutes later: "Waiting

5

to hear back from title counsel -- call may not be necessary. He has the November order."

At approximately 10:44 a.m., Akerman called Feldman. Once he had Feldman on the line, Akerman dialed the telephone number provided to him by Sanford. This number was the direct office telephone number of Melissa Ringel ("Ringel"), a Court Attorney employed at the First Department. Ringel is married to Esposito. During the call, Ringel explained that, after the November 2015 Order denied the Knopfs' motion for a preliminary injunction, there was no longer any encumbrance on the sale of the Penthouse. Neither the Knopfs nor their attorney were notified of or participated in this telephone call.

After the telephone call with Ringel, Feldman emailed Sanford at 11:25 a.m.:

> Got off conference call. I told Melissa that I needed the clarification as I was our real estate attorney and I needed to be assured that I was not violating some restraining order when I represented you in a sale of the unit. She confirmed that there are no restraints and that the denial of your attorney's motion was due to the fact that there was nothing to vacate. I drafted a file memo to that effect.

At 1:59 p.m., Esposito emailed Sanford: "The Title company should be satisfied at this point." The next day, Feldman emailed Sanford to inform him that Phillips' title company may be willing to close on the sale of the Penthouse.

6

On February 1, 2016, Phillips and Pursuit closed on the sale of the Penthouse. While the Penthouse was sold for $3 million, since Phillips had previously loaned Sanford almost $600,000, Phillips only paid $2,420,311.68 at the closing. The February 1 list of disbursements for the closing included payments for taxes and costs associated with the closing and many payments to attorneys. The payments to attorneys included a $25,000 payment to Feldman's law firm for its work on the closing and a $50,000 payment to Esposito Partners PLLC.[2] Sanford's email of February 1 directed Feldman to make the disbursement of $50,000 to "Esposito Partners, PLLC."

After learning of the sale of the Penthouse, the Knopfs filed a motion on February 25 to hold Sanford and his appellate counsel in contempt of the escrow requirement. In an Order of June 16, the Appellate Division denied the Knopfs' motion for contempt, stating:

> Plaintiffs-appellants seek an order of contempt against defendants and their counsel for allegedly violating a temporary restraining order issued by a single justice of this Court on October 22, 2015 (TRO);
> . . .
> The motion for contempt is denied because the TRO was vacated once plaintiffs' prior motion for a preliminary injunction was denied.

---

[2] Sanford had already paid Esposito $5,000 on January 16, 2016.

On August 2, 2017, the Knopfs filed this § 1983 action against Sanford, Esposito, Feldman, Akerman, and Akerman's law firm, Dorsey & Whitney, LLP ("Dorsey"). The complaint alleged that Sanford and the attorney defendants conspired with Esposito's wife to violate the Knopfs' Fourteenth Amendment due process rights by depriving them of their property interests in the Penthouse and the proceeds of its sale without notice and an opportunity to be heard. An Opinion of December 7 dismissed the case. See Knopf v. Esposito, No. 17CV5833 (DLC), 2017 WL 6210851 (S.D.N.Y. Dec. 7, 2017) ("2017 Opinion"). On February 25, 2020, the Court of Appeals vacated the 2017 Opinion and remanded for further proceedings. See Knopf v. Esposito, 803 F. App'x 448, 457 (2d Cir. 2020). The Court of Appeals held that the Knopfs had plausibly alleged that Ringel was a state actor whose statements constituted improper ex parte communications and that the Knopfs had an equitable interest in the Penthouse and had been harmed by the defendants' conduct. Id. at 454-56.

The Knopfs filed a second amended complaint on June 16. With the consent of the Knopfs, an Order of July 30 dismissed all claims against Sanford. On March 10, 2021, the Knopfs, Akerman, and Dorsey filed a stipulation of settlement. As a result, Esposito and Feldman are the only remaining defendants.

On March 12, Knopf moved for summary judgment against Esposito and Feldman on her sole claim of conspiracy to violate

8

42 U.S.C. § 1983. Esposito and Feldman filed cross-motions for summary judgment on April 2. The motions became fully submitted on May 5. Knopf's motion for summary judgment against Esposito and Esposito's cross-motion are addressed in a separate Opinion.

## Discussion

A motion for summary judgment may not be granted unless all of the submissions taken together "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law." Frost v. New York City Police Dep't, 980 F.3d 231, 242 (2d Cir. 2020) (citation omitted). In making this determination, the court "constru[es] the evidence in the light most favorable to the nonmoving party and draw[s] all reasonable inferences and resolv[es] all ambiguities in its favor." Jaffer v. Hirji, 887 F.3d 111, 114 (2d Cir. 2018) (citation omitted). When deciding cross-motions for summary judgment, the court must construe the evidence in each case in the light most favorable to the non-moving party. Wandering Dago, Inc. v. Destito, 879 F.3d 20, 30 (2d Cir. 2018).

"Where the moving party demonstrates the absence of a genuine issue of material fact, the opposing party must come

9

forward with specific evidence demonstrating the existence of a genuine dispute of material fact." Robinson v. Concentra Health Servs., Inc., 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted). The nonmoving party may rely neither "on conclusory statements", CIT Bank N.A. v. Schiffman, 948 F.3d 529, 532 (2d Cir. 2020) (citation omitted), nor on "mere speculation or conjecture as to the true nature of the facts." Fed. Trade Comm'n v. Moses, 913 F.3d 297, 305 (2d Cir. 2019) (citation omitted).

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." Pangburn v. Culbertson, 200 F.3d 65, 72 (2d Cir. 1999). "[C]onspiracies are by their very nature secretive operations, and may have to be proven by circumstantial, rather than direct, evidence." Id. (citation omitted). See also Victory v. Pataki, 814 F.3d 47, 68 (2d Cir. 2016).

A public official is a state actor where she "exercised power possessed by virtue of state law and made possible only because [she was] clothed with the authority of state law." West v. Atkins, 487 U.S. 42, 49 (1988) (citation omitted). See also United States v. Giordano, 442 F.3d 30, 43 (2d Cir. 2006). "One who abuses a position given to him or her by the government

10

is said to act under color of law." United States v. Temple, 447 F.3d 130, 138 (2d Cir. 2006).

"[A] plaintiff alleging a § 1983 conspiracy claim must prove an actual violation of constitutional rights." Singer v. Fulton Cty. Sheriff, 63 F.3d 110, 119 (2d Cir. 1995). When the object of the § 1983 conspiracy is a violation of the plaintiff's procedural due process rights, a plaintiff must demonstrate that she possesses a liberty or property interest protected by the Constitution or federal statutes and that she was deprived of that liberty or property interest without due process. Francis v. Fiacco, 942 F.3d 126, 141 (2d Cir. 2019). "[A] cause of action is a species of property protected by the Fourteenth Amendment's Due Process Clause." Logan v. Zimmerman Brush Co., 455 U.S. 422, 428 (1982); see also Rosu v. City of New York, 742 F.3d 523, 526 (2d Cir. 2014) (same); New York State Nat. Org. for Women v. Pataki, 261 F.3d 156, 163 (2d Cir. 2001) (same).

Knopf contends that Feldman conspired with Ringel -- a state employee -- and others to deprive Knopf of her due process rights and her property interest in the Penthouse. Feldman moves for summary judgment on the ground that there is no admissible evidence to support a finding that he conspired with a state actor to violate Knopf's due process rights. Feldman is correct.

11

Assuming, arguendo, that Knopf will be able to establish at trial that Sanford, Ringel and others agreed to deprive her of her due process rights, Knopf has not identified sufficient evidence to raise an issue of fact that Feldman knew of the agreement. To begin with, Sanford would have had no need to tell Feldman of the conspiracy and, if he had done so, would have risked Feldman withdrawing his cooperation. Knopf has offered no evidence that Sanford and Feldman had a personal relationship. Feldman was employed by Sanford as a real estate attorney for the sale of the Penthouse and was paid $25,000 for that work. Knopf has pointed to no evidence that Feldman had any other connection to Sanford or Pursuit.

Feldman acknowledges that he participated in a telephone call to the Appellate Division to seek clarification about whether any restraints on the sale of the Penthouse were in place, but it was Sanford who obtained the telephone number for that call. Sanford gave that number to Akerman, who conferenced in Feldman and placed the call. Sanford has testified that Feldman did not know whose number Akerman called at the First Department, and that stands uncontradicted. Feldman has testified that he had no knowledge that a state court employee was conspiring with Sanford or Esposito or was acting in violation of her duties as a court employee. Feldman has also testified, and again there is no evidence to contradict his

12

testimony, that he had never heard of Esposito at the time of the call. Feldman had no knowledge that the court employee with whom he spoke was married to Esposito and did not learn that fact until mid-2017, when Feldman was deposed in a related case. Knopf has not supplied sufficient evidence -- circumstantial or direct -- to show that Feldman was a knowing and intentional conspirator with a corrupt state court employee or to raise a question of fact in that regard.

Knopf makes several arguments in opposition to Feldman's motion for summary judgment. First, Knopf argues that Feldman's email of January 11 demonstrates that Feldman knew about a prior arrangement to contact Ringel. Specifically, Knopf points to Feldman's statement to Akerman that he needed to know everyone's availability for a call so that he could "call the clerk to get her time and availability." (Emphasis added.) Knopf speculates that Feldman was referring to Ringel when he wrote "her."

Drawing all inferences in favor of Knopf, this email is insufficient to support a verdict against Feldman for conspiring with a state court employee to violate Knopf's due process rights. Feldman does not remember why he used the female pronoun and has suggested several reasons for doing so, including that he was referring to Susanna Rojas (the First Department Clerk of Court) or Lori Braverman (Phillips' attorney), or that he simply defaulted to the female pronoun.

13

While Feldman's use of the female pronoun may indicate that he expected that the state court employee with whom he and Akerman would speak the following day would be a woman, it does not show, even circumstantially, that Feldman knew that the employee would be Melissa Ringel, that the employee was married to an attorney for Sanford, or that the employee had agreed to assist Sanford and Pursuit in return for a payment to her husband. The email does nothing to refute Feldman's testimony that he did not know who Esposito was at that point or that he would be speaking to a court employee who was married to Esposito.

Knopf also argues that Feldman's email to Sanford <u>after</u> the January 12 call demonstrates that Feldman knew <u>before</u> the call that the court employee to whom they would speak would be Melissa Ringel. Feldman's use of the name "Melissa" after the telephone call has no probative value. Feldman had been a participant in the call with Melissa Ringel, and there is nothing unusual about knowing after the call the first name of the employee with whom he had just spoken.

Knopf next contends that Feldman's actions on February 1 or later demonstrate that he must have known of Esposito's connection to Ringel before the January 12 call. First, Feldman wrote a check for $50,000 to Esposito Partners PLLC on February 1, 2016, the day of the closing on the sale of the Penthouse. As the closing attorney, Feldman was in charge of disbursing the

14

proceeds of the sale to numerous entities.  Esposito Partners PLLC was one of many law firms that received disbursements that day from the sale of the Penthouse.  The payment to Esposito Partners PLLC at Sanford's direction reflects no special knowledge that the principal of Esposito Partners PLLC was married to Melissa Ringel.

Additionally, Knopf contends that Feldman tried to conceal the $50,000 payment to Esposito Partners PLLC.  Specifically, in response to a subpoena, Feldman produced on May 22, 2020 a non-final version of the anticipated disbursements for the closing of the Penthouse that did not list the $50,000 check.  Then, on March 1, 2021, Feldman produced the final version, which included several additional payments, including the payment of $50,000 to Esposito Partners PLLC.  Knopf argues that Feldman's failure to produce the final version of disbursements in 2020 demonstrates that Feldman was attempting to conceal Esposito's connection to the sale of the Penthouse.

This discovery lapse by Feldman occurred over four years after the 2016 call.  Esposito had been a defendant in this case since August 2017.  The first amended complaint, which was filed on September 2, 2017, alleged that Esposito had received "between $25,000 and $55,000 in consideration for an ex parte advisory opinion rendered by Esposito's wife."  As a result, there is no reason to infer from Feldman's 2020 document

15

production that he was attempting to conceal Esposito's connection to the case.

Finally, Knopf argues that Feldman's incorrect testimony in 2017 about the 2016 call is evidence that Feldman joined a corrupt agreement with a state court employee. Feldman testified at his deposition on June 29, 2017 that, when Akerman called the Appellate Division, Akerman "asked for the clerk" and they were "transferred once or twice" before speaking with Ringel. Akerman initially provided the same incorrect account of the call before admitting that he had been mistaken.

Feldman's incorrect statement about the first moments of a call placed by Akerman is not enough to create a genuine dispute of material fact about whether Feldman conspired with Ringel as alleged here. As explained, Sanford gave the telephone number to Akerman. Akerman called Feldman and then dialed the telephone number provided to him by Sanford. Feldman's incorrect recollection at his 2017 deposition about the beginning of a telephone call made over a year earlier by another person is not probative of whether he entered an agreement with Ringel.

## **Conclusion**

Feldman's April 2, 2021 motion for summary judgment is granted.

Dated:    New York, New York
          May 26, 2021

                              _____
                                    DENISE COTE
                              United States District Judge